In re DOCTORS HOSPITAL OF HYDE PARK, INC., Debtor.

Doctors Hospital of Hyde Park, Inc., Plaintiff,

v.

Dr. James H. Desnick, et al., Defendants.

Bankruptcy No. 00 B 11520.
Adversary No. 02 A 00363.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

March 2, 2007.

John E. Frey, Esq., John Costello, Esq., Scott A. Semenek, Esq., Jeffrey L. Gansberg, Esq., Wildman Harrold Allen & Dixon, Chicago, IL, Counsel for Debtor/Plaintiff/Trustee.

Kathryn M. Gleason, Esq., Office of the U.S. Trustee, Chicago, IL.

Gus A. Paloian, Esq., Seyfarth, Shaw, Chicago, IL, for trustee.

Lewis T. Stevens, Esq., Michael Warner, Esq., Warner Stevens LLP, Fort Worth, TX, Howard L. Adelman, Esq., Adam P. Silverman, Esq., Adelman, Gettleman, Merens, Berish & Carter, Ltd., David T.B. Audley, Esq., Chapman and Cutler, Chicago, IL, Counsel for LaSalle Bank.

David J. Tecson, Esq., Michael N. Ripani, Esq., Chuhak & Tecson, P.C., Chicago, IL, Counsel for Michael Nelson.

James M. Witz, Esq., Frances Gecker, Esq., Freeborn & Peters, Chicago, IL, Counsel for Stephen Weinstein.

Jane B. McCullough, Esq., Greenburg Traurig PC, Chicago, IL, Counsel for Asset Securitization Corp. and Nomura Asset Capital Corp.

Robert D. Nachman, Esq., John L. Conlon, Esq., Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, Counsel for James H. Desnick.

Margaret H. Weging, Esq., Oak Park, IL, Counsel for Richard Felbinger.

Neville N. Reid, Esq., Mayer Brown Rowe & Maw LLP, Chicago, IL, Counsel for Unsecured Creditors Committee.

Michael J. Kralovec, Esq., Joseph R. Lemersal, Esq., Sara J. Rowden, Esq., Nash, Lalich & Kralovec, Chicago, IL, Counsel for Robert Krasnow.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary case relates to the Chapter 11 bankruptcy case filed by Chapter 11 Trustee for Debtor Doctors Hospital of Hyde Park, Inc. ("Doctors Hospital" or "Trustee"). The Adversary Complaint pleaded a total of twenty-eight Counts ("Complaint"). Three of the Counts pertain to Defendant LaSalle Bank National Association, f/k/a LaSalle National Bank as Trustee for Certificate Holders of Asset

Securitization Corporation Commercial Mortgage Pass–Through Certificates, Series 1997, D5, by and through its Servicer, Orix Capital Markets, LLC ("Trust" or the "LaSalle Trust"), those Counts being VIII, IX, and X ("LaSalle Counts"). Separate trial of those Counts was ordered.

In Counts VIII, IX and X, Doctors Hospital asserted three claims against the Trust:

- Pursuant to Section 544 of the Bankruptcy Code and the Illinois Uniform Fraudulent Transfer Act, (a) to void the Guaranty, the Assignment, the Pledge and Security Agreement, and the Equity Pledge Agreement; (b) to recover all proceeds from the sale of hospital assets that formed the collateral associated with the Guaranty, Assignment, and pledges; and (c) pursuant to Section 550 of the Bankruptcy Code, to recover an amount equal to the aggregate payments on the Nomura Loan. (Count VIII) [1]

- Pursuant to Section 544 and 550 of the Bankruptcy Code and the Illinois Uniform Fraudulent Transfer Act, (a) to void the Lease and (b) in any event, to recover payments made under the Lease to the extent that they exceed a fair market rental. (Count IX)

- Pursuant to Section 548 of the Bankruptcy Code, (a) to avoid transfers made pursuant to the Lease and (b) in any event, to recover those payments to the extent that they exceed a fair market rental. (Count X)

The Trust filed a Proof of Claim (the "Claim") in the related bankruptcy case in the amount of $60,139,317.04 based on obligations of Doctors Hospital arising from its guarantee of a loan. Count VIII of this Adversary proceeding and the Claim are factually related because resolution of issues in the Adversary proceeding impacts certain agreements between the LaSalle Trust and Doctors Hospital, agreements that are the underlying basis for the Claim. Therefore, Adversary allegations against the LaSalle Trust and objections to the Claim were consolidated for purposes of trial to the extent of some common issues, but the Claim itself is not to be fully resolved here.

Prior to trial, Doctors Hospital moved for "partial summary judgment" seeking a judgment limiting the Trust's Claim against the estate to the extent that it exceeds that value of its collateral. An Order and supporting Memorandum Opinion was entered on September 22, 2005, concluding that the Trust's Claim is limited to the value of its collateral.

Also prior to trial the Trust moved for summary judgment as to Counts VIII, IX, and X. An Order and supporting Memorandum Opinion was entered on October 17, 2005 denying the Trust's motion for summary judgment, but undisputed facts were set forth and deemed established for trial under Rule 56(d) Fed.R.Civ.P. [Rule 7056 Fed. R. Bankr.P.]

Following trial and with agreement of the parties, final arguments were submitted in writing through filings of proposed Findings of Fact and Conclusions of Law. Supplemental briefs were filed as required. For reasons stated below and pursuant to separate judgment order to be entered, judgment will be entered in favor of Plaintiff in Counts IX and X based on payments of rent in excess of market value through July 7, 1998, and in favor of Defendant as to rent of payments after July 7, 1998; in favor of Plaintiff as to all remaining claims in Count VIII; and in favor of Defendant

---

1. By post trial filing of January 18, 2007, the Trustee expressly abandoned his claim for Nomura Loan payments.

on the prayer in Count IX to void the Lease.

## BACKGROUND

The Defendant Dr. Desnick purchased Doctors Hospital in 1992 for approximately $2.4 million. Ownership of the real estate and certain fixtures were titled in HPCH, a Delaware limited liability company. HPCH is owned 99% by HPCH Partners, L.P. and 1% by its managing member, HP Membership. Desnick owned 100% of HP Membership and a controlling interest in HPCH Partners, L.P. Doctors Hospital managed the hospital's business operations. Doctors Hospital entered into a lease to rent the hospital property located at 5800 South Stoney Island Avenue, Chicago, Illinois (the "Hospital Property") from HPCH for approximately $470,000 per month.

On August 28, 1997, Nomura Asset Capital Corporation ("Nomura") loaned $50 million to HPCH (the "Loan"). The Loan was secured by the hospital real estate, equipment, accounts receivable, and certain other intangibles relating to Doctors Hospital. As further security, HPCH assigned to Nomura all of its rights in the HPCH Lease with Doctors Hospital and the rental payments due thereunder. Doctors Hospital also executed a Guaranty and Suretyship Agreement (the "Guaranty") in favor of Nomura. Pursuant to the Guaranty, Doctors Hospital became surety to Nomura for the loan amount. Nomura transferred all title, rights, and obligations relating to the Loan to Asset Securitization Corporation ("ASC"), which later assigned such rights and obligations to the LaSalle Trust.

The Loan was primarily intended for the benefit of Dr. Desnick.

## PLEADINGS

Doctors Hospital filed its Chapter 11 bankruptcy petition on April 17, 2000. On March 28, 2001, the LaSalle Trust filed its Proof of Claim in the bankruptcy case in the amount of $60,139,317.04 based on asserted obligations of Doctors Hospital arising from its guarantee of the Loan. Doctors Hospital filed this Adversary proceeding on April 15, 2002.

Counts VIII and IX assert that the Guaranty, an Operator Pledge and Security Agreement, the Equity Pledge Agreement ("Guaranty and Related Agreements"), and all rent payments made to HPCH pursuant to the HPCH Lease were fraudulent transfers under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 et seq., as made applicable under § 544 of the Bankruptcy Code. (Compl. 160–76.) Count X asserts that rental payments are also recoverable under § 548 of the Bankruptcy Code

The LaSalle Trust has six remaining affirmative defenses pursuant to an agreed order entered in this Court on October 3, 2005:(1) HPCH is the initial transferee of rent transfers, and the Trust is a good faith transferee for value without knowledge of the voidability of the rent transfers of HPCH, and as such, Plaintiff may not recover the transfers from the Trust (third affirmative defense); (2) the Complaint is barred because it fails to state a claim against the Trust upon which relief can be granted (fourth affirmative defense); (3) the Complaint is barred by failure of consideration and/or failure of conditions precedent (fifth affirmative defense); (4) the Complaint is barred by various principles and/or doctrines of estoppel including, but not limited to, the principals and/or doctrines of equitable estoppel (sixth affirmative defense); (5) the Complaint is barred by the principles or doctrines of *in pari delicto* or unclean hands (seventh affirmative defense); (6) and the Complaint is barred by virtue of the information, knowledge or belief, at all relevant times, held

by the Debtor or the Estate (eighth affirmative defense). (Amend.Ans.1–10.)

The Debtor and the Trust filed an extensive stipulation of facts on August 18, 2005 and a joint supplemental stipulation of facts on March 13, 2006. The Memorandum Opinion entered on October 17, 2005 set forth undisputed facts that were deemed established for trial under Rule 56(d) Fed.R.Civ.P. [Rule 7056 Fed. R. Bankr.P.] In addition, both parties filed post-trial proposed findings of fact, to which each party responded. Those asserted facts not objected to are deemed undisputed. Undisputed facts from all of the foregoing sources are included in the Findings of Fact.

The following are major factual issues to be decided in reaching a decision:

1) Whether the Trust was the initial transferee of rents payments that Doctors Hospital made under the Lease.

2) Whether the $801,926 paid into the Cash Collateral Account on May 11, 1998 were made with funds owned by Doctors Hospital.

3) Whether the Cash Collateral Account was a true escrow account.

4) Whether the parties post-Agreement course of performance modified the Daiwa Loan Agreement such that Doctors Hospital, and not MMA Funding, should be treated as the actual borrower.

5) Whether MMA Funding was the alter ego or instrumentality of the Debtor such that Doctors Hospital should be treated as the actual borrower on the Daiwa Loan.

6) Whether the Debtor was insolvent at the time of the alleged fraudulent transfers.

7) Whether Lease payments exceeded reasonably equivalent rental value.

8) Whether in making the Guaranty and Related Agreement, Doctors Hospital incurred an obligation without receiving reasonably equivalent value while Debtor was insolvent.

9) Whether Plaintiff can void the earlier rejected Lease as a fraudulent transfer.

Some consideration has been given to paring down the many specific Findings of Fact set forth below to eliminate some not directly supportive of the rulings. However, all of these facts were asserted by one, another, or both parties. By including them all, the parties and any reviewing court will have a complete inventory of facts for use during the likely appeal.

To aid the reader in this fact-intensive case, there follows a list of some persons referred to in this opinion:

1) Michael **Lane:** Plaintiff's insolvency expert

2) Richard **Felbinger:** Chief Financial Officer of Doctors Hospital from April to September 1998

3) Michael **Nelson:** Chief Financial Officer of Doctors Hospital from October 1998 to April 1999

4) Phillip **Robinson:** Chief Financial Officer of Medical Management of America, Inc. who helped to oversee all of the holdings and investments of Desnick

5) Scott **Peltz:** Plaintiff's expert of American Express Tax and Business Services

6) Thomas **Blake:** Trust's insolvency expert of Charles River Associates

7) Stephen **Weinstein:** Chief Executive Officer of Doctors Hospital from September 1994 to September 1998 who left the employ of Doctors Hospital in September 1998 for Michael Reese Hospital

8) Carrie **Widman**: Plaintiff's witness, an employee of American Express Tax Business Services

9) Dr. James H. **Desnick**: at all relevant times, Desnick was the sole shareholder and a director of Doctors Hospital

## FINDINGS OF FACT

### Parties and Related Entities

1. Doctors Hospital of Hyde Park, Inc. ("Doctors Hospital" or "Debtor") is an Illinois Subchapter S corporation that had its principal place of business at 5800 South Stoney Island Avenue, Chicago, Illinois. At all relevant times, it operated hospital facilities at that address. (Jt.Ex.202, ¶ 1.)[2]

2. Defendant LaSalle Bank National Association, f/k/a LaSalle National Bank as Trustee for Certificate Holders of Asset Securitization Corporation Commercial Mortgage Pass–Through Certificates, Series 1997, D5, by and through its Servicer, Orix Capital Markets, LLC (the "Trust"), is a trust that has elected to be treated as a Real Estate Mortgage Investment Conduit under the Internal Revenue Code of 1986, whose Trustee, LaSalle Bank National Association is a national banking association with its principal place of business in Illinois. (Jt. Ex. 142, Counter–Claim 1; Jt. Ex. 202, ¶ 2.)

3. Daiwa Healthco–2 LLC ("Daiwa") is a Delaware limited liability company with a place of business located in New York, New York. (Jt.Ex.202, ¶ 3.)

4. HPCH LLC ("HPCH") is a Delaware limited liability company. In approximately July or August 1997, HPCH acquired the record title of the Hospital Property from HPCH Partners, L.P. (Jt.Ex. 202, ¶ 4.)

5. Desnick is an individual residing at 344 Ravine Dr., Highland Park, Illinois. At all relevant times, Desnick was the sole shareholder and a director of Doctors Hospital. (Jt.Ex.202, ¶ 5.)

6. Desnick Descendants Irrevocable Trust ("Desnick Trust I") is a trust created by Desnick and the owner of 1,305 shares of stock in Medical Management of America, Inc. (Jt.Ex.202, ¶ 6.)

7. Desnick Family Irrevocable Trust ("Desnick Trust 2") is a trust created by Desnick and the owner of 137 shares of stock in Medical Management of America, Inc. (Jt.Ex.202, ¶ 7.)

8. HPCH Partners, L.P. is an Illinois limited partnership. (Jt.Ex.202, ¶ 8.) HPCH Partners, L.P. is owned 1% by its general partner, Stoney Island Ventures, which is wholly owned by Desnick. HPCH Partners, L.P. is 99% owned by its limited partners. HPCH Partners, L.P.'s tax returns show that in August 1997, those limited partners and their ownership interests were as follows: Desnick 95.2%, Dan Webb 3.8%, Robert Krasnow 0%, Stephen Weinstein 0%. The tax returns also show that in September 1997 Desnick acquired Webb's interest and became 99% owner of HPCH Partners, L.P. (Jt.Ex.202, Supp.Stip.1.)

9. HP Membership Inc. ("HP Membership") is a special purpose Delaware Corporation. This corporation may have been dissolved for failure to file annual franchise reports. (Jt.Ex.202, ¶ 9.)

---

**2.** Citations are to volume and page numbers of the trial transcript (e.g., Tr. II: 13), joint exhibits (Jt.Ex.—), plaintiff's exhibits (Pl. Ex.—), and defendant's exhibits (Def.Ex.—). Where an exhibit is a deposition, the witness's name is indicated (e.g., Pl.Ex. 52 (Desnick) at—). Citations to Jt. Ex. 202,—refer to the Joint Stipulation filed on August 18, 2005 unless denoted as "Supp. Stip. ¶." "Supp. Stip." refers to the Joint Supplemental Stipulation of Facts filed on March 13, 2006, which is also included as part of Jt. Ex. 202.

10. Medical Management of America, Inc. ("MMA") is a Delaware corporation and was a purported manager of Doctors Hospital and ETCH. Desnick, Desnick Trust 1, and Desnick Trust 2 own 100% of MMA. (Jt.Ex.202, ¶ 10.) Desnick holds a controlling interest in MMA. (Pl.'s Am. Proposed Findings of Fact and Conclusions of Law, ¶ 12; Def.'s Resp. To Pl.'s Post–Trial Proposed Findings of Fact, ¶ 12.)

11. MMA Funding, Inc. is a special purpose Delaware corporation and the special purpose manager of MMA Funding L.L.C. Desnick is 100% owner of MMA Funding, Inc. (Jt.Ex.202, ¶ 11.)

12. MMA Funding L.L.C. ("MMA Funding") is an Illinois limited liability corporation. MMA Funding is owned 99% by Doctors Hospital and 1 % by MMA. (Jt.Ex.173.)

13. HPCH is owned 99% by HPCH Partners, L.P. and 1% by its managing member, HP Membership. Desnick owns 100% of HP Membership and a controlling interest in HPCH Partners, L.P. (Jt.Ex.202, ¶ 13.)

14. Nomura Asset Capital Corporation ("Nomura") is a Delaware corporation with its principal place of business located in New York, New York. (Jt.Ex.202, ¶ 14.)

15. Orix Capital Markets LLC ("Orix") is special servicer of a pool of loans owned by the Trust, including the Nomura Loan (defined below), securitized by the Trust. As special servicer, Orix attempts to maximize the collection of principal and interest and other amounts due under the loan documents. (Jt.Ex.202, ¶ 15.)

16. Nelson Vasquez ("Vasquez") is an individual who is or was residing in Chicago, Illinois and was a financial officer of Doctors Hospital from approximately 1998 to the closing of the hospital. (Jt.Ex.202, ¶ 16.)

17. Michael Nelson ("Nelson") is a former chief financial officer of Doctors Hospital from October 1998 to April 1999. (Jt.Ex.202, ¶ 17.)

18. Stephen Weinstein ("Weinstein") was the Chief Executive Officer of Doctors Hospital from September 1994 to September 1998. (Pl.Ex. 37 (Weinstein) at 7–9.) Weinstein left the employ of Doctors Hospital in September 1998. (Jt.Ex.202, ¶ 39.)

19. At all relevant times Desnick owned and/or controlled Doctors Hospital, HPCH, MMA, Inc., MMA Funding, HP Membership, and HPCH Partners, L.P. (Jt.Ex.202, ¶ 18.)

### Procedural Background

20. Doctors Hospital filed a petition under Title 11 of the United States Code on April 17, 2000. (Jt.Ex.202, ¶ 20.)

21. On April 15, 2002 Doctors Hospital filed this Adversary Complaint ("Complaint") against Desnick, the Trust, MMA Funding, and various other defendants. (Jt.Ex.141.)

22. On April 29, 2004, Gus A. Paloian was appointed Trustee of the Debtor. (Jt.Ex. 202, ¶ 21.)

23. This Adversary Proceeding arises out of and relates to the Chapter 11 case of Doctors Hospital of Hyde Park, Inc., No. 00 B 11520 on the docket of this Court. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. The claims set forth herein concern the determination, allowance, and amount of claims asserted by Doctors Hospital pursuant to 11 U.S.C. §§ 544(b), 547, 548, 549, and 550, and, as such, constitute a core proceeding under 28 U.S.C. § 157(b)(2)(C), (E) and (F). (Jt.Ex.202, ¶ 23.)

24. Venue is based on 28 U.S.C. §§ 1408 and 1409. (Jt.Ex.202, ¶ 24.)

25. On February 22, 2001, this Court entered an Amended Order Authorizing Debtor to Enter Into A Sale/Auction Agreement For The Sale And Auction Of Equipment Free And Clear Of Liens, Claims, Interests, And Encumbrances authorizing only the sale of Doctors Hospital's equipment, inventory and hospital contents. (Jt.Ex.202, ¶ 25.)

26. When the equipment belonging to Doctors Hospital was sold, there was an agreement that the proceeds of the sale would be held in an interest-bearing account pending resolution of the Trust's claim. (Jt. Ex. 152; Pl.'s Am. Proposed Findings of Fact and Conclusions of Law, ¶ 30; Def.'s Resp. To Pl.'s Post–Trial Proposed Findings of Fact, ¶ 30.)

27. On March 28, 2001, the Trust filed its Proof of Claim in the bankruptcy case in the amount of $60,139,317.04. The Proof of Claim was based on the contractual obligations of the Debtor arising from the Guaranty and Suretyship Agreement, Operator Security and Pledge Agreement, and the Equity Pledge Agreement. (Jt.Ex.202, ¶ 26.)

28. In March of 2004, the Trust filed its Amended Proof of Claim to assert additional damages resulting from fraud by Doctors Hospital. (Jt.Ex.202, ¶ 27.)

29. The parties reached an agreement with respect to the Trust's Amended Claim memorialized by an Agreed Order under the terms of which the Amended Claim was withdrawn by the Trust. (Pl.'s Am. Proposed Findings of Fact and Conclusions of Law, ¶ 27; Def.'s Resp. To Pl.'s Post–Trial Proposed Findings of Fact, ¶ 27.)

30. On or about April 1, 2004, Doctors Hospital filed with this Court a Settlement Agreement between Doctors Hospital, Desnick, and all the other defendants except the Trust, Stephen Weinstein, and Robert Krasnow. Doctors Hospital's claims against Weinstein and Krasnow have been severed from those against the Trust for purposes of trial. (Jt.Ex.202, ¶ 28.)

31. $6,709,413.11, inclusive of interest through February 2006, is being held in an account at J.P. Morgan Chase. The funds represent the proceeds of the Settlement Agreement, which is currently on appeal to the Seventh Circuit Court of Appeals. (Pl.'s Am. Proposed Findings of Fact and Conclusions of Law, ¶ 31; Def.'s Resp. To Pl.'s Post–Trial Proposed Findings of Fact, ¶ 31.)

### General Background

32. Doctors Hospital was built in 1916 by the Illinois Central Railroad as a component of its employee health insurance plan. In 1960 the railroad sold the facility, and it became a not-for-profit community hospital named Hyde Park Community Hospital. After the not-for profit community hospital ceased operations, HPCH Partners, L.P., an entity controlled by Desnick, purchased the real estate and facilities for approximately $2,400,000.00 in 1992. (Jt.Ex.202, ¶ 30.)

33. Doctors Hospital's revenue was largely derived from reimbursements from the government in the form of Medicare and Medicaid reimbursements, as well as payments from private insurance companies such as Blue Cross and Blue Shield. (Jt.Ex.202, ¶ 31.)

34. On August 24, 1992, HPCH Partners, L.P. leased the real estate located at 5800 South Stoney Island Avenue, Chicago, Illinois (the "Hospital Property") to Doctors Hospital. Doctors Hospital leased and utilized the Hospital Property as a hospital. (Jt.Ex.202, ¶ 32.)

35. Doctors Hospital's audited financial statements for the year 1994 note that Doctors Hospital made payments of rent to HPCH Partners, L.P. totaling approximately $5,778,000. (Jt.Ex.202, ¶ 33.)

36. Doctors Hospital's audited financial statements for the year 1995 note that Doctors Hospital made payments of rent to HPCH Partners, L.P. totaling approximately $5,778,000. (Jt.Ex.202, ¶ 34.)

37. Doctors Hospital's audited financial statements for the year 1996 note that Doctors Hospital made payments of rent to HPCH Partners, L.P. totaling approximately $5,775,000. (Jt.Ex.202, ¶ 35.)

38. Doctors Hospital's audited financial statements for the year 1997 note that Doctors Hospital made payments of rent to HPCH Partners, L.P. totaling approximately $5,808,000. (Jt.Ex.202, ¶ 36.)

39. Doctors Hospital's audited financial statements for the year 1998 note that Doctors Hospital made payments of rent to HPCH Partners, L.P. totaling approximately $5,960,000. (Jt.Ex.202, ¶ 37.)

40. Doctors Hospital's audited financial statements for the year 1999 note that Doctors Hospital made payments of rent to HPCH Partners, L.P. totaling approximately $6,020,000. (Jt.Ex.202, ¶ 38.)

### The Daiwa Loan

41. On March 31, 1997, Daiwa, pursuant to a healthcare receivables securitization program, agreed to lend up to $25,000,000 to MMA Funding (the "Daiwa Loan"). Under the language of the loan transaction documents, Doctors Hospital contributed its receivables to MMA Funding, and Daiwa, in turn, loaned funds to MMA Funding according to specified formulae. (Jt.Ex.202, ¶ 40.)

42. In connection with and describing the structure of the Daiwa Loan, Daiwa representatives prepared a document entitled "Credit Approval Memorandum" which summarized the terms of the Daiwa Loan, indicated that three hospitals (including Doctors Hospital) would be participating, and identified that in each case the Borrower (in Doctors Hospital's case, MMA Funding) would be wholly-owned

subsidiaries of the hospitals themselves. (Jt.Ex.168.)

43. The Daiwa Loan was memorialized in several key documents: (i) The Loan and Security Agreement between MMA Funding and Daiwa ("Daiwa Loan Agreement"); (ii) The Healthcare Receivables Contribution Agreement between MMA Funding and Doctors Hospital ("Contribution Agreement"); (iii) The Depository Agreement between Doctors Hospital, MMA, MMA Funding, Daiwa and Grand National Bank ("Daiwa Lockbox Agreement"); and (iv) Assignment of Healthcare Receivables Contribution Agreement as Collateral Security by MMA Funding in favor of Daiwa ("MMA Funding Assignment"). (Jt.Ex.202, ¶ 41.)

44. The index of the closing documents delivered in connection with the closing of the Daiwa Loan identify these and other closing documents. (Jt.Ex.170.)

45. The introductory paragraph of the Daiwa Loan Agreement identifies MMA Funding as the "Borrower." (Jt.Ex.202, ¶ 42.)

46. The Daiwa Loan was signed by two parties: MMA Funding and Daiwa (identified as the "Lender"). (Jt.Ex.202, ¶ 43.)

47. Pursuant to Section 1.01 of the Daiwa Loan, Daiwa agreed "to lend to [MMA Funding] ... such amounts as may be requested by [MMA Funding]. By the terms of Section 1.02(a) of the Daiwa Loan, the aggregate unpaid principal of the Daiwa Loan was not to exceed $25,000,000. (Jt.Ex.202, ¶ 44.)

48. Section 1.02(b) of the Daiwa Loan provides, "[MMA Funding] may borrow, repay, (without premium or penalty) and reborrow the Revolving Loan." (Jt.Ex.202, ¶ 45.)

49. Section 4.01 of the Daiwa Loan provides that "[a]s collateral security for [MMA Funding's] obligations to pay the

Lender Debt when due and payable hereunder, [MMA Funding] hereby grants to [Daiwa] a first priority Lien on and security interest in and right of setoff against all of the rights, title and interest of [MMA Funding] in and to (i) the [Contribution Agreement], (ii) . . . the Provider Lockbox and Provider Lockbox Account, (iii) all of the [receivables] and (iv) all Proceeds of the foregoing." (Jt.Ex.202, ¶ 46.)

50. Exhibit III to the Daiwa Loan contains representations and warranties made by MMA Funding to Daiwa, and are made part of the Daiwa Loan pursuant to Section 3.01. (Jt.Ex.202, ¶ 47.)

51. In Subsection (k) to Exhibit III of the Daiwa Loan, MMA Funding warranted to Daiwa in connection with the Daiwa Loan that MMA Funding was "the legal and beneficial owner of the [receivables] free and clear of any Lien." (Jt.Ex.202, ¶ 48.)

52. Exhibit IV to the Daiwa Loan Agreement contains covenants which MMA Funding agreed to observe. Such covenants are made part of the Daiwa Loan Agreement pursuant to Section 3.01. (Jt. Ex. 1, Exhibit IV.)

53. In subparagraph (p) of Exhibit IV of the Daiwa Loan Agreement, MMA Funding covenanted to Daiwa that it would observe all of its obligations under the Contribution Agreement. (Jt. Ex. 1, Exhibit IV(p).) Such obligations included all of the "Special Covenants Corporate Separateness" in Exhibit IV to the Contribution Agreement (the "Separateness Covenants")-pursuant to which MMA Funding agreed to be a separate and distinct corporate entity from Doctors Hospital. (Jt. Ex. 5, Exhibit IV.)

54. Section 1.01 of the Contribution Agreement states that "[Doctors Hospital] agrees . . . to contribute all of its Receivables to [MMA Funding], and [MMA Funding] agrees . . . to accept the Contri-

bution by [Doctors Hospital] of such Receivables." (Jt.Ex.202, ¶ 49.)

55. When the Daiwa Loan was consummated, Doctors Hospital expressly acknowledged the separateness of MMA Funding and that the transfer of the Receivable was a "true sale." (Jt.Ex.5, ¶ 5.08, Ex. IV.) These representations were expressly ratified by Doctors Hospital in the amendment to the Contribution Agreement on February 25, 1999. (Jt.Ex.6.)

56. Section 1.03 of the Contribution Agreement provides:

SECTION 1.03. *The Contributions.* Effective on each Transfer Date, all right, title and interest in and to the Offered Receivables shall be transferred by the applicable [Doctors Hospital] as a Contribution and [MMA Funding] hereby accepts and receives, as absolute owner, all right, title and interest in and to such Receivables on such Transfer Date (such Offered Receivables being referred to herein as a "Transferred Batch"). On or prior to each Transfer Date, the conditions in Exhibit H shall be satisfied.

(Jt.Ex.202, ¶ 50.)

57. The transfer of Receivables to MMA Funding was structured to occur not only on the closing date of the Daiwa Loan, but also on a continuing basis until the Daiwa Loan was terminated. (Jt.Ex.5, ¶ 1.01.)

58. Pursuant to Section 4.04 of the Contribution Agreement, Doctors Hospital pledged its receivables to MMA Funding for the purpose of providing security for "Provider's [i.e., Doctors Hospital's] obligations to purchase denied receivables under Section 4.01 hereof, MMA Funding's and the Providers' indemnification obligations to the Company under Section 4.02 hereof and MMA Funding's and the Providers' obligations to pay costs and expenses under Section 5.05 hereof." In

Section 4.02 of the Contribution Agreement, Doctors Hospital indemnified MMA Funding in the event of

> (d) the failure to vest in [MMA Funding] a perfected ownership interest in each Eligible Receivable included in a Transferred Batch and the Collections in respect thereof, free and clear of Liens; [or]

> (f) a failure of MMA or [Doctors Hospital] ... to perform its duties or obligations in accordance with the provisions [of the Contribution Agreement] or to perform its duties or obligations ... [in the Contribution Agreement].

(Jt.Ex.202, ¶ 51.)

59. Pursuant to Section 5.09 of the Contribution Agreement, Doctors Hospital shall, as of the date of the Contribution Agreement, be deemed to have granted a security interest to MMA Funding in its Transferred Receivables "[i]n the event that, contrary to the mutual intent of MMA, The Providers [i.e., Doctors Hospital] and The Company [i.e., MMA Funding], any contribution of Transferred Batch is not characterized as a full and complete transfer of ownership." (Jt.Ex.202, ¶ 52.)

60. Section 2.02 of the Daiwa Loan provides that all receivables were to be applied to principal and interest repayments on the credit facility unless the balance of the loan had been paid in full. Only "[u]pon payment in full of all Lender Debt, all remaining amounts held in the [Daiwa Account] shall be delivered to [MMA Funding]" according to Section 2.02. (Jt.Ex.202, ¶ 53.)

61. Isaac Solemoni, Senior Vice President at Daiwa in charge of its healthcare receivables lending business, testified that it would be incorrect to refer to the Daiwa Loan Agreement between Daiwa and Doctors Hospital; rather, pursuant to the Daiwa Loan, it was between Daiwa and MMA Funding, to which Doctors Hospital contributed its receivables. (Def.Ex.42, (Solemoni) p. 21.)

62. The Law Firm of Chuhak & Tecson, P.C. issued an opinion letter dated March 31, 1997, in which it rendered opinions about corporate matters relating to MMA Funding. (Jt.Ex.166.)

63. Desnick executed a Officer's Certificate in support of the Chuhak legal opinion. (Jt.Ex.169.)

64. In connection with the Daiwa Loan, the law firm of Shefsky & Froelich delivered a legal opinion concerning whether the transfer of the Receivables would be characterized as a "true sale" in the event of a bankruptcy proceeding involving Doctors Hospital as debtor. (Def.Ex.16.) The Shefsky opinion further addressed the question of whether, in the event of a bankruptcy proceeding involving Doctors Hospital as debtor, MMA Funding would not be substantively consolidated into Doctors Hospital. *Id.*

65. Desnick executed an Officer's Certificate in support of the Shefsky & Froelich opinion. (Def.Ex.15.)

66. As Phillip Robinson[3] testified, and as the transaction documents reflect, MMA Funding was newly formed in March 1997 to fit the loan structure of the Daiwa transaction. (Tr. II, p. 24; Jt. Exs. 117, 166, 171, 173.)

67. Andrew Tecson[4] testified that he understood MMA Funding to be a special purpose entity. (Tr. II, p. 113.)

---

3. Phillip Robinson ("Robinson") is the Chief Financial Officer of Medical Management of America, Inc. and helped to oversee all of the holdings and investments of Desnick.

4. Andrew Tecson ("Tecson") is an attorney at the law firm of Chuhak & Tecson, P.C.

68. Daiwa documents reflect that Daiwa would not have made the loans without MMA Funding being established as a special purpose entity. (Jt.Exs.117, 168, 171.)

69. Robinson testified that MMA Funding was never intended to be an operating company. (Tr. II, p. 24.)

70. In connection with the transfer of the Receivables to MMA Funding, Doctors Hospital executed and filed with the Illinois Secretary of State Office a UCC–1 statement. (Jt.Ex.175.)

71. In connection with the closing of the Daiwa Loan, MMA Funding executed a separate UCC–1 statement granting security interests in the Receivables to Daiwa. (Jt.Ex.176.)

72. According to Robinson, the "documented" borrower under the Daiwa Loan Agreement was always MMA Funding (Tr. I., p. 178) and on the closing date of the Daiwa Loan there was "no doubt" that Doctors Hospital and MMA Funding were separate corporate entities. (Tr. I, pp. 188.)

73. Joint Exhibits 117, 168 and 171 show Daiwa's pre-closing understanding of the transaction and the separateness of the entities.

74. Three amendments to the Daiwa Loan Agreement were entered into on August 21, 1997, August 26, 1997, and February 25, 1999. (Jt.Exs.2, 3, 4.) Each amendment was signed by MMA Funding. *Id.* Doctors Hospital was not a signatory to any of these amendments. *Id.*

75. The Daiwa Loans had an original maturity date twenty-four months from its inception, or March 31, 1999. (Jt.Exs.1, 4.)

76. On February 25, 1999, MMA Funding and Daiwa, in the Third Amendment to the Daiwa Loan Agreement, extended the maturity date of the Daiwa Loans to March 31, 2001. (Jt.Ex.4.)

77. An Account Agreement was executed by MMA Funding, establishing an account at Grand National Bank. (Jt.Ex.71.) The account agreement was executed on behalf of MMA Funding by Desnick and Robinson. *Id.*

78. Articles of Organization for MMA Funding were filed with the Illinois Secretary of State's office on March 25, 1997 (Jt.Ex.173), as well as the Operating Agreement of MMA Funding. (Jt.Ex.174.)

79. Section 1.03 of the Daiwa Loan Agreement required that MMA Funding submit borrowing base certificates to Daiwa in connection with each advance under the Daiwa Loan Agreement. (Jt.Ex.1.)

80. Defendant introduced into evidence borrowing base certificates from MMA Funding to Daiwa for each of the months of August 1998 through March 1999. (Def.Ex.9.) In addition, Joint Exhibit 61 represents a borrowing base certificate dated June 28, 1998.

81. Vasquez, CFO of Doctors Hospital from April 1999 to April 2000, testified that at all times while he was at Doctors Hospital, borrowing base certificates were sent to Daiwa either weekly or monthly. (Def.Ex.43, (Vasquez), pp. 37–38.)

82. Robinson testified that he never knew the signatories to the borrowing base certificates to exceed their authority. (Tr. I, pp. 198, 201, 203.)

83. Over the course of the Daiwa Loan, the principal of the loan was never paid down to $0. (Jt.Ex.202, ¶ 54.)

84. As of March 2000, approximately $10,300,000 of the Daiwa Loan was outstanding. (Jt.Ex.202, ¶ 55.)

85. Pursuant to the Daiwa Loan, Daiwa issued new borrowings from account # 205779 at the Bank of New York (the "Daiwa Account"). (Jt.Ex.202, ¶ 56.)

86. The new borrowings forwarded from Daiwa represented new borrowings under the Daiwa Loan. (Jt.Ex.202, ¶ 57.)

87. Section 2.02 of the Daiwa Loan provides that the Daiwa Account was under the sole dominion and control of Daiwa. Section 2.02 also states that the Daiwa Account was established "for the purpose of receiving funds from [MMA Funding] to be distributed towards repayment of the Daiwa Loan." (Jt.Ex.202, ¶ 58.)

88. Section 2.05 of the Daiwa Loan provides in part that "[d]istributions to [MMA Funding] on each Funding Date shall be deposited in an account designated by [MMA Funding]." (Jt.Ex.202, ¶ 59.)

89. From the period of April 1997 (the inception of the Daiwa Loan) through June 1998, Daiwa transferred new borrowings under the Daiwa Loan directly to Grand National Bank account # 6700010103, an account titled in the name of MMA Funding (the "MMA Funding Account"). (Jt.Ex.202, ¶ 60.)

90. When the Daiwa Loan was implemented, Daiwa initially funded $7,975,500.00. Approximately $6,524,000.00 of that amount was used to retire an existing line of credit that MMA had obtained for the benefit of Doctors Hospital, Desnick, ETCH Partners, Barry Harlem Corp., J.H. Desnick, M.D. Eye Services, Ltd., James H. Desnick, M.D., S.C. and James H. Desnick, M.D., P.A. (the "MMA Line of Credit"). Approximately $1,372,000.00 was made available to Doctors Hospital and the remaining proceeds were used to pay expenses relating to the transaction. (Jt.Ex.202, ¶ 61.)

91. Of the $6,524,000.00 used to retire the MMA Line of Credit, approximately $3,900,000.00 was used to retire the indebtedness of the entities other than Doctors Hospital. (Jt.Ex.202, ¶ 62.)

92. Doctors Hospital's receivables were always reflected as its assets on its audited financial statements for fiscal years 1997, 1998 and 1999. (Jt.Ex.202, ¶ 63.)

93. Doctors Hospital's audited financial statements for years 1997, 1998 and 1999 did not reflect any accounts receivable transferred to MMA Funding. (Jt.Ex.202, ¶ 64.)

94. No balance sheets or profit-and-loss statements were prepared for MMA Funding after the Daiwa Loan closed, and MMA Funding never filed a tax return. (Jt.Ex.202, ¶ 65.)

95. However, when the Daiwa Loan closed, a balance sheet for MMA Funding was prepared, which showed MMA Funding as owner of the receivables. (Jt.Ex.172.)

96. At trial, the Trust introduced a letter and borrowing base certificates with the name "MMA Findings LLC" above the signatures of Michael Nelson and Richard Felbinger, identified on each document as "Executive Vice–President Finance." (Def. Ex. 9; Jt. Ex. 61.) The letter (which was sent to Daiwa with the borrowing base certificate) was on Doctors Hospital's letterhead-even though MMA Funding's operating agreement required it to "maintain its own separate stationery." (Jt.Ex.174, Art. III(7).)

97. MMA Funding had no active checking account, no insurance, and no phone. (Tr. 1:116–20.)

98. Doctors Hospital's audited financial statements for the fiscal years ending September 30, 1997, September 30, 1998, and September 30, 1999 state that Doctors Hospital "maintains a revolving line of credit arrangement pursuant to a Loan and Security Agreement dated March 31, 1997," and that "[a]ll eligible patient accounts receivable of the Hospital are pledged as collateral to secure the revolving line of credit." (Jt.Ex.202, ¶ 66.)

99. On June 1, 1997, Weinstein, Chief Executive Officer of Doctors Hospital, sent a letter to Blue Cross/Blue Shield of Illi-

nois stating in part that Doctors Hospital had "contributed to [MMA Funding] the currently existing receivables payable by you to [Doctors Hospital] and we intend to contribute to [MMA Funding] hereafter arising receivables payable by you to [Doctors Hospital]." (Jt.Ex.202, ¶ 67.)

100. On June 1, 1997, Weinstein sent a letter to the Comptroller for the State of Illinois stating in part that Doctors Hospital had "contributed to [MMA Funding] the currently existing receivables payable by you to [Doctors Hospital] and we intend to contribute to [MMA Funding] hereafter arising receivables payable by you to [Doctors Hospital]." (Jt.Ex.202, ¶ 68.)

101. On June 1, 1997, Weinstein sent a letter to more than 100 private insurers stating in part that Doctors Hospital had "contributed to [MMA Funding] the currently existing receivables payable by you to [Doctors Hospital] and [Doctors Hospital] intend[s] to contribute to [MMA Funding] hereafter arising receivables payable by you to [Doctors Hospital]." (Jt.Ex.202, ¶ 69.)

### *The Nomura Loan*

102. On August 28, 1997, Nomura loaned the principal amount of $50,000,000 (the "Nomura Loan") to HPCH, the entity from whom Doctors Hospital leased the Hospital Property. The obligations of HPCH under the Nomura Loan were secured, *inter alia*, by the Hospital Property and a lease between HPCH and Doctors Hospital. (Jt.Ex.202, ¶ 70.)

103. All of the proceeds of the Nomura Loan were initially deposited in an account in the name of Desnick and his spouse. (Jt.Ex.202, ¶ 85.)

104. None of the proceeds of the Nomura Loan were disbursed to Doctors Hospital. (Jt. Ex. 135, Stipulated Facts 31.)

105. As security for the performance of its obligations under the Guaranty, Doc-

tors Hospital executed the Pledge. Section 2 of the Pledge granted to Nomura a security interest in and lien on all of Doctors Hospital's interest in the property necessary to operate the hospital facility, including inventory, fixtures, equipment, permits, licenses, intangibles, accounts, account collateral, leases, money, investment properties, rights to proceeds of letters of credit, contract rights, lease rights, and rents. (Jt. Ex. 135, Stipulated Facts 33.)

106. Exhibit B to the Nomura Loan Agreement established $471,630.19 as the base monthly payment of principal and interest under the Nomura Loan. (Jt.Ex.11.)

107. The Lease was rejected by order of the Bankruptcy Court as of May 31, 2000. (Jt.Ex.180.)

108. The Nomura Loan was memorialized in several key documents: (i) the Nomura Loan; (ii) a Promissory Note; (iii) Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (the "Mortgage"); an Assignment of Leases and Rents (the "Lease Assignment"); (iv) a Guaranty and Suretyship Agreement (the "Guaranty"); (v) an Operator Security and Pledge Agreement (the "Pledge"); (vi) an Assignment of Management Agreement and Agreements Affecting Real Estate (the "Assignment"); (vii) an Equity Pledge Agreement; (viii) an Intercreditor Agreement; (ix) a Cash Collateral Account Agreement; and (x) a Collection Account Agreement (collectively, the "Nomura Loan Documents"). (Jt.Ex.202, ¶ 71.)

109. The Nomura Loan was evidenced by a Promissory Note in the principal sum of $50,000,000 in favor of Nomura (the "Promissory Note") and was secured, *inter alia*, by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (the "Mortgage") and an Assignment of Leases and Rents (the "Lease Assignment"). The Lease Assignment pledged

to Nomura the lease between HPCH and Doctors Hospital. (Jt.Ex.202, ¶ 72.)

110. In connection with the Nomura Loan, Doctors Hospital, as Operator, executed a Guaranty and Suretyship Agreement, dated August 28, 1997, in favor of Nomura (the "Guaranty"). By executing and delivering the Guaranty, Doctors Hospital guaranteed and became surety to Nomura for the entire amount of the Nomura Loan. The obligations under the Guaranty were secured by the equipment, accounts receivable and other intangibles owned by Doctors Hospital. (Jt.Ex.202, ¶ 73.)

111. Absent the occurrence of an Event of Default in the Nomura Loan Documents, Doctors Hospital had no obligation to make debt service payments or other payments under the terms of the Nomura Loan transaction documents. HPCH had no source of income other than the Lease payments from Doctors Hospital. MMA Funding had no obligation to make payments of rent to HPCH or satisfy the obligations due to Nomura under the Nomura Loan. (Jt.Ex. 202, ¶ 74.)

112. As security for the performance of its obligations under the Guaranty, Doctors Hospital executed an Operator Security and Pledge Agreement, dated August 28, 1997 (the "Pledge"). Section 2 of the Pledge granted to Nomura a security interest in and lien on:

(a) All Inventory, fixtures relating to the Facility, Equipment, Permits, Licenses, General Intangibles, Instruments, Accounts, Account Collateral, Leases, Money, investment properties relating to the Facility, rights to proceeds of letters of credit relating to the Facility and goods, now existing or hereafter arising or acquired (other than Permits and Licenses which by their terms or applicable law prohibit a collateral assignment thereof);

(b) All present and future contract rights, lease rights and Rents, not otherwise included as collateral under the foregoing clause (a);

(c) All other property relating to or necessary to operate the Facility;

(d) To the extent related to the property described in clauses (a) through (c) above, all books, correspondence, credit files, records, invoices, bills of lading and other documents including, without limitation, to the extent so related, all tapes, cards, computer runs, computer programs and other papers and documents in the possession or control of [Doctors Hospital] or any computer bureau from time to time acting for [Doctors Hospital] and, to the extent so related, all rights in, to and under all policies of insurance, including claims or rights to payments thereunder and proceeds therefrom, including credit insurance;

(e) any other property relating to the Facility in which Lender may create or perfect a security interest; and

(f) all proceeds and products of any of the foregoing.

(Jt.Ex.202, ¶ 75.)

113. In Section 3.9 of the Pledge, Doctors Hospital represented and warranted to Nomura that Doctors Hospital was "not party to any agreement or instrument which might materially adversely affect the business, operations, or condition (financial or otherwise) of [Doctors Hospital]." (Jt.Ex.202, ¶ 76.)

114. In Section 3.19 of the Pledge, Doctors Hospital represented and warranted to Nomura that Doctors Hospital did not "have any defense or right of offset with respect to its rights, duties, and obligations under the [Pledge] or the [Lease], or any claim of right against [HPCH]." (Jt.Ex.202, ¶ 77.)

115. In Section 3.27 of the Pledge, Doctors Hospital represented and warranted to Nomura that Doctors Hospital "has not asserted, and has no knowledge of, any claim against [HPCH] under the [Lease] that might be set-off or credited against future accruing rents." (Jt.Ex.202, ¶ 78.)

116. As further security for the performance of its obligations under the Guaranty, Doctors Hospital executed an Assignment of Management Agreement and Agreements Affecting Real Estate, dated August 28, 1997, in favor of Nomura (the "Assignment"). Doctors Hospital thereby assigned to Nomura all of its rights in contracts with third parties made in connection with the management, construction, renovation, use, operation or maintenance of Doctors Hospital's facilities. (Jt.Ex.202, ¶ 79.)

117. Section 1 of the Assignment provides:

1. *Definition of Additional Collateral.* The items which shall be the subject of this Assignment and which are sometimes collectively referred to herein as *"Additional Collateral"* are as follows:

1.1 All of Assignor's right, title and interest in and to all contracts between Assignor and third parties in connection with the management, construction, renovation, use, operation or maintenance of the Facility, including without limitation, the Management Agreement applicable to the Facility, any franchise agreements, any agreements regarding parking facilities for the Facility, any architect's agreements, construction contracts, licensing agreements, subcontracts, service and supply agreements, "provider or participation agreements" under Medicaid, Medicare, Blue Cross and/or Blue Shield and any other private commercial insurance managed care and/or employee assistance program, receivables agreements, patient and resident care agreements, any other agreements with design professions, all agreements, allocations, and rights with all utility services serving the Facility and all development agreements, reservation agreements, agreements of sale, options to purchase, rights of first refusal or any other preferential right and Permits and Licenses, which have heretofore been or will hereafter be executed by or on behalf of Assignor or any manager under any management agreement (the *"Manager"*), or which have been or will hereafter be assigned to Assignor, as the same may thereafter from time to time be supplemented, amended, modified or extended by one or more written agreements supplemental thereto applicable to the Facility (collectively, the *"Agreements"*; the parties with whom or to whom such Agreements have been or may hereafter be given are, along with the Contractors, hereinafter collectively referred to as the *"Contractors"*).

1.2 All of Assignor's right, title and interest in and to all warranties, guarantees, and other rights of Assignor or any manager under any management agreement, direct and indirect, against manufacturers, dealers, suppliers, Contractors, and others in connection with the work done or to be done and the materials supplied or to be supplied for the Facility (together, the *"Warranties"*).

(Jt.Ex.202, ¶ 80.)

118. As further security for the performance of its obligations, Doctors Hospital executed an Equity Pledge Agreement, dated August 28, 1997, in favor of Nomura. Section 2 of the Equity Pledge Agreement granted to Nomura a security interest in and lien on all of Doctors Hospital's 99%

interest in MMA Funding. (Jt.Ex.202, ¶ 81.)

119. Contemporaneously with the Nomura Loan on August 28, 1997, Daiwa and Nomura entered into the Intercreditor Agreement (the "Intercreditor Agreement") wherein Daiwa and Nomura set forth their respective rights and obligations with respect to new borrowings under the Daiwa Loan. Doctors Hospital executed an acknowledgment of its acceptance of the Intercreditor Agreement. (Jt. Ex. 202, 82; Jt. Ex. 12.)

120. Section 5(c) of the Intercreditor Agreement provides that Nomura "will not contest the validity of the true sale and contribution by [Doctors Hospital] to [MMA Funding] of the [receivables]." (Jt.Ex.202, ¶ 83.)

121. Section 3 of the Intercreditor Agreement states that "Daiwa has been directed by [MMA Funding] and [Doctors Hospital] to remit all funds which [MMA Funding] and/or [Doctors Hospital] are entitled to receive pursuant to [the Daiwa Loan] to the [Cash Collateral Account]." (Jt.Ex.202, 84.)

### The HPCH Lease

122. Contemporaneously with the Nomura Loan, on August 28, 1997, HPCH, now the record owner of the Hospital Property, and Doctors Hospital entered a lease agreement (the "Lease"). (Jt.Ex. 202, 86.)

123. Nomura prepared the Lease, and counsel for Doctors Hospital and HPCH reviewed it. (Pl.Ex. 36 (Wall) at 28.)

124. In December 1997, Doctors Hospital's auditor wrote that the Lease "require[s] an ongoing active recalibration of the rent expense which may end up having no bearing on a fair rent expense that would have been achieved in an arm's length transaction." (Jt.Ex. 100.)

125. "Rent" under the Lease is defined as "Base Rent" plus all "Excess Cash Flow" plus any additional rent, fees or payments to be made by Doctors Hospital under the Lease. Base Rent, in turn, is defined as the sum of the "Basic Carrying Costs," "Operating Expenses," "Capital Reserve Amount," "Debt Service," and "Extra Funds," as each term is defined in the Nomura Loan Agreement. (Jt.Ex.73, 2.1.) The Nomura Loan Agreement generally defines these terms as follows: (i) Basic Carrying Costs means real estate taxes for the Hospital Property and insurance required to be maintained by HPCH for the Hospital Property and Doctors Hospital for its operations; (ii) Operating Expenses means all costs of cleaning, repair, maintenance, employees, utilities, professional fees, security, garbage disposal, and environmental costs related to the Hospital Property or the operations of Doctors Hospital; (iii) Capital Reserve Account means the amount of reserve required to be maintained with the Trust by either formula (i.e., $8,000.00 per bed) or as determined by an engineering report; and (iv) Debt Service means the principal and interest payments and certain other charges due and payable under the Nomura Loan Agreement. (Jt.Ex.202, 87.)

126. Excluding such pass-through items such as real estate taxes, insurance, capital improvements, and maintenance, Doctors Hospital paid rent, on a net basis, for fiscal years 1998 and 1999 the respective sums of $5,668,658 and $5,669,459. In addition, Doctors Hospital paid rent on a net basis for the first eight months of fiscal year 2000 equal to $3,779,529. The rent, on a net basis, equaled the debt service payment owed by HPCH to the Trust under the Nomura Loan. (Jt.Ex.158.)

127. Exhibit B of the Nomura Loan established $471,630.19 as the base monthly payment of principal and interest under the Nomura Loan. (Jt.Ex.202, ¶ 88.)

128. Section 2.1 of the Lease provided:

[HPCH] acknowledges, so long as the Loan is outstanding, that the Rent may be paid by way of transfer of funds by Daiwa to the Cash Collateral Account. To the extent that the aggregate amount of any such transfer shall exceed the Rent then due and subject to the terms of the Loan Agreement, Landlord agrees to promptly remit such excess to [Doctors Hospital].

(Jt.Ex.202, 89.)

129. The Lease provides for "an initial term beginning August 29, 1997 and ending on August 29, 2012." (Jt.Ex.202, 90)

130. Doctors Hospital's audited financial statements for the year 1998 state that Doctors Hospital "has an operating lease with HPCH Partners, L.P. to lease the hospital facility. The lease agreement is valid through October 1, 1998." (Jt.Ex.202, ¶ 91.)

131. Discussing the term of the HPCH Lease, Doctors Hospital's audited financial statements for the year 1999 state that "[t]he original lease agreement term was initially valid through October 1, 1998." (Jt.Ex.202, ¶ 92.)

132. Other than the Lease, there are no agreements between Doctors Hospital and HPCH. (Jt.Ex.202, ¶ 93.)

133. As part of the Nomura Loan transaction, HPCH assigned to Nomura all of its rights in the Lease and the rental payments due thereunder (the "Lease Assignment"). (Jt.Ex.202, ¶ 94.)

134. Pursuant to Section 2 of the Lease Assignment, HPCH assigned the HPCH Lease to Nomura which gave Nomura "the right to collect the Rents and to apply the Rents in partial payment of the [Nomura Loan]." (Jt.Ex.202, ¶ 95.)

135. Subsequent to HPCH's acquisition of the Hospital Property, rent due under the Lease continued to be reported on the tax returns of HPCH Partners, L.P. The tax returns of HPCH Partners, L.P. indi-cate receipt of rents, and it had no tenants other than Doctors Hospital. HPCH owned no property other than the Hospital Property. (Jt.Ex.202, ¶ 96.)

136. The Hospital Property had an assessed value of $1,143,800, according to the Cook County, Illinois taxing authorities in 1997, which was based on 38% of the fair market value. HPCH obtained an appraisal in July 1997, valuing the property (as of January 1, 1997) at $2,675,000.00, which appraisal was used by HPCH to protest the ad valorem tax valuation of the Hospital Property. (Jt.Ex.192.)

137. Counts IX and X of Plaintiff's Complaint sought recovery of "rent" from both Defendant and HPCH. (Jt.Ex.141, pp. 40–43.)

138. On February 12, 2004, Orix conducted a "Litigation Webcast" on its website. The webcast provided background information on the Nomura loan and the Trust's litigation against Nomura. In the webcast, Michael Wurst of Orix made the following statements:

What Nomura did here was size the lease to the loan. They determined the amount of the proceeds they wanted to lend based on the business enterprise value, and then they structured the lease to make those debt service payments. In fact, if you read the lease, the lease doesn't contain a discrete amount due. In fact, the lease says lease payments will consist of the debt service due under the mortgage loan. In other words, there's a one-to-one debt service coverage ratio between the gross income that the borrower was entitled to receive and its debt service obligations.

(Jt.Ex.202, ¶ 97.)

139. HPCH made representations and warranties to Nomura regarding the HPCH Lease. In Section 4.1(b)(AJ) of the Nomura Loan, HPCH warranted to No-

mura that the lease agreement between HPCH and Doctors Hospital was "valid and enforceable," and that "there exist[ed] no offsets or defense to the payment of any portion of the Rents." (Jt.Ex.202, ¶ 99.)

140. The Trust, like Daiwa, received Doctors Hospital's financial statements on an annual basis. (Tr. I: 132) Nomura conducted due diligence of Doctors Hospital prior to the Nomura Loan, at a time when the Daiwa Loan was in place. (Tr. I: 130–31.) In that context Nomura reviewed Doctors Hospital's books and records. *Id.*

141. The Trust admitted the following allegation by plaintiff in its answer to the complaint:

> The substance of these lockbox agreements was to provide a mechanism through the HPCH Lease, described below, whereby all loan proceeds that Doctors Hospital and/or MMA Funding was entitled to borrow under the A/R Securitization Program were sent by Daiwa directly to a lockbox controlled by Nomura. Nomura was authorized under these agreements *to deduct from Doctors Hospital's loan proceeds* all amounts owed to Nomura by HPCH, including principal and interest and other reserves and payments due under the loan.

(Jt. Ex. 142 at 14–15, 55; emphasis added.)

### Transfer of Loan from Nomura to the Trust

142. On October 24, 1997, pursuant to the terms of a certain Mortgage Loan Purchase and Sale Agreement, Nomura sold and transferred all title, rights, and obligations relating to the Nomura Loan to Asset Securitization Corporation ("ASC"), a Delaware corporation with its principal place of business in New York, New York. (Jt. Ex. 135, Stipulated Facts 37.)

143. In the PSA, ASC as "depositor" sold to LaSalle as "Trustee" all of ASC's "right title and interest in and to [the Nomura Loan]...." (Jt.Ex.202, 106.)

144. The PSA provides for sale of the Nomura Loan and other loans "to the Trustee." (Jt.Ex.23, Sec.2.01.)

145. Section 1.01 of the PSA originally named AMRESCO Services, L.P., as the Special Servicer. (Jt.Ex.202, 108.)

146. The PSA sets forth the duties of the loan servicer in servicing and administering the subject loans, including the Nomura Loan. (Jt. Ex. 23, Secs. 3.01 *et seq.*) The PSA specifically provides that the servicer shall service the loans solely in the best interests of and for the benefit of the Trust's certificate holders. *Id.* at 56.

147. ORIX Capital Markets, LLC is the successor-in-interest to AMRESCO Management, Inc., in its role as Special Servicer under the PSA. (Jt.Ex.202, 109.)

148. In 2002 and 2003, Orix invested approximately $85 to $90 million in the Trust. As of February 2004 the Trust owned $171 million in securities of the Trust. (Pl.Ex. 39 (Wurst) at 99–105; Jt. Ex. 151 at 50.)

### Relationship Between the Trust and Nomura

149. On October 24, 1997, Nomura and Asset Securitization Corporation ("ASC") entered a Mortgage Loan Purchase and Sale Agreement ("MLPSA"). (Jt.Ex.202, ¶ 100.)

150. Under Section 1 of the MLPSA, Nomura sold and transferred all of its right, title and interests in and to the Nomura Loan, along with numerous other mortgage loans, to ASC. (Jt.Ex.202, ¶ 101.)

151. Section 1 of the MLPSA also consummated the purchase for value as represented by a cash "purchase price" from ASC to Nomura. (Jt.Ex.202, ¶ 102.)

152. Nomura represented and warranted to ASC in Section 2(b)(iv) of the

MLPSA that to the best of Nomura's knowledge "there is no valid defense, counterclaim, or right of set-off or abatement available to [HPCH] with respect to the Note, Mortgage and other agreements." (Jt.Ex.202, ¶ 103.)

153. Section 2(b)(x) of the MLPSA also contains a representation by Nomura to ASC that Nomura had "no knowledge that the representations and warranties made by each related Borrower in such Mortgage Loan are not true in any material respect." (Jt.Ex.202, ¶ 104.)

154. Contemporaneously with the execution of the MLPSA on October 24, 1997 ASC, LaSalle National Bank and others entered into a Pooling and Servicing Agreement. (Jt.Ex.202, ¶ 105.)

155. In Section 2.01 of the PSA, ASC as "Depositor" sold to LaSalle as "Trustee" all of ASC's "right, title and interest ... in and to [the Nomura Loan]" along with all of the various other mortgage loans. (Jt.Ex.202, ¶ 106.)

156. In the PSA, ASC specifically warranted that all of the representations and warranties of Nomura contained in the MLPSA were "true and correct." (Jt.Ex.202, ¶ 107.)

157. Section 1.01 of the PSA originally named AMRESCO Services, L.P. as the Special Servicer of the REMIC trust. (Jt.Ex. 202, ¶ 108.)

158. ORIX Capital Markets, LLC is the successor-in-interest to AMRESCO Management, Inc. in its role as Special Servicer under the PSA. (Jt.Ex.202, ¶ 109.)

### Flow of Cash After the Daiwa Loan and Before the Nomura Loan

159. After the Daiwa Loan in April 1997, repayments on the Daiwa Loan moved through a series of lockboxes and bank accounts. This movement of cash was initially governed by a Depositary Agreement among MMA, MMA Funding, Daiwa, and Grand National Bank. Cash originating from Medicare and Medicaid first went to a joint Doctors Hospital–Daiwa account, # 6700010129 at Grand National Bank. These receipts were then swept to another account at Grand National Bank, # 6700010022 in the name of Daiwa only. The latter account also received cash from originating payments made by insurance companies such as Blue Cross and Blue Shield. From account # 6700010022, the funds were swept to another Daiwa Account at the Bank of New York. The Bank of New York account received not only the cash described above, but also funds related to Daiwa's financing arrangements with many other borrowers. (Jt.Ex.202, 110.)

160. Daiwa credited certain funds deposited into the Daiwa Account at the Bank of New York to the debt under the Daiwa Loan. (Jt.Ex.202, ¶ 111.)

161. Daiwa forwarded to an account titled in the name of MMA Funding ("The MMA Funding Account") new borrowings as dictated by the Daiwa Loan agreement. (Jt.Ex.202, ¶ 112.)

162. The cash flow described above is reflected in the diagram below:

### Cash Flow After the Nomura Loan and up to July 7, 1998

163. The Nomura Loan Documents called for the creation of additional restricted bank accounts and other significant changes in the way that cash flowed through the accounts. These changes were not implemented, however, until July 1998. (Jt.Ex.202, ¶ 114.)

164. Upon the execution of the Nomura Loan, Doctors Hospital began making direct transfers from its general account to the Trust. These payments were used to service HPCH's debt and other obligations under the Nomura Loan until July 1998. The payments went from Doctors Hospital Account # 6111100385 at Grand National Bank to account # 677802001, titled HPCH Cash Collateral Account, at La-Salle National Bank, an account that was set up in connection with the Nomura Loan. This account is often referred to as the "Cash Collateral Account." (Jt.Ex.202, ¶ 115.)

165. The cash flow from August 28, 1997 up to July 7, 1998, can be represented as follows:

166. The parties executed four documents for the purpose of integrating the Nomura Loan transaction into the pre-existing Daiwa Loan: (1) the Intercreditor Agreement (Jt.Ex.12), (2) the Cash Collateral Agreement (Jt.Ex.13), (3) the Collection Account Agreement (Jt.Ex.14), and (4) the Payment Direction Letter (Jt.Ex.92) (collectively the "Cash Flow Agreements").

167. The Cash Flow Agreements required that two new bank accounts be established: (1) the Cash Collateral Account, and (2) the Collection Account.

168. The Cash Collateral Account, Account No. 677802001, was governed by the Cash Collateral Account Agreement. LaSalle National Bank acted as Cash Collateral Account Bank. (Jt.Ex.13.)

169. The Collection Account, Account No. 6700021493, was maintained at Grand National Bank in Northwood, Illinois. The monies deposited into the Collection Account were "Receipts" as defined in the Collection Account Agreement. (Jt.Ex.14, ¶2(c).) These were checks or wires received by Grand National Bank for deposit in the Collection Account.

170. Plaintiff's witness, Carrie Widman ("Widman"), an employee of American Express Tax Business Services, testified that she considered LaSalle Bank's role with respect to the Cash Collateral Account to be that of "cash management agent." (Tr. V, p. 41.)

171. Robinson testified that the Lease was the main document which required the Daiwa Loans to be deposited in a Cash Collateral Account. (Tr. I, p. 86.)

172. Under Section 3(b) of the Cash Collateral Account Agreement, LaSalle Bank (as Cash Collateral Account Bank) was required to create several sub-accounts. These sub-accounts were documented by LaSalle Bank on a "ledger basis." (Jt.Ex.12, ¶3(b).) The sub-accounts were not separate accounts with separate account numbers. Rather, they allowed for provisional allocations to be made within the Cash Collateral Account. (See Tr. V, p. 30; D. Ex. 41 (Severyn) at p. 17.)

173. Widman prepared calculations of funds flowing into and out of the Cash Collateral Account. (Jt.Ex.158.) The spreadsheet in Widman's calculations entitled (in the lower right hand corner) "cash flow" calculates by month all funds received by the Cash Collateral Account (on the left side of the dark bar) and the allocation of such funds into the sub-accounts (on the right side of the dark bar) required by the Cash Collateral Account Agreement.

174. Disbursements out of the sub-accounts were governed by Section 3(c) of the Cash Collateral Account Agreement.

(Jt.Ex.12, ¶ 3(c).) Disbursements were to be made pursuant to written payment instructions in the form attached to the Cash Collateral Account Agreement. (Jt.Ex.13, ¶ 3(c).)

*Debtor's Representatives' Attempted Analysis of the Nomura Loan Documents after AMRESCO's Rejection of Written Request to Modify Agreements*

175. When the Nomura Loan was closed in August 1997, "Team Y" at AMRESCO, the predecessor to ORIX as special servicer, serviced two Nomura securitization portfolios, including D5, the pool into which the Nomura Loan was transferred. (Def.Ex.36, (Brown) p. 8.)

176. On November 7, 1997, Robinson wrote to John Depa ("Depa") at KPMG, and stated that the Nomura Loan had a "fairly pervasive impact" on the flow of cash that he had "not yet focused a lot of attention on." (Jt.Ex.83.) Robinson further observed that he was still "trying to figure out [how] to live within the confines of the agreements." *Id.* Robinson requested that KPMG look at the Nomura closing documents, since he was "particularly baffled" by the central cash management aspects of the agreements between Nomura and Daiwa. *Id.* Robinson requested a meeting with KPMG to figure out what the agreements meant so they could then talk with the attorneys, Nomura, or Daiwa to clarify matters. *Id.*

177. Robinson and Depa from KPMG believed that the Nomura documents were extremely complex and difficult to interpret, and that both of them were very concerned that the documents had very specific cash management procedures which were not being currently followed. (Jt.Ex.84.)

178. Robinson and Depa believed that it was "virtually impossible" to stay in compliance with the cash management procedures required by the Intercreditor Agreement which, in addition to the Daiwa bank accounts, made the cash management "so complex, cumbersome and time-consuming that it would severely restrict our ability to manage cash internally." (Jt.Ex.99.)

179. In November 1997, Depa suggested that the best resolution was to amend or simplify the agreements, but Robinson was "skeptical" of Nomura's willingness to do this, particularly in light of Nomura's intention to deposit the Nomura Loan into a pool. (Jt.Ex.99.)

180. Depa, on behalf of KPMG then concluded that the most "prudent business approach" would be to have a meeting between HPCH and Nomura to discuss a "Clarification Amendment" to the various documents, resulting in a simplified document containing all the compliance steps required, while at the same time maintaining or enhancing Nomura's security interests. (Jt.Ex.100.)

181. Depa specifically suggested that such an agreement would eliminate the "very complex cash transfer process" and would simply require that the loan be repaid from the cash proceeds of the Debtor, with a required monthly transfer of cash from the Debtor to HPCH. (Jt.Ex.100.)

182. On February 23, 1998, Victor Brown ("Brown") became the new cash management analyst at AMRESCO. (Jt.Ex.38.)

183. On March 23, 1998, Robinson and Depa met with AMRESCO to "discuss the Loan Agreement and possible modifications." (Jt.Ex.55.) Robinson summarized the results of that meeting and stated that "AMRESCO made no commitments to modifications pending a review of the situation by their attorneys." *Id.* To address Nomura's concerns, Robinson sought information related to capital expenditures from September 1, 1997 to March 1998,

and information on property tax and insurance payments, so this information could be forwarded to AMRESCO. *Id.*

184. On April 1, 1998, Robinson provided Brown information as to the insurance and property tax amounts, and when they needed to be paid. (Jt.Ex.34.)

185. In early April 1998, AMRESCO required that a payment of $482,000 be made to make up for the January, February, and March 1998 payments into the capital reserve sub account of the Cash Collateral Account. (Jt.Exs.35, 50.)

186. Based on the March 23, 1998 meeting with AMRESCO, Robinson requested from AMRESCO a "consent to amendment of the Loan Agreement between HPCH, LLC and Nomura Asset Capital Corporation," and submitted therewith a formal written request for such an amendment. (Jt.Ex.199.) The formal request for amendment to the Nomura Loan sought, on behalf of HPCH, that the cash management system be amended such that HPCH would post an irrevocable letter of credit in an amount equal to the debt service, basic carrying costs and capital reserves for one interest accrual period, but if there was a default in the Nomura Loan, or a termination of the Daiwa Loan, Daiwa would then remit to the Debtor and/or MMA Funding the receivables proceeds, and at that time the Debtor would directly deposit the debt service, basic carrying costs, and capital reserve payments to the Collection Account or Cash Collateral Account, as directed by the servicer, on or before each payment date. *Id.* Robinson further sought to eliminate the required audited financial information from HPCH, such that only the audited financials from the Debtor need be provided to AMRESCO. *Id.*

187. AMRESCO rejected the request for amendment of the Nomura Loan documents and Intercreditor Agreement (Tr. II, p. 39), and responded by giving written notice to both HPCH and Daiwa that they were not complying with the terms of either the Nomura Loan or the Intercreditor Agreement. (Jt.Exs.43, 44.) The notice stated, "[T]his letter serves as formal notice and demand from AMRESCO Services, L.P., as the authorized agent of Lender, for Daiwa to immediately comply with all provisions of the Agreement ..." *Id.*

188. AMRESCO then advised Robinson in June 1998 as to what was required with the various bank accounts and flows of cash to be in conformance with the Nomura Loan documents and the Intercreditor Agreement. (Jt.Ex.45.) Robinson was advised of all of the appropriate account numbers, and that a person at LaSalle Bank would be able to assist Robinson as to how all of the sweeps from the accounts from Grand National to LaSalle Bank, as well as from Daiwa to LaSalle Bank, were to take place, effective immediately. *Id.*

189. Robinson then confirmed the process for compliance with the Nomura Loan documents with Felbinger, CFO of the Debtor, including that all funds would flow into the Cash Collateral Account on the 11th of each month, and that LaSalle would then fill the debt service, capital and operating expense "buckets" in the required amounts. (Jt.Ex.56.) After the monthly buckets were filled, all excess cash would be forwarded to the Debtor's operating account. *Id.* Robinson provided a breakdown of the funding requirements for principal and interest, capital improvement reserves, and the tax and insurance escrow reserve. *Id.*

### Cash Flow After July 7, 1998

190. After July 7, 1998, money flows adhered to the terms of the Nomura Loan transaction documents. One change was the use of Grand National Bank Account # 6700021493 titled in the name of Nomura as mortgagee of HPCH (the "Nomura

Collection Account"). The Nomura Collection Account received miscellaneous receipts of Doctors Hospital that were not part of the Daiwa receivables borrowing base. These transfers from the Nomura Collection Account to the Cash Collateral Account were dictated by a Collection Account Agreement among Grand National Bank, HPCH, Doctors Hospital and Nomura. The Collection Account Agreement was one of the Nomura Loan Documents. (Jt.Ex.202, ¶ 117.)

191. Section 3 of the Cash Collateral Account Agreement provides: "Daiwa has been instructed by [Doctors Hospital], [MMA Funding] and [Nomura] to deposit all [new borrowings under the Daiwa Loan] directly into the [Nomura Account]." (Jt.Ex.202, ¶ 118.)

192. After July 7, 1998, where previously the borrowings from Daiwa had gone directly from Daiwa's account at the Bank of New York to the MMA Funding Account and then to Doctor's Hospital, now the borrowings from Daiwa were routed, pursuant to the Intercreditor Agreement between Daiwa and Nomura, to the Nomura Cash Collateral Account. Before reaching the Nomura Cash Collateral Account, the funds were routed through LaSalle National Bank Account # 2090067, which was a general ledger account that received all cash coming into LaSalle National Bank's Trust Department. The Nomura Cash Collateral Account thus received new borrowings under the Daiwa Loan as well as Doctors Hospital's receipts that had been deposited in the Nomura Collection Account. Each month the Trust took from the funds in the Nomura Cash Collateral Account amounts sufficient to fund reserve accounts for capital improvements, taxes and insurance, and the debt service on the Nomura Loan (the "Reserve Accounts"). Funds representing the debt service payments were forwarded to the Trust's bondholders. After payment of expenses and funding of the Reserve Accounts, the remainder of the funds in the Nomura Cash Collateral Account were then sent to Doctors Hospital's general operating account (Account # 6111100385). In addition, the Daiwa Loan advances were no longer sent through the MMA Funding account. In summary, where Doctors Hospital had, between August 1997 and July 1998, made transfers directly to the Nomura Cash Collateral Account and the Trust accepted them as payments on the Nomura Loan, from July 1998 the Trust took payments owed it by HPCH from the deposits made into the Nomura Cash Collateral Account and applied them to the Reserve Accounts. (Jt.Ex.202, ¶ 119.)

193. Funds forwarded to Doctors Hospital from the Nomura Cash Collateral Account were used to fund Doctors Hospital's operations. (Jt.Ex.202, ¶ 120.)

194. The flow of cash after July 7, 1998 is reflected in the following diagram:

195. Section 2.12 of the loan agreement between HPCH and Nomura dictates the creation of the Cash Collateral Account and the creation of the Reserve Accounts. (Jt.Ex.11.)

196. Column 9 in Widman's "cash flow" spreadsheet is entitled "debt service." This column-title reflects Widman's own words. (Tr. V, p. 48.)

197. Column 5 in Widman's "cash flow" spreadsheet is entitled "MMA Funding." This column-title reflects Widman own words. (Tr. V, p. 45.)

198. In the post July 1998 timeframe, the flow of funds operated exactly as required under the Cash Flow Agreements. Pursuant to the Intercreditor Agreement and the Payment Direction Letter, all advances under the Daiwa Loan Agreement were paid into the Cash Collateral Account.

199. At trial, Plaintiff offered no expert testimony concerning "ownership" of the funds advanced into the Cash Collateral Account by Daiwa. Widman testified that she did not have an opinion on that question. (Tr. V, pp. 43, 76.)

200. Widman testified that her demonstrative "damages" exhibit did not subtract out "capital reserve sub-account" payments. (Tr. V, pp. 58, 60.) She testified that she had no evidence that Defendant or the Certificateholders ever received any of the money in the "capital reserve sub-account." (Tr. V, p. 60.)

201. At trial, Plaintiff offered no expert testimony concerning "ownership" of the funds advanced into the Cash Collateral Account by Daiwa. Widman testified that she did not have an opinion on that question. (Tr. V, pp. 43, 76.)

202. Section 6 of the Collection Account Agreement, which relates to the governance of the Nomura Collection Account, provides:

[Grand National Bank] and [HPCH] each acknowledge and agree that the accounts maintained hereunder are subject to the sole dominion, control and discretion of [Nomura] and its authorized agents or Designees and the Borrower shall have no right to close any such account or right of withdrawal with respect to any such account except with the prior written consent of the Lender; *provided,* however, that Borrower shall have the right to receive funds from the Security Deposit Account in accordance with Section 2(k).

(Jt.Ex.202, ¶ 122.)

203. Section 6 of the Cash Collateral Account Agreement, which relates to the governance of the Nomura Cash Collateral Account, provides:

(a) [LaSalle National Bank] and [HPCH] each acknowledge and agree that the accounts maintained hereunder are subject to the sole dominion, control and discretion of [Nomura] (which may be exercised through its Designee) and the Borrower shall have no right to close such accounts or right of withdrawal with respect to any such accounts or right to give directions with respect to any such accounts except with the prior written consent of the Lender, but the Borrower shall be entitled to request and receive any information about the Cash Collateral Account that it shall reasonably request from time to time.

(Jt.Ex.202, ¶ 123.)

204. The Trust had a right to access Doctors Hospital's cash flow only because of the terms of the Nomura transaction documents described above. (Jt. Ex. 89, 2; Jt. Ex. 11, secs. 2.5, 2.8, 2.12, 2.13; Jt. Ex. 18, ¶ 2.1; Jt. Ex. 14, secs. 2, 7; Jt. Ex. 13, secs. 2, 3, 6, 7, 8; Jt. Ex. 12, 3, 4; Jt. Ex. 92; Jt. Ex. 89.) Absent a default under the Nomura Loan documents, Doctors Hospital had no obligation to make debt service payments or other payments under

the terms of the Nomura Loan transaction documents. (Jt.Ex.11, secs.2.5, 2.8.) HPCH had no source of income other than the Lease payments from Doctors Hospital. (Pl.Ex. 39 (Wurst) at 44; Tr. I: 98; Jt. Ex 202, 74.)

205. The agreement that established the account specifically provides that a cash collateral account shall be established in the name of "Nomura Asset Capital Corporation as Mortgagee of HPCH, LLC." (Jt.Ex.13, Sec.3(a).) An account in Nomura's name was in fact opened. (Jt.Ex.113.) The Cash Collateral Account Agreement further provided that "the accounts maintained hereunder are subject to the sole dominion, control and discretion of [Nomura]...." (Jt.Ex.13, Sec.6.) The agreement also provides that Nomura had "the sole right to make withdrawals from the Cash Collateral Account." Id., Sec. 2. The Loan Agreement between Nomura and HPCH provides: "The cash collateral account shall be under the sole dominion and control of the Lender." (Jt. Ex. 11 at 43.) In its answer to the complaint, the Trust admitted that the Daiwa borrowings "were sent by Daiwa directly to a lockbox controlled by Nomura." (Jt.Ex.142, 55.) The LaSalle Bank officer responsible for oversight of the Cash Collateral Account confirmed that the Trust alone controlled the account. (Pl.Ex. 32 (Severyn) at 30–31, 35; 39–41.)

206. At no point in the flow of cash to the Cash Collateral Account did HPCH have dominion and control of the funds. (Jt. Ex. 11, sec. 2.12; Jt. Ex. 14, secs.2, 6, 7, 8, 16; Jt. Ex. 13, secs. 2, 3, 6, 7, 8; Jt. Ex. 92; Jt. Ex. 89, 2; Jt. Ex. 12, 3.)

207. Disbursements out of the Cash Collateral Account were documented by AMRESCO, as predecessor to ORIX. (Jt.Ex.46.) When disbursements were made, AMRESCO would complete a form indicating the amount of the transfer and the payee of the transfer (the "Disbursement Form"). Id.

208. Gary Severyn, an employee of LaSalle Bank in 2000 who was familiar with the dictates of the Cash Collateral Account, testified that the Cash Collateral Account was created to "trap" cash from HPCH and advances from Daiwa before it was disbursed out, to allow for the management of cash in accordance with the Cash Collateral Account Agreement. (Def.Ex.41, (Severyn), pp. 21–22.)

209. The Cash Collateral Account Agreement would dictate what amounts needed to be placed in each of these reserve sub-accounts. As cash came into the Cash Collateral Account, the waterfall was created so that each of the sub-accounts were first satisfied and, after the dictated amount was filled in each sub-account, all excess funds were distributed out to the Debtor. (Def.Ex.36, (Brown), pp. 53–54, 72.)

210. After the sub-accounts were filled, all excess funds would automatically be paid to Doctors Hospital. There was no separate instruction required for that payment to be made to the Debtor. (Def.Ex.41, (Severyn), p. 44.)

211. Felbinger, CFO of the Debtor, testified that as to the capital reserve sub-account, Doctors Hospital would try to time the payments to vendors for capital improvements so that they could request that the monies from the capital reserve sub-account be paid directly to the vendor, instead of Doctors Hospital having to "front" the money. (Dep. Richard Felbinger, Def. Ex. 38, p. 34.)

### Amounts of Transfers to LaSalle

212. The chart on the following page lists the month and year of the debt service payments in issue.

Doctors Hospital of Hyde Park ("DHHP")
Plaintiff's Calculation of Damages (Excluding Attorneys' Fees and Costs)

| Month | (1) Debt Service Payment [a] | (2) Net Fair Market Rent ("FMR") [b] | (3) Debt Service Payments in Excess of Net Fair Market Rent (a)-(b) | (4) Unused and Unapplied Reserve Funds Not Returned to DHHP [c] | (5) Interest from Time of Transfer to Filing of Complaint (April 15, 2002) [d] | (6) Interest from Filing of Complaint (April 15, 2002) to Trial Date (March 30, 2006) [e] | (7) |
|---|---|---|---|---|---|---|---|
| Aug-97 | $ - | $ - | $ - | $ - | $ - | $ - | |
| Sep-97 | - | - | - | - | - | - | |
| Oct-97 | 471,630.19 | 175,833.33 | 295,796.86 | | 112,143.45 | 58,200.26 | |
| Nov-97 | 472,354.46 | 175,833.33 | 296,521.13 | | 110,346.48 | 58,342.77 | |
| Dec-97 | 472,461.45 | 175,833.33 | 296,628.12 | | 108,244.88 | 58,303.82 | |
| Jan-98 | 472,487.96 | 175,833.33 | 296,654.63 | | 106,112.95 | 58,369.03 | |
| Feb-98 | 472,486.98 | 175,833.33 | 296,653.65 | | 104,178.26 | 58,368.84 | |
| Mar-98 | 472,403.17 | 175,833.33 | 296,569.84 | | 102,007.84 | 58,352.35 | |
| Apr-98 | 472,484.30 | 175,833.33 | 296,650.97 | | 99,963.25 | 58,368.31 | |
| May-98 | 472,455.77 | 175,833.33 | 296,622.44 | | 97,812.26 | 58,362.70 | |
| Jun-98 | 472,482.04 | 175,833.33 | 296,648.71 | | 95,748.45 | 58,367.87 | |
| Jul-98 | 472,453.57 | 175,833.33 | 296,620.24 | | 93,597.91 | 58,362.27 | |
| Aug-98 | 472,479.75 | 175,833.33 | 296,646.42 | | 91,464.62 | 58,367.42 | |
| Sep-98 | 472,478.70 | 175,833.33 | 296,645.37 | | 89,391.85 | 58,367.21 | |
| Total FY 1998 | 5,668,658.34 | 2,110,000.00 | 3,558,658.34 | - | 1,211,012.22 | 700,192.84 | |
| Oct-98 | 472,450.30 | 181,108.33 | 291,341.97 | | 79,641.72 | 57,323.73 | |
| Nov-98 | 472,476.35 | 181,108.33 | 291,368.02 | | 77,756.94 | 57,328.85 | |
| Dec-98 | 472,448.01 | 181,108.33 | 291,339.68 | | 75,794.61 | 57,323.28 | |
| Jan-99 | 472,473.96 | 181,108.33 | 291,365.63 | | 73,846.42 | 57,325.38 | |
| Feb-99 | 472,472.86 | 181,108.33 | 291,364.53 | | 72,080.39 | 57,328.17 | |
| Mar-99 | 472,390.32 | 181,108.33 | 291,281.99 | | 70,105.59 | 57,311.93 | |
| Apr-99 | 472,469.96 | 181,108.33 | 291,361.63 | | 68,232.90 | 57,327.60 | |
| May-99 | 472,441.78 | 181,108.33 | 291,333.45 | | 66,271.57 | 57,322.05 | |
| Jun-99 | 472,467.47 | 181,108.33 | 291,359.14 | | 64,385.58 | 57,327.11 | |
| Jul-99 | 472,439.35 | 181,108.33 | 291,331.02 | | 62,424.65 | 57,321.57 | |
| Aug-99 | 472,464.93 | 181,108.33 | 291,356.60 | | 60,475.25 | 57,326.61 | |
| Sep-99 | 472,463.76 | 181,108.33 | 291,355.43 | | 58,583.19 | 57,326.38 | |
| Total FY 1999 | 5,669,459.05 | 2,173,300.00 | 3,496,159.05 | - | 829,598.83 | 687,895.63 | |
| Oct-99 | 472,435.73 | 186,541.58 | 285,894.15 | | 60,420.16 | 56,251.83 | |
| Nov-99 | 472,461.17 | 186,541.58 | 285,919.59 | | 58,405.87 | 56,256.83 | |
| Dec-99 | 472,433.20 | 186,541.58 | 285,891.62 | | 56,315.40 | 56,251.33 | |
| Jan-00 | 472,458.53 | 186,541.58 | 285,916.95 | | 54,234.45 | 56,256.31 | |
| Feb-00 | 472,457.10 | 186,541.58 | 285,915.72 | | 52,282.86 | 56,256.07 | |
| Mar-00 | 472,402.79 | 186,541.58 | 285,861.21 | | 50,187.36 | 56,245.35 | |
| 4/1/00 - 4/16/00 (Pre-petition) | 472,454.38 | 99,488.84 | 372,965.54 | | 64,075.48 | 71,383.78 | |
| 4/17/00 - 4/30/00 (Post-petition) | | 87,052.74 | (87,052.74) | | (14,668.84) | (17,128.28) | |
| May-00 | 472,426.57 | 186,541.58 | 285,884.99 | | 46,087.40 | 56,250.03 | |
| | 1,779,529.67 | 1,492,332.67 | 2,287,197.00 | - | 427,341.15 | 450,023.24 | |
| Balance at May 31, 2000 | | | | 761,395.08 | 122,744.19 | 149,810.22 | |
| Disbursements to DHHP Mar-01 thru Aug-01 | | | | (19,597.60) | (1,757.23) | (3,855.98) | |
| | | | | 741,797.48 | 120,986.96 | 145,954.24 | |
| Total | $ 15,117,047.06 | $ 5,775,632.67 | $ 9,342,014.39 | $ 741,797.48 | $ 2,588,939.16 | $ 1,984,065.96 | |

Notes:

(1) This schedule provides for the plaintiff's calculation of actual damages, excluding attorneys' fees and costs, resulting from payments made to the Trust in excess of the fair market rent ("FMR"). FMR amounts have been excluded in August and September 1997, as transfers to Trust didn't begin until October 1997, except for $11,451 contributed by HPCH at loan closing. Additionally, FMR amounts have been excluded subsequent to May 2000, due to the lease rejection on May 31, 2000.

(2) Sources

(a) Data obtained from Expert Report of Carrie R. Widman, dated February 4, 2005, re Flow of Funds to and from HPCH, LLC Cash Collateral LaSalle Account #677802001

(b) Annual fair market rent ("FMR") of $2,110,000 at August 1, 1997 per Integra report dated February 2, 2005. Net rent excludes passthrough items such as capital improvements, taxes, and insurance. For this analysis, assumed 3% increase in FMR each fiscal year.

(c) Represents balance in the HPCH, LLC Cash Collateral (LaSalle Account #677802001) as of May 31, 2000 ($761,395.08) less amounts subsequently disbursed to DHHP ($19,597.60), totaling $741,797.48. Data obtained from Expert Report of Carrie R. Widman, dated February 4, 2005

(d) Interest was calculated based on the number of days from the end of month (or period) to April 15, 2002, the Filing of Complaint. Interest was calculated using an average of the monthly Prime Rates for each of the fiscal years ("FY") or periods presented. The monthly Prime Rates, provided by the Federal Reserve Board, were obtained from the website www.nfsn.com/library/prime.htm.

Average Prime Rate used were as follows:

| | | | |
|---|---|---|---|
| Aug-Sept 1997 | 8.50% | Oct 1999 to May 2000 | 8.59% |
| FY September 1998 | 8.50% | June to Dec 2000 | 9.50% |
| FY September 1999 | 7.90% | Jan to Dec 2001 | 7.13% |

(e) An interest rate of 4.97% was calculated using the average monthly Prime Rates (see 2(d)) for the period April 2002 to March 2006.

213. From October 1997 through June 1998 Doctors Hospital made transfers from its general operating account to the Nomura Cash Collateral Account in various amounts totaling $4,922,486. (Jt.Ex.202, ¶ 124.)

214. In May 1998, Doctors Hospital caused $801,926.62 to be transferred to the Nomura Cash Collateral Account. (Jt.Ex.202, ¶ 125.)

215. From July 1998 through April 2000, Doctors Hospital caused the transfer of $3,712,818.46 in receipts from its ac-

counts receivable from Grand National Bank account # 6700021493 to the Nomura Cash Collateral Account. (Jt.Ex.202, ¶ 126.)

216. From July 1998 through April 2000, $80,938,402.35 was transferred from Daiwa's Bank of New York account # 205779, through the LaSalle Bank general ledger account, to the Nomura Cash Collateral Account. (Jt.Ex.202, ¶ 127.)

217. From July 1998 through April 2000, the Trust retained $23,771,082 of the funds sent to the Nomura Cash Collateral Account. (Jt.Ex.202, ¶ 128.)

218. Of the $23,771,082 retained by the Trust, $3,323,446 was deposited in the reserve account for basic carrying costs, $15,092,166 was deposited in the reserve account for debt service, and $4,816,445 was deposited in the reserve account for capital reserve. An additional $482,000 went to the capital reserve account in April 1998. The remainder of the funds were taken for cash management fees ($24,878), an environmental holdback ($31,451), and surveillance fees ($695). (Jt.Ex.202, ¶ 129.)

219. As of the date of each alleged transfer to Defendant, a creditor or creditors of Doctors Hospital had allowable claims against it. (Jt.Ex.202, ¶ 130.)

220. There are no allegations of intentional wrongdoing by Defendant in this case.

### EVIDENCE RELATED TO SOLVENCY ISSUES

#### Insolvency Experts

221. Michael Lane ("Lane"), one of plaintiff's insolvency experts, is an expert in the healthcare industry, healthcare financing (including receivables financing), Medicare/Medicaid (including Medicare/Medicaid reimbursement), and the Chicago metropolitan area healthcare market. (Tr. III: 49–50, 61–62.) Lane, who now leads the healthcare corporate restructuring practice at Navigant Capital Advisors, has over 25 years of experience in banking and accounting aspects of healthcare. *Id.* at 22–49. He also has become intimately familiar with Doctors Hospital during the course of his work with its creditors committee and counsel since August 2000. (Tr. III: 64–67.)

222. Thomas Blake ("Blake") of Charles River Associates ("CRA") the Trust's insolvency expert, is not a healthcare expert. (Tr. VI: 119.) Blake testified that he had assistance from Rene Prew, who he described as a "healthcare specialist" at his firm. *Id.* at 42. She conducted healthcare audits at Arthur Andersen for five years, was an accounting manager for Mercy Hospital in Chicago for nine years, and since 2000 has performed consulting work for Blake's firm. *Id.* at 126–27.

#### Representations and Warranties of Solvency

223. On August 28, 1997, in connection with the Guaranty, Debtor specifically warranted that it was solvent in Section 3.15 of the Operator Security and Pledge Agreement, and in Section 4(J) of the Equity Pledge Agreement. (Jt.Ex.18, 19.) Then, on February 25, 1999, Debtor ratified its continued solvency in the amendment to the Contribution Agreement by warranting that the express solvency representation it had made in Exhibit III of the Contribution Agreement was "correct on and as of the date hereof…" (Jt.Ex. 5, 6.)

224. In addition, the Debtor also represented its solvency on March 22, 1999 in a settlement agreement entered into with the United States. (Jt.Ex.161, p. 14.)

#### Financial Performance as Disclosed by Audited Financials

225. From its incorporation in 1992 through 1999, the Debtor prepared annual

financial statements that were audited by KPMG. (Jt.Ex.28.) These audited financial statements contain yearly comparative balance sheet, income statement, and cash flow data in dollars, percentages, and ratios. *Id.*

226. The Debtor reported increases in revenues from $29.4 million in 1993 to $68.1 million in 1996. (Jt. Ex. 28, Ex. 31 at p. 3.) Reported revenues in 1997 were $68.5 million. *Id.*

227. In 1997, the reported net income reflected a $7.4 million management fee that was actually a distribution to the owner. *Id.*

228. In its startup year of fiscal 1993, the Debtor had an operating cash flow deficit of $.6 million. (Jt.Ex.31, p. 3.)

229. Total liabilities of the Debtor increased with the size of the business from $6.9 million in 1993 to $12.6 million in 1996. (Jt.Ex.28.) In 1997, liabilities as listed on the audited financials increased to a total of $25 million as a result of the Daiwa Loan. (Jt. Ex. 28, Ex. 31 at p. 3.) Total liabilities increased very slightly in 1998 to $25.5 million. *Id.*

230. KPMG's audited financials of Doctors Hospital for the years ending September 30, 1997 and 1998 did not contain any going concern qualifications. (Jt.Ex.37.)

### Proceeds of Daiwa Facility

231. Approximately $7.9 million was funded upon closing of the Daiwa Loan in March 1997. (Jt. Ex. 61; Jt. Ex. 31, page 3.) Approximately $1.4 million of the $7.9 million initial funding was used to provide capital for Debtor's operations. (Jt. Ex. 202, ¶ 61; Jt. Ex. 37; Ex. 31, page 3.)

### Financial Performance After Daiwa and Nomura Transactions

232. After the Daiwa and Nomura loans were consummated on March 31, 1997 and August 28, 1997, the Debtor continued in operation for about three years before filing for bankruptcy on April 17, 2000. (Jt. Ex. 202, ¶ 20; ¶¶ 70–84.)

233. Doctors Hospital never defaulted on any payments under the Daiwa loan or the HPCH Lease. Some initial capital contributions due under the Nomura Transaction were inadvertently not paid, but were made up in May 1998. (Tr. II, pp. 70–71; Tr. IV, p. 206.)

234. There was a renewal of the Daiwa Loan between MMA Funding and Daiwa in February 1999 for two more years. (Jt. Ex. 4, 28, 31 at p. 3.)

235. From 1997 to 1998, the Debtor's gross and net incomes improved. (Tr. IV, pp. 207–09.)

236. Doctors Hospital's audited financials showed a revenue increase of over $2.6 million from 1997 to 1998. (Jt.Exs.28, 37.)

237. Robinson also testified that from December 1999 to the bankruptcy filing, Doctors Hospital made a net operating profit. (Tr. II, pp. 32–34; 99–100.)

238. In 1997 Doctors Hospital's accounts payable days outstanding were significantly below (better than) the CHIPS–Urban hospital data for that period. (Jt. Ex. 159; Tr. III, pp. 153–56.)

239. Doctors Hospital's days receivables outstanding were less (better) than the 1997 RMA and CHIPS–Urban averages. (Jt. Ex. 159; Tr. III, pp. 153–56.)

240. Robinson, CFO of Medical Management of America, Inc., who provided financial advices and oversight for Desnick's companies, including the Debtor, testified (and the audited financials confirmed), that Doctors Hospital had an operating profit in 1997, actually improved its financial condition in 1998, and was turning an operating profit during the last three months prior to the bankruptcy filing. (Jt. Ex. 28; Tr. II, pp. 77, 99–100.)

241. In 1998, Doctors Hospital's daily receivables outstanding were better than the RMA and CHIPS–Urban averages. (Jt. Ex. 159; Tr. III, pp. 155–56.)

242. Of the eight hospitals within a five mile radius of Doctors Hospital, in 1997 and 1998 Doctors Hospital had better occupancy rates than five of those eight. (Jt.Ex.159, p. 9.)

243. Doctors Hospital had an occupancy rate of 64% in 1997, which was better than its closest competitors and better than the 61% average rate of occupancy for Chicago, Illinois hospitals. (Tr. III, pp. 145–46.)

244. As of September 30, 1997, Doctors Hospital's daily receivables outstanding were very close to the average for urban hospitals. (Tr. III, pp. 155–56.)

245. The Debtor's net working capital for 1998 was not materially below the industry average. (Tr. IV, p. 203.)

246. Doctors Hospital's net working capital as a percentage of its revenues improved from 1997 to 1998 as compared to industry averages. (Tr. IV, p. 204.)

247. Debtor's EBITDA improved from 1997 to 1998. (Tr. IV, pp. 208–09.)

248. Debtor's funded debt decreased (improved) and its funded debt over the book value of invested capital improved from 1997 to 1998. (Tr. IV, pp. 208–09.)

249. Debtor's interest coverage and debt service ratio improved from 1997 to 1998. (Tr. IV, pp. 208–09.)

250. Weinstein, the President of Doctors Hospital who left for Michael Reese Hospital in October 1998, and who reviewed the Debtor's financial statements monthly, testified that he did not recall the Debtor having difficulty paying its bills, holding checks, or having negative fluctuations in cash flow while he was employed by Doctors Hospital. (Def. Ex. 44 (Weinstein), pp. 69–70, 78, 83.)

251. Felbinger, CFO for the Debtor from April to September 1998, testified that one request for an advance from IDPA was made by Doctors Hospital in May 1998. That was the only request he could recall. (Pl.Ex. 26 (Felbinger), pp. 39–40.)

252. Felbinger also testified that overdrafts were not continuous during his time at Doctors Hospital; they were able to manage cash, obtain funds from Desnick, and a bridge loan from a local bank. (Pl. Ex. 26 (Felbinger), p. 38.)

253. In November 1998 Doctors Hospital obtained a commitment for $10 million in financing from Grand National Bank. (Jt.Ex.178.)

254. Nelson, CFO of Doctors Hospital from October 1998 to May 1999, testified that while during this period some checks were held, it was not a standard practice to issue checks without sufficient funds in the Doctors Hospital account. (Pl.Ex. 29 (Nelson), pp. 33–36.)

255. The evidence shows that a total of at least $4,816,445.21 was spent by the Debtor between 1997 and 2000 on capital projects at the hospital to keep its facilities in operating condition. (Jt.Ex.158.)

256. Lane admitted that other local hospitals were built some time ago, and that other than Cook County Hospital, no other new hospital had been built in the last 20 years. (Tr. III, pp. 159–60.)

257. As to Jackson Park Hospital, which Lane conceded was the closest competition to Doctors Hospital in terms of size and patient population, it was "old" as well, and he had not taken the time to determine the age of the other facilities within 10 miles of Doctors Hospital. (Tr. III, pp. 159–60.)

*Termination of Daiwa Facility as the Determining Factor Leading to Bankruptcy Filing*

258. On February 25, 1999, Daiwa and MMA Funding extended the Daiwa Loan to March 31, 2001, (Jt.Ex.4), which was the final extension.

259. Robinson testified that no payment defaults existed when the Daiwa facility was terminated. (Tr. II, pp. 82, 85–88.) Rather, Daiwa's termination of the Daiwa Loan was based on a minor mechanic's lien issue ($13,000), and Doctors Hospital being late in delivering financial statements. (Jt. Ex. 163; Tr. II, pp. 85–88; IV, p. 144.)

260. Accordingly, Robinson testified the termination of the Daiwa facility was sudden and without any prior notice, such that the Debtor had no time to obtain alternative sources of financing to replace the Daiwa facility. (Tr. II, pp. 80–81.)

261. Up to the time of termination of the Daiwa facility, Robinson testified that there had been no discussions whatsoever of bankruptcy by anyone associated with Doctors Hospital. (Tr. II, pp. 82; 87–89.)

262. Peltz also admitted, upon questioning from this Court, that up to March 2000, Daiwa was funded based on the receivables facility in place, and that while he believed the Debtor would have had to "eventually" file for bankruptcy without that facility, he could not specify when that "ultimate" time would have been. (Tr. IV, p. 145.)

*No Causal Connection Between Guaranty and Bankruptcy*

263. Lane was asked at trial if he had an opinion as to whether the Debtor's execution of the Guaranty as part of the Nomura Transaction in August 1997 impacted on or was otherwise a cause of the Debtor's bankruptcy filing in April 2000. Lane could not offer any opinion that such a causal connection existed. (Tr. III, pp. 186–87.)

264. At no time at trial did Peltz offer that the execution of the Guaranty in August 1997 as part of the Nomura Transaction somehow caused the bankruptcy filing in April 2000.

265. When asked how it could be that the Debtor survived for such a long period after execution of the Guaranty in August 1997, Peltz did not identify facts related to the execution of the Guaranty, or how that secondary obligation impacted on the Debtor's financial condition. Rather, he testified that the Debtor was able to do so "on the backs of creditors," by inflating the borrowing base, and by virtue of the capital infusions from Desnick. (Tr. IV, pp. 153–54.)

266. As to the "inflated receivables" reference, there was one instance in February 1998 where Daiwa wrote down the eligible receivables by an undefined amount. (Pl.Ex. 26 (Felbinger), p. 42.) The facility then remained in place, was renewed in February 1999, and was in effect without monetary default until terminated in March 2000.

267. Weinstein testified that he could not recall that any payment made by Doctors Hospital in connection with the Nomura Loan had an adverse economic impact on the Debtor. (Def. Ex. 44 (Weinstein), p. 68.)

*Withdrawals and Capital Contributions by Desnick*

268. It was stipulated by the parties that between January 1, 1997 and 2000, Desnick withdrew approximately $14.2 million from the Debtor. (Jt. Ex. 32; Tr. II, p. 70; Tr. III, pp. 164, 175–76.)

269. However, Felbinger, CFO of the Debtor from April to September 1998, attributed the cash flow issues experienced during that time period (1998 to 2000) at

least in part to these significant withdrawals by Desnick, who again desired to take "certain amounts out of the business." (Pl.Ex. 26 (Felbinger), pp. 45–46.)

270. Felbinger indicated the amounts taken out monthly by Desnick were up to $400,000. (Def. Ex. 38 (Felbinger), pp. 70–71.)

271. Robinson also confirmed that Desnick was taking out substantial amounts of money during this period. (Tr. II, pp. 29; 71–73.)

272. Plaintiff's experts testified that they had not tried to determine how those large withdrawals would have impacted on the Debtor's ability to manage cash on a daily basis, and to pay debts as they became due. (Tr. III, pp. 177–79.)

273. It was further stipulated that approximately $14.2 million was contributed by Desnick to the Debtor from 1998 to April 2000, prior to the bankruptcy filing. (Jt.Ex.32.)

274. Approximately $14.2 million was contributed by Desnick to the Debtor from 1998 to April 2000 prior to the bankruptcy filing. (Jt.Ex.32.) Desnick also funded the $4.5 million up-coding settlement in 1999, again pre-petition. The only post-petition payment from Desnick was the additional $14 million settlement payment made in December 2000 to the federal government and the State of Illinois. (Jt.Ex.162.)

275. None of the CFOs (Richard Felbinger, Michael Nelson, or Nelson Vasquez) were ever concerned with having enough cash on hand to meet the short or long term cash needs of the Debtor. (Tr. I, pp. 159–60; Tr. II, pp. 96–97; Pl.Ex. 26 (Felbinger), p. 74; Pl.Ex. 29 (Nelson), pp. 13–14, 26; Pl.Ex. 35 (Vasquez), pp. 22–23.)

276. Peltz admitted that he was unaware of any learned treatise setting out a standard methodology that suggests one cannot or should not consider the capital contributions of shareholders in conducting an insolvency analysis. (Tr. IV, pp. 195–96.) Rather, Peltz again said it was simply his "judgment call" not to do so, given the facts of this case. *Id.*

### Financial Wherewithal of Desnick

277. Desnick received almost all of the $50 million generated as part of the Nomura Transaction. (Jt.Ex.182.)

278. Robinson testified that he had seen personal financial statements showing Desnick with a net worth approaching $100 million. (Tr. II, p. 91.)

### Coopers & Lybrand Report

279. On July 30, 1997, prior to the Nomura Loan, Coopers & Lybrand was engaged by Nomura to conduct a financial review of the Debtor to: (i) verify current and projected net income to support the $50 million loan; (ii) determine if any significant regulatory, market or competitive factors would impact on on-going operations and the financial performance of the Debtor; and (iii) whether any significant internal factors would preclude Nomura from entering into the $50 million loan. (Jt.Ex.25.)

280. In September 1997, Coopers & Lybrand prepared a report ("Coopers & Lybrand Report") titled "Summary of Information for Desnick Refinancing: $50,000,000." (Jt.Ex.177.)

281. The Coopers & Lybrand Report reflected its site visits to the Debtor, review of financial information, analysis of the Hospital's competitive environment, and adjustments downward to the Debtor's income to account for possible improper up-coding. (Jt.Ex.177.)

282. Coopers & Lybrand calculated the Debtor's EBIDTA and Adjusted NOI, and determined that it had sustained a debt service coverage of 2.12 for the prior twelve months ending July 31, 1997. *Id.* at pp. 1–3.

283. Coopers & Lybrand concluded that the Debtor would be able to achieve profit margins going forward that would be similar to the adjusted net operating income for the trailing twelve months, and should be able to generate cash flows in amounts in excess of that needed to meet the debt service requirements of the Nomura Loan. *Id.*, p. 11–5.

284. Coopers & Lybrand also addressed the up-coding issue in their report by attempting to compute Doctors Hospital's likely exposure and the amount that it would be expected to pay if the government examined its coding practices. *Id.*

### Dobson Reports

285. Dr. Allen Dobson ("Dobson"), Senior Vice President and Director of the Healthcare Finance Practice at The Lewin Group, a nationally recognized healthcare consulting company, has led several analyses for the American Hospital Association on the impact of the Balanced Budget Act of 1997. These analyses were used to support the Balanced Budget Refinement Act of 1999 and the Benefits Improvement Protection Act of 2000, give back legislations enacted by Congress. (Def.Ex.1, p. 1.)

286. Dobson issued a report ("Dobson Report") on September 29, 2003 in which he analyzed the factors that contributed to the bankruptcy of the Debtor. (Def.Ex.1.)

287. Dobson determined that the Debtor's bankruptcy filing was caused by: (1) the departure of key management executives including hospital CEO Stephen Weinstein; (2) the departure of at least ten key admitting physicians; (3) overly cautious billing practices by physicians aware of federal investigations of hospital billing practices; (4) a decline in Medicaid cases and Medicare case mix; (5) lack of cost control following the departure of Debtor executives; and (6) ultimately, the immediate, complete loss of cash flow following the loss of the Daiwa Loan in March 2000. (Def.Ex.1, p. 1.)

288. Dobson also concluded that the six above listed factors and their ultimate impact were not foreseeable as of the fall of 1997. *Id.*

289. In reaching these conclusions, Dobson analyzed the Debtor's financial statements from 1994 through 1997, as well as background information, including review of the Nomura loan documents and the Daiwa Loan, and concluded that as of September 30, 1997, the Debtor was a "going concern business," with a "strong financial base." (Def Ex. 1, pp. 3–5; 7–34.)

290. Dobson also concluded that from the date the Nomura Loan was sold on October 24, 1997 to September 30, 1998, the Debtor continued to perform well financially, with net income of $3.56 million and a margin (net income/revenues) of 5.0 percent. (Def.Ex.1, p. 5.)

291. Dobson attributed the financial issues addressing the Debtor in 1999 as resulting from the CEO, Stephen Weinstein, leaving the Debtor, together with 10 high revenue producing doctors.

292. Robinson confirmed that while Doctors Hospital did lose money in 1999, as reflected on its audited financials, one of the reasons it lost money during that period was as a result of Stephen Weinstein, the President of Debtor, resigning in October 1998 and going to a direct competitor of the Debtor, Michael Reese Hospital. (Tr. II, pp. 89–90.)

293. Robinson further testified that in addition to the loss of its President, up to 10 admitting physicians left with Weinstein for Michael Reese, and these doctors began admitting the majority of their patients at Michael Reese. (Tr. II, pp. 90, 93.)

294. Robinson also agreed that the loss of Weinstein and the admitting doctors resulted in a "noticeable drop-off" in the Debtor's admissions in 1999. (Tr. II, p. 90.)

295. Lane admitted, however, that he never talked to Robinson or anyone else, or reviewed any records, to confirm their departures or assess the financial loss to the Debtor caused by these departures. (Tr. IV, p. 49.)

296. Lane, however, testified that the composition and strength of a hospital's medical staff would impact on the patient base and number of admissions, and that admissions were very important to Doctors Hospital. (Tr. III, pp 184–85.)

297. Lane admitted that losing 10 to 15% of gross revenues, as testified to by Robinson, would constitute a significant negative financial event for the Debtor. (Tr. III, pp. 185–86.)

298. Robinson then quantified the loss of this revenue as between 10 to 15% of the gross revenues of Doctors Hospital in 1998, (Tr. II, pp. 98–99), which equates to an approximate $7.9 million loss in revenue.

299. Dobson was also asked to examine the factors that lead to the Debtor's bankruptcy filing in April 2000, and to determine if the most significant factors leading to the filing were foreseeable when Nomura entered into the loan with HPCH for $50 million on August 28, 1997, and on October 24, 1997. (Def.Ex.1, p. 1.)

300. Dobson concluded these events were not foreseeable. (Def.Ex.1, p. 1.)

301. As to termination of the Daiwa Facility, Dobson believed the Debtor had regained partial financial footing as of the spring 2000. Daiwa had, however, packaged certain of its healthcare receivables for sale, including the Daiwa Loan, and the potential purchaser of the health care receivables portfolio did not want to have

receivables dependent upon Medicaid. Daiwa terminated the Daiwa Loan on March 30, 2000, leaving the Debtor without an immediate source of capital. (Def.Ex.1, p. 6.)

302. Dobson concluded that "in the final analysis," the loss of the Daiwa facility was the deciding factor leading to the Debtor's bankruptcy, since it was likely the Debtor could have continued to operate had the Daiwa facility continued. (Def.Ex.1, p. 32.)

303. Dobson also authored a Rebuttal Report on October 14, 2003 that concluded that at the time of the Nomura Loan the effects of the Balanced Budget Act ("BBA") on hospital performance "were anything but certain." (Def.Ex.2, p. 1.)

304. In his Rebuttal Report, Dobson analyzed the up-coding issues at Doctors Hospital and the report prepared by Coopers & Lybrand, which itself analyzed the Debtor for Nomura prior to the Nomura Loan, and determined that the Debtor could generate cash sufficient to satisfy the debt service on the Nomura Loan. (Def.Ex.2, pp. 2–9.)

305. In addition, Dobson found that the analysis employed by J.H. Cohn, in particular, was flawed for a number of other reasons, including:

J.H. Cohn's analysis incorrectly assumed that estimates prepared by Valuation Counselors ("VC") and Coopers & Lybrand are directly comparable. They are not.

J.H. Cohn improperly modeled the effects of the BBA on Doctors Hospital's total revenue, rather than its Medicare revenue, and, thus, failed to model the effects of the BBA appropriately. In addition, J.H. Cohen failed to take into account the cost containment actions that Doctors Hospital would likely implement in response to the BBA.

J.H. Cohn's labor analysis did not include Professional Fees and Purchased Services in the labor per day calculation. Cohn also did not reference increase in total dollars across all labor categories. As a result, Cohn's labor analysis was misleading as the decline in projected labor dollars per patient day was consistent with the increased efficiency for increased occupancy rates.

*Id.*

For these reasons and others set forth in his reports, Dobson concluded that methodologies applied by J.H. Cohn and others relied on by the Plaintiff in this case were faulty (or not even disclosed) and that, instead, Coopers & Lybrand appropriately and reasonably addressed the issues faced by Doctors Hospital as of August 1997. (Def.Exs.1, 2.)

306. Dobson ultimately concluded that "the comparative analysis indicates that Debtor's decline in financial performance was not an inevitable result of local market forces, but rather a result of a series of internal factors." (Def.Ex.1, p. 32.)

### Expert Witness Conclusions

307. Defendant's solvency expert, Blake, concluded that Doctors Hospital was solvent as of September 30, 1997 and September 30, 1998, under the balance sheet test of Section 101(32) of the Bankruptcy Code, as well as the adequate capital and cash flow tests under Bankruptcy Code Sections 548(a)(1)(B)(ii)(II) and (III). (Jt.Ex.31, pp. 15–20.)

### Balance Sheet Test

308. To reach his balance sheet conclusions, Blake employed a Capitalization of Normalized Income Method. (Jt.Ex.31, pp. 15–17.) Blake also analyzed the propriety of utilizing the "Guideline Company" and "Guideline Transactions" methods of calculating the balance sheet solvency of Doctors Hospital, determining each were unreliable given the lack of any comparable companies or transactions.

### Capitalization of Normalized Income Approach

309. To employ his Capitalization of Normalized Income methodology, Blake started with the audited financials from KPMG for September 30, 1997 and 1998.

310. Blake then made adjustments to the 1997 and 1998 net income of the Debtor as presented in the Debtor's audited financial statements. The adjustments are summarized as follows:

| Dollars in Thousands | 1997 CRA | 1998 CRA |
|---|---:|---:|
| Adjustments to New Income | | |
| Excess Management Fee | $ 7,376 | $- |
| Alleged Fraudulent Earnings— Kickbacks | (2,665) | (1,412) |
| Alleged Fraudulent Earnings— Upcoding | (750) | - |
| Reverse Prior Booking of Alleged Fraudulent Earnings— Upcoding | 4,500 | - |
| Reversal of Accrued Tax Expenses Based on Audits | 265 | - |
| Prorated Tax Based on Audits | (88) | - |
| Total Adjustments to Net Income | $ 8,638 | $(1,412) |

(Jt.Ex.31, p. 15.)

311. Blake then further determined a derivation of enterprise value that includes six general steps:

(1) To adjust net income to debt-free cash flow, Blake added back reported depreciation to net income because it does not require cash expenditures. Blake then subtracted reported interest expense because he was calculating the business enterprise value from all capital sources, including interest bearing debt (with interest bearing debt being subtracted in its entirety later). Blake subtracted capital expenditures based on the succeeding year's capital expenditures. For capital expenditures, Blake departed from using actual reported financial statement data because the capital expenditure budget for the following year would be known at year-end. Capital expenditures should be

higher than depreciation for a going concern so that it grows and implements new technology. Blake adjusted taxes for the impact of the prior mentioned adjustments. Finally, Blake adjusted working capital to an industry level similar to the level employed by Plaintiff's expert, Scott Peltz of American Express Tax and Business Services.

(2) Blake then determined a capitalization rate by using the same general methodology as Scott Peltz, the Plaintiff's expert, namely, the Capital Asset Pricing Model ("CAPM"). The CAPM was used to determined the required equity rate of return. Secondly, Blake used the Weighted Average Cost of Capital ("WACC") to determine the overall combined equity and debt return. Third, an estimate of long-term growth was subtracted by Blake from the WACC to determined the Capitalization Rate. The Capitalization Rate was then converted to a multiple (the multiple is the inverse of the Capitalization Rate) so that it would be comparable to the Market Approach to solvency. Since the methods were very similar, Blake adopted Peltz' WACC data, with the exception of the Specific Company Risk Premium. Blake applied a premium of 5%, whereas Peltz applied a premium of 10%. Blake used a company specific risk premium of 5.0%, which he believed was a better indication of the amount of additional risk associated with the company. The reason for the 5.0% specific company risk premium used by Blake was due to the transactions with Desnick and other related parties. (Jt.Ex.31, p. 25.) Blake did not believe this adjustment should be higher because adjustments have been made to normalize historical financial performance, industry factors are already "baked into" the beta factor affecting the equity risk premium, and a size adjustment has already been incorporated. *Id.* As a result of Blake's adjustments, Blake concluded that the appropriate WACC to use in calculating the capitalization rate was 15.9% and 16.5% in 1997 and 1998 respectively. (Jt.Ex.31, p. 25.) Using these discount rates, and a growth rate of 3.0%, Blake calculated a capitalization rate of 12.9 and 13.5% in 1997 and 1998, which equated to a multiple of 7.75 and 7.41, respectively. *Id.*

(3) Blake then calculated the indicated enterprise value of the Debtor by increasing the debt-free cash flow by the estimated growth rate (3%), and then the multiple calculated in the capitalization rate step was applied.

(4) Blake then added back non-operating assets, since receivables and payables from Desnick and related parties such as MMA and HPCH were excluded from the calculation of working capital, because they were a discretionary allocation among related parties. Blake treated these as a subtraction or addition to working capital on a dollar-for-dollar basic.

(5) Blake then subtracted debt and other claims on enterprise value by subtracting (I) the principal of reported interest bearing debt and obligations under capital leases; (ii) subtracted the reported cash overdraft; (iii) subtracted out an insurance reserve contingency of $2.5 and $2.8 million for 1997 and 1998, respectively, even though these items would not require a cash outflow in those years and had already been reflected in the financial statements; (iv) subtracted the entire amount of the al-

leged fraud settlements for both the alleged kickbacks and upcoding at the Debtor, since the existence of government "regulatory investigations" was disclosed in the Debtor's 1997 and 1998 financial statements, with the $4.5 million settlement recorded in 1997 as a liability and a reduction to revenue. Blake recorded the entire amount of the ultimate government regulatory settlement as a reduction of enterprise value.

(6) Blake then reflected contributions by Desnick. (Jt.Ex.31, pp. 15–17.)

312. Blake also added back $7.4 million to the net income of the Debtor in 1997 and 1998 to reflect an excess management fee of $7.4 million paid in 1997 to Desnick, which was simply outside the norm of both historical management fees and a projected $24,000 per year management fee on a go forward basis. (Jt. Ex. 31, p. 15; Tr. II, pp. 79–80; Tr. VI, p. 53.)

313. Blake further: (i) reversed a prior $4.5 million charge the Debtor took against earnings in 1997 related to wrongful upcoding, and then subtracted $750,000 from those revised earnings as the *pro rata* amount allocable to 1997 for the erroneous up-coding, and (ii) reduced the income in 1997 and 1998 for alleged fraudulent earnings related to alleged kick-backs. (Jt. Ex. 31, p. 15; Tr. VI, pp 54–55.)

314. As reflected at page 15 of Blake's Report, these adjustments resulted in a net positive adjustment to income in 1997 of $8.6 million, and a net reduction in 1998 by approximately $1.4 million. (Jt.Ex.31, p. 15.)

315. Based upon the above assumptions and calculations, Blake calculated the fair enterprise value of the Debtor, using the Capitalization of Cash Flow Method, as shown below:

| Dollars in Thousands | 1997 CRA | 1998 CRA |
|---|---|---|
| Indicated Enterprise Value | | |
| Less Claims on Enterprise Value | $47,574 | $19,411 |
| Indicated Fair Value of Equity | (31,808) | (31,918) |
| Plus Capital Contribution by Owner | 15,766 | (12,507) |
| Prorated Tax Based on Audits | 18,000 | 18,000 |
| Indicated Fair value of Equity after Capital Contribution | $33,766 | $ 5,493 |

(Jt.Ex.31, p. 17.)

316. Blake viewed the settlement liabilities, and the funding from Desnick, as contingent assets and liabilities (until assessed and paid) that could not be categorized as non-contingent liabilities or assets on the Debtor's balance sheet. (Tr. VI, pp. 94–95.)

317. Blake assumed these contingencies would be due as of 1997 and 1998 (and hence subtracted them from income for those years) with the additional assumption that Desnick would fund these obligations as he had done throughout 1998–2000 for other cash needs of the Debtor. (Tr. VI, pp. 94–95.) Blake relied on Desnick's capital contribution because his financial interests would be harmed if he did not fund the liabilities, both as a shareholder and guarantor of the Daiwa Loan. *Id.*

318. Although Blake valued the settlements and Desnick's contributions at face value, Plaintiff did not provide any calculation as to the appropriate amount of reduction to these amounts if "present valued."

### Guideline Company Method

319. Blake also analyzed the Guideline Company Method approach to valuing the Debtor as of August 28, 1997. In order to apply the Guideline Company Method, Blake performed a search to determine a set of potentially similar public companies operating in the hospital industry represented by SIC Code 8062—General Medical and Surgical Hospital. Blake screened the list of potentially comparable companies based on business description, size, geographic operating area, payor mix, occupancy rates, average length of stay, and whether the company operated during a substantial portion of the 1997 through

2000 time frame. The following companies were selected as potential guideline companies by Blake:

- HCA Inc.
- Health Management Associates Inc.
- Paracelsus Healthcare Corp.
- Province Healthcare Co.
- Quorum Health Group Inc.
- Tenet Healthcare Corp.
- Universal Health Services Inc.

(Jt.Ex.31, p. 17.)

320. Blake's analysis indicated that these seven companies did not provide a reliable indicator of the fair market enterprise value of Doctors Hospital. Four of the companies identified by Blake were also used by Peltz, and the results are described in the following paragraphs. For the three other companies analyzed by Blake, Paracelsus, Province, and Quorum, Blake found that the underlying market information was not complete and reliable. Therefore, Blake excluded these companies from further analysis. (Jt.Ex.31, p. 17.)

321. Blake did identify four of the same companies employed by Peltz in his Guideline Company approach. Blake found that both quantitatively and qualitatively, these public companies were substantially different from the Debtor, as shown below:

| | | As of September 30, 1997 | | |
| | Revenue | Total Number | Number of | |
| Guideline Company | (in 000s) | of Beds | Hospitals | Geographic Coverage |
| --- | --- | --- | --- | --- |
| HCA Inc. | $19,583,000 | 61,096 | 309 | United States, Spain, Switzerland, and United Kingdom |
| Health Management Associates, Inc. | 895,482 | 3,108 | 26 | Southeastern United States |
| Tenet Healthcare Corp. | 9,583,400 | 27,959 | 128 | United States and Spain |
| Universal Heath Services Inc. | 1,374,494 | 5,166 | 43 | United States and Puerto Rico |
| Doctors Hospital of Hyde Park | 68,725 | 241 | 1 | Chicago, Illinois |

(Jt. Ex.31, p. 18; Jt. Ex. 159.)

322. Blake also prepared a table, provided below, that showed the size differential in the terms of the number of times these companies were in terms of revenue, beds and hospitals, greater than the Debtor. For example, HCA Inc. is 285 times larger in revenue than the Debtor. It has 254 times the number of beds and it has more than 300 times the number of hospitals, which are geographically dispersed throughout the United States and three foreign countries. Further, HCA Inc. has a much wider range of services including specialized psychiatric hospitals, tertiary care, teaching hospitals, OB/GYN, and many other services and facilities not covered by the Debtor. Doctors Hospital is a community hospital that services the needs of a specific community and these needs are not the same as those served by HCA Inc., Health Management Associates Inc., Tenet Healthcare Corp., and Universal Health Services Inc. Another important distinction is the payor mix, with the Debtor having a much higher proportion of

Medicare/Medicaid revenue than the four larger public companies. It was Blake's conclusion that these companies were not sufficiently comparable to Doctors Hospital to provide pricing guidance for the determination of enterprise value:

| Guideline Company | Multiples of Guideline Companies/Debtor | | |
| | Revenue | Total Number of Beds | Number of Hospitals |
| --- | --- | --- | --- |
| HCA Inc. | 284.9 | 253.5 | 309 |
| Health Management Associates, Inc. | 13 | 12.9 | 26.0 |
| Tenet Healthcare Corp. | 139.4 | 116.0 | 128.0 |
| Universal Health Services Inc. | 20 | 21.4 | 43.0 |
| Median Multiple | 79.7 | 68.7 | 85.5 |
| Average Multiple | 114.4 | 101 | 126.5 |

(Jt. Ex. 31, p. 19; Jt. Ex. 159.)

### Guideline Transactions Method

323. In order to apply the Guideline Transactions Method, Blake also performed a search to determine a set of potentially similar merger and/or acquisition transactions in the hospital industry. Based on Blake's review of these transactions, he determined that no transactions were sufficiently comparable to the Debtor. As a result, Blake did not incorporate this method into his analysis. (Jt.Ex.31, p. 19.)

### Cash Flow and Capital Adequacy Tests for Solvency

324. Blake also conducted a cash flow and capital adequacy test of the Debtor pursuant to Bankruptcy Code Sections 548(a)(1)(B)(ii)(II) and (III). Although the cash flow and capital adequacy standards are separate tests, from a financial standpoint both consider the same underlying data and were considered jointly by Blake. (Jt.Ex.31, p. 19.)

325. In 1997, the Debtor reported a GAAP loss of $2.9 million. This included a distribution to the owner classified as a management fee of $7.4 million. Therefore, the actual earnings of the business were $4.5 million in 1997. (Jt.Ex.31, p. 19.) GAAP cash flow was reported negative, but this included a $4.9 million advance to the owner.

326. There was no indication of trade payables being stretched in 1997, as the amounts were consistent with 1996 and had declined slightly as a percentage of expenses and assets. (Jt.Ex.31, p. 20.) With regard to the Daiwa Loan, there was no payment or covenant default. *Id.* Estimated third-party settlements increased to reflect an estimate of the potential fraud settlement liability, but this was not immediately due and did not settle until 1999. (Jt.Ex.31, p. 20.)

327. In addition, in fiscal 1997, the Debtor invested $1.1 million in property and equipment. (Jt.Ex.31, p. 20.)

328. It was Blake's opinion that the Debtor was adequately capitalized in 1997. (Jt.Ex.31, p. 20.)

329. In 1998, the Debtor reported GAAP earnings of positive $3.6 million. (Jt.Ex.31, p. 20.)

330. With regard to the Daiwa Loan, there is no indication of any payment or covenant defaults. (Jt.Ex.31, p. 20.) Estimated third-party settlement liabilities decreased by $2 million. *Id.* Trade payables and accrued expenses increased by $3.3 million, offsetting the decreases in Daiwa and third-party settlements. *Id.*

331. Also in fiscal 1998, the Debtor had positive working capital of over $3.1 million. (Jt.Ex.31, p. 20.) In addition, in fiscal 1998, the Debtor invested $1.7 million in property and equipment. *Id.*

332. On November 25, 1998, Grand National Bank signed a commitment letter for a $10 million revolving loan with Doctors Hospital to replace the Daiwa Loan. (Jt. Ex. 178; Jt. Ex. 31, p. 20.)

333. It was Blake's opinion that the Debtor was adequately capitalized in 1998. (Jt.Ex.31, p. 20.)

### Plaintiff's Expert Report

334. As with Blake, Scott Peltz ("Peltz"), Plaintiff's expert, also considered both the fair market value balance sheet method, and the cash flow and capital adequacy methods to assess the Debtor's solvency. (Jt.Ex.159.)

335. Both experts agreed that the Capitalization of Cash Flows Method was the proper method for valuing Debtor's enterprise value for the balance sheet test of insolvency. (Jt. Ex. 31; Jt. Ex. 159.)

336. Despite agreement on the use of the Capitalization of Cash Flows method, Blake differed from Peltz on normalization assumptions and valuation related calculations, as summarized below. (Jt. Ex. 31; Jt. Ex. 159.)

### Failure to Add Back Reduction in 1997 Income for Up-coding Charge

337. Peltz admitted that Doctors Hospital had charged the $4.5 million against its 1997 earnings when he testified in his deposition that Doctors Hospital had taken the $4.5 million charge against income in 1997. (Tr. IV, p. 169.) When shown his deposition testimony at trial, Peltz only testified that he was "not sure what he meant when he said that." (Tr. IV, p. 169.)

338. Peltz, however, admitted that if he had added back the $4.5 million to 1997 income in his calculations, it would have impacted his solvency conclusion. (Tr. IV, p. 173.)

### Improper Tax Affecting to Reduce 1997 and 1998 Income

339. Peltz used a 40% federal tax rate to reduce the net income of the Debtor in 1997 and 1998 as part of the Capitalization of Cash Flows Method.

340. However, the Debtor is a Subchapter S corporation, and is exempt from federal income taxes. (Jt.Ex.202, 1.)

341. Peltz admitted that since its inception the Debtor had been a Subchapter S corporation, and that he was unaware of any circumstances to suggest the Debtor was at risk of ever losing that corporate election. (Tr. IV, p. 188.)

342. The Debtor did not use cash flow to pay federal income taxes.

343. The audited financial statements of the Debtor reveal the only tax the Debtor ever paid was a State of Illinois replacement tax of 1.5%, and sales tax. (Jt.Ex.28, 37.)

344. While Peltz testified he assumed a "for profit" company was the most likely hypothetical company that would acquire Doctors Hospital, his co-author of the Plaintiff's expert report, Michael Lane, testified that there was really no target acquirer for Doctors Hospital. (Dep. Michael Lane, 4/12/05, p. 128, 131–32.)

345. Blake, however, determined that the most likely buyer of Doctors Hospital would be a not-for-profit or other Subchapter S corporation, and not a for-profit corporation, since his team determined that only one of the ten closest competitors of the Debtor was a for-profit company, and only 7% of all of the hospitals in Illinois were for-profit companies. (Tr. VI, p. 62–63.)

346. Lane admitted that the for-profit companies had largely exited the hospital

markets in the Chicago, Illinois metropolitan area by 1997 and 1998 (Tr. III, pp. 129–31), and that in the Chicago, Illinois area from 1994 to 2000, ten not-for-profit companies purchased hospitals, while only one for-profit company made a hospital acquisition. (Tr. VIII, pp 30–31.)

347. Lane went even further and testified that in the entire State of Illinois for that same time period, approximately twenty not-for-profit companies purchased hospitals, while again only one for-profit company made a hospital purchase. (Tr. VIII, p. 31–32.)

348. Lane then also admitted that, based on his experience as a CPA, these not-for-profit companies would not be concerned with what taxes a Subchapter S company like Doctors Hospital would pay if it were a C corporation, because the not-for-profit purchaser would not be paying any federal income taxes. (Tr. VIII, pp. 32–33.)

349. Peltz agreed with this assessment. (Tr. IV, p. 181.)

350. Peltz testified that since certain subchapter S corporations pay the income tax of its shareholders, thereby effectively paying a federal income tax, that is another factor in favor of tax affecting. (Tr. IV, pp. 143, 198.)

351. Blake confirmed that during his and his staff's review of all of the financial information available, there was never anything to suggest that Doctors Hospital was making large quarterly distributions to Desnick at times when Desnick would otherwise be responsible for paying personal income tax. (Tr. VII, pp. 19–20.)

352. By assessing a 40% tax rate, Peltz reduced normalized income of the Debtor in the amounts of $2.2 million in 1997, and $2.6 million in 1998.

## Inconsistent Application of Discount Rate

353. Peltz selected a 1997 discount rate of 17.5%. This discount rate was applied by Peltz to all sources of revenues, expenses and cash flow items. However, when Peltz segregated the rent paid by the Debtor into a "fair market" component, and an "excess" component, he applied different discount rates to each, 17.5% to the market component, and 9.67% to the excess amount. (Jt.Ex. 31, p. 23.)

354. As a threshold matter, Blake disagreed with Peltz' approach in separating out the lease payments into two different categories, testifying that leases between related parties are encountered all the time by valuators, whether assessing a grocery store, manufacturing facility, or other business. (Tr. VI, p. 105.)

355. Blake then disagreed with Peltz's failure to consistently apply the discount rates. (Tr. VI, pp. 99–100.)

## Improper Imposition of 40% Tax Rate and 10% Specific Company Risk Premium in Calculating WACC

356. Blake and Peltz both agreed that the appropriate risk-adjusted discount rate to use in calculating the capitalization rate was the after-tax weighted average cost of capital, or "WACC." (Jt. Ex. 31, p. 24; Ex. 159.) However, Blake differed from Peltz in the inputs used to calculate the WACC. These adjustments included taxes and the Company Specific Risk Premium.

357. As to taxes, again Peltz used a 40.0% federal tax rate for the Debtor as part of calculating the WACC. Debtor is a Subchapter S corporation and is therefore exempt from federal income taxes. (Jt.Ex.202, ¶ 1.)

358. However, Lane, who was designated as the healthcare expert between himself and Peltz, had never previously

participated in a calculation of a specific company risk premium. (Tr. III, p. 182.)

359. As to the $14 million settlement regarding kickbacks, covering the period 1994 through 1998, (Jt.Ex.162), Doctors Hospital had revenue during that period, as reported on its audited financial statements, of $295,750,190. (Jt.Ex.28.) The $14 million settlement related to kickbacks equals slightly less than 5% of that amount.

360. Also, allegations of fraud were not unique to Doctors Hospital. Lane admitted that other local competitors of the Debtor, including the University of Chicago Hospitals, were the subject of fraud allegations in the Winter 1997 and for a period of years thereafter. (Tr. III, p. 161.)

361. Lane also admitted, as also set forth in his Report, that the allegations of fraud were of such a level that it was estimated fraud accounted for 10% of all income for all healthcare facilities across the United States. (Jt. Ex. 159, p. 7; Tr. III, p. 162.)

362. 110 hospitals across the country were served with subpoenas pursuant to governmental initiatives to investigate the healthcare industry. (Tr. IV, pp. 20–21.)

### Improper Use of Guideline Company Approach by Using Companies not Comparable to Debtor

363. As stated by Peltz in his Report, the Guideline Company methodology, sometimes referred to as the "Capital Markets Method," tries to determine the value of the subject company based on the value of publicly traded companies with similar operations to the company being valued. (Jt.Ex.159, Ex. C3, p. 1.)

364. Peltz admitted that he could locate no similar publicly traded company in the United States with operations similar to the Debtor. *Id.*

365. Michael Lane also testified that none of the companies chosen as comparable companies were, in fact, comparable to Doctors Hospital. (Tr. III, pp. 191–92.)

366. However, Peltz then identified seven publicly traded companies which he admitted were "significantly larger" than the Debtor, and had "greater economies of scale, greater access to resources, diversified operations and patient loads, improved bargaining positions with third-party payers, and greater leverage over their suppliers than Debtor." (Jt. Ex. 159 and Ex. C3, p. 2; Tr. IV, p. 146.) Peltz used these companies to conclude that his solvency analysis under the Capitalization of Cash Flows test was valid. *Id.*

367. Blake determined that Peltz' reliance on the Guidelines Companies Method was flawed for several reasons.

### Improper Use of Guideline Transactions Method By Failing To Identify Any Comparable Transactions

368. Blake also concluded that Peltz' Merger and Acquisition Method contained numerous errors and was not a reliable method of estimating Enterprise Value. (Jt.Ex.31, p. 26.)

369. The Peltz Report listed twelve hospitals that were acquired as an indication of value. Only four of the transactions, however, had data elements that Peltz selected for a reliable multiple calculation. (Jt.Ex.31, p. 26.) Furthermore, three of those four transactions occurred during or before May 1995. *Id.* Blake observed that the industry environment in the 1997 to 2000 time period was vastly different than in 1995. (Jt.Ex.31, p. 26.)

370. The remaining transaction, the acquisition of Swedish American Hospital, involved a nonprofit hospital in Rockford, Illinois, which faced a significantly different operating environment than the Debt-

or, based on competition and geography. (Jt.Ex.31, p. 27.)

371. As to the Swedish American Hospital acquisition, it did not have a "price to EBITDA multiple," which of the multiples selected by Peltz was admitted by Plaintiff's experts to be the best indicator of value for solvency purposes. *Id.;* Tri. III, pp. 201–02.

372. Blake also concluded that the Price/Bed multiple used by Peltz was not an accurate metric to use when valuing a company. (Jt.Ex. 31, p. 27.) These problems include the fact that hospitals all experience varying levels of occupancy rates. *Id.* Additionally, the bed count at a hospital does not capture outpatient activity, which was increasing dramatically as a percentage of total revenues for many of these hospitals between 1997 and 2000. *Id.*

373. Blake also observed that Peltz employed a multiple of assets for Swedish American Hospital and applied it to Debtor. (Jt.Ex.31, p. 27.)

374. Therefore, Blake concluded that any multiple derived from the Swedish American Hospital transaction could not be applied to the Debtor with any reasonable level of comparability. (Jt.Ex.31, p. 27.)

### Peltz' Cash Flow and Adequate Capital Conclusions

375. Based on the same financial data used for the balance sheet approach, Peltz concluded that Doctors Hospital was insolvent under the capitalization and cash flow tests. (Jt.Ex.159, pp. 17–20.)

376. As to adequate capitalization, Peltz admitted the Debtor had net working capital of $3.1 million in 1997, and $3.4 million in 1998. (Jt. Ex. 159, p. 17 and Ex. B2.)

### Doctors Hospital Healthcare Industry 1995–1997

377. Medicare and Medicaid reimbursement rates are lower than those for commercial insurance, in large part because Medicare and Medicaid reimbursement is determined by the patient's diagnosis at discharge-regardless of the length or cost of the stay. (Tr. III: 81–85; Def. Ex. 1 at 17.) Doctors Hospital's revenues from Medicare and Medicaid ranged from 85 to 89 percent while those revenues for the average Chicago hospital were approximately 50 percent. *Id.* at 77–79; Jt. Ex. 72 at 9. Doctors Hospital's Medicare revenues ranged from 54 to 59 percent in 1997 and 1998, while the national average was 45 to 55 percent. (Tr. III: 79; Jt. Ex. 72, Tab A3.) Doctors Hospital's Medicaid revenues for that period were 25 to 33 percent, while the national average was only 12 to 15 percent. (Tr. III: 79–80; Jt. Ex. 72, Tab A3.)

378. Doctors Hospital's audited financial statement for fiscal years 1996 through 1999 showed the following percentages of the hospital's gross patient revenue from Medicare and Medicaid:

| | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|
| Medicare | 58% | 59% | 54% | 57% |
| Medicaid | 27% | 25% | 33% | 26% |
| Total | 85% | 84% | 87% | 83% |

### Case Mix Index

379. A "case mix index" is an overall indicator of the acuity level of patients treated by

the hospital. (Tr. III: 81.) In 1996 Doctors Hospital's case mix index was 1.5, which was about average. By 1999 its case mix had declined to about 1.1. (Tr. III: 85–87.) The decline resulted from a reduction in the hospital's medical/surgical business and an increase in lower severity cases such a psychiatric, skilled nursing and substance abuse. *Id.* at 87.

### Average Length of Stay

380. In 1996 Doctors Hospital's average length of stay per patient was significantly higher than that of other hospitals in its market and higher than the industry average by approximately 25 percent. (Tr. III: 94–95.) Although the length of stay decreased after 1996, it was always above industry norms. *Id.* Because Medicare and Medicaid reimbursed Doctors Hospital on a per-case basis, not on length of stay, its higher-than-average length of stay indicated higher costs per patient and thus a lower percentage of reimbursement for those costs. *Id.* at 95, 104.

### Overbedded Market

381. In 1997 Illinois was overbedded by 16,176 beds. Doctors Hospital's market was overbedded by 9,853 beds. *Id.* at 89–90; Jt. Ex. 72 at 8. In Doctors Hospital's Hyde Park area, there were approximately 1,100 unused beds, 37 percent of the total. (Tr. III: 90.)

### Doctors Hospital's Competition

382. Less than 1½ miles from Doctors Hospital is the University of Chicago Hospitals and Clinics. (Tr. III: 88, 103–04.) Other hospitals in the area include Jackson Park Hospital, South Shore Hospital, Michael Reese Medical Center and Mercy Hospital Medical Center. (*Id.* at 89.)

### Obsolescence

383. Doctors Hospital was built in 1916. (Tr. III: 90–91.)

384. In determining fair market rental for Doctors Hospital, plaintiff's expert Gary DeClark ("DeClark") obtained a Facility Evaluation Study from an architectural firm RTKL Associates, Inc. (Jt. Ex. 160, Addendum E.) DeClark used the RTKL analysis as a check on his own valuation of the hospital. (Tr. II: 140–41.) In reaching its valuation, RTKL undertook an analysis of the hospital. This analysis led RTKL to depreciate the estimated reproduction cost of Doctors Hospital by almost 70 percent. (Jt. Ex. 160 at 3–5, App. A.)

### Desnick's Reputation

385. In 1991 the Illinois Department of Professional Regulation instituted an action against Desnick alleging improper medical and advertising practices and the unlicensed practice of medicine. Desnick settled the claim by paying a $100,000 fine and agreeing not to practice medicine in Illinois for two years. Desnick was named a defendant in two class action *qui tam* cases alleging medically unnecessary procedures. (Jt.Ex.11, Ex. D.)

### Balanced Budget Act of 1997

386. On August 5, 1997, Congress passed the Balanced Budget Act ("BBA"). Although passed in 1997, the BBA's changes did not take effect until the beginning of the Debtor's fiscal year 1998, and many changes were to be phased in over the following five years. (Def.Ex.1, p. 1.)

387. Arthur Gimmy said that the BBA was "the biggest financial news event in years during the first half of 1997" and "had the potential to bankrupt hospitals like [Doctors Hospital]." (Jt. Ex. 53 at 24.) "Numerous articles and analyses during and at the time of the passage of the [BBA] proclaimed that numerous inefficient, older, freestanding hospitals would likely go out of business as a result of measures in the act which affect hospitals." *Id.* at 117. As early as October 1995, an article entitled "Illinois Hospitals Brace For Medicare Cutbacks" appeared in *Crains Chicago Business. Id.* at 58–60.

388. In May 1997 the CEO of Doctors Hospital wrote to U.S. senators and congressmen to express his concern about the proposed act, saying "there is simply no longer any more to cut from hospitals." (Jt.Ex.36.)

389. Regarding the payment freezes and reductions in the BBA:

For inpatient services covered by the prospective payment system, the BBA froze base payments in fiscal year 1998 and reduced updates in subsequent years, instituted a new policy for transfer cases, lowered the adjustment for indirect medical education (IME) to teaching hospitals, lowered the adjustment received by hospitals that treat a disproportionate share (DSCH) of low-income patients, and reduced capital payment rates. For outpatient services, the BBA eliminated the so-called formula driven overpayment, extended reductions in payments for capital and services paid on a cost basis, and directed the Secretary to implement a prospective payment system for services still being paid at least partially on the basis of costs. Collectively, these provisions were intended to slow Medicare spending growth, bring inpatient payments in line with costs, and move payments for outpatient services from a cost-based system to a prospective one. (Jt. Ex. 31, Tab C at 17–18.)

390. Allen Dobson, one of Nomura's experts in its litigation with the Trust, calculated in a retrospective analysis that in 1997 Doctors Hospital stood to lose $1.3 million in Medicare payments in 1998 and $3.7 million in 1999 as a result of the BBA. (Def. Ex. 2 at 3.) Dobson also observed, the decrease in disproportionate share payments alone went from $7.2 million in 1997 to $4.3 million in 1999. (Jt. Ex. 31, Tab C at 23.)

391. Lane testified that most of the BBA's substantive provisions had an initial effective date of July 1, 1998, so that any impact of the BBA on Doctors Hospital would not have started to occur until about one year after the Nomura Transaction. (Tr. III, pp. 164–65.)

392. Lane testified that two of the major components of the BBA, i.e. reductions in in-patient rates and reimbursements for bad debts, were to be phased in over a two year period starting on July 1, 1998. (Tr. III, pp. 105, 166.)

### Cost Increases

393. The mid to late 1990s was a high inflationary period for healthcare costs. (Tr. III: 107.) Pharmaceutical costs increased by double digits. *Id.* at 108. Because of nursing shortages Doctors Hospital had to use agency nursing, which is significantly more expensive than employee nursing. *Id.*

### Federal Investigations

394. At the time of the Nomura Loan in August 1997, Doctors Hospital was the subject of a federal investigation into billing irregularities known as "upcoding." (Jt. Ex. 11, Ex. D; Tr. III: 76–77; Jt. Ex. 138 at 4.) "Upcoding" occurs when a healthcare provider receives reimbursements from Medicare and Medicaid based on a more acute (and therefore more costly) diagnosis than the patient's condition warranted. (Tr. IV: 30; Jt. Ex. 147 at 9 n. 15.) There are almost 500 different diagnosis codes. (Tr. III: 81.)

395. Coopers & Lybrand prepared a report on Doctors Hospital in connection with the Nomura Loan. The report included a review of the hospital's adjusted net operating income for the twelve month period ending July 31, 1997. Coopers & Lybrand normalized Doctors Hospital's patient revenues by subtracting $4.6 million based on upcoding of 12 billing codes. (Jt. Ex. 31, Tab B; Pl.Ex. 30 (Preddice) at 104–05; Def. Ex. 2 at 3.)

396. In 1999 the federal and state governments reached a settlement with Doctors Hospital concerning overcharges due to "upcoding" on patient billings submitted to Medicare and Medicaid. Doctors Hospital agreed to pay a fine of $4.5 million. (Jt.Ex. 161.) The overbilling related to this

settlement occurred from January 1993 to June 1997. *Id.* at 2.

397. A separate investigation focused on: (1) kickbacks paid to Doctors Hospital's physicians in exchange for medically unnecessary patient admissions; and (2) the hospital's inability to establish medical necessity and Medicare eligibility requirements for certain physicians' services. All of these activities occurred during the period 1993—1998. (Jt. Ex. 72, Tab B4.)

398. In December 2000 the federal government reached a settlement with Desnick regarding the kickback and other fraud allegations. He agreed to pay $14.5 million. (Jt.Ex.162.)

399. Doctors Hospital's director of marketing was indicted, pleaded guilty to Medicare and Medicaid fraud charges, and was sentenced to 37 months in prison. (Pl.Exs.5, 6.)

400. In a webcast on February 12, 2004, a representative of Orix, the Trust's special servicer, stated:

Nomura failed, as far as we can tell, to underwrite any of the senior staff or significant physicians at the operating business, at the healthcare provider.

There's no evidence of record that we've been able to locate that Nomura took into account the problems that had been created and that were being investigated at the time of the loan with respect to these individuals. Of course, we recently learned that senior executives and physicians at the hospital have been not only investigated but indicted and convicted for Medicare and Medicaid-related transgressions.

Now, this is important, because 92 percent of the operating business tenant's income was derived from Medicare and Medicaid. Now, in the disclosures that were made by Desnick, there were, in fact, numerous instances of litigation that were listed.

\* \* \*

In fact, we've subsequently learned that Doctors Hospital, the operating business tenant, was fined a total of $18.5 million for Medicare and Medicaid-related violations. Those are in two separate fines. One was $4.5 million; one was $14 million. Desnick personally paid both those fines, presumably from the proceeds of this loan.

(Jt. Ex. 151 at 23–24.)

401. The notes to Doctors Hospital's audited financial statements for fiscal year 1999 contain the following statement:

The hospital is involved in a *qui tam* legal action that was filed against a number of hospitals across the country concerning certain billing practices. In 1999, the Hospital executed an agreement (Settlement Agreement) with the United States Attorney's Office for the Northern District of Illinois, Civil Division; the United States Department of Health and Human Services, Office of Inspector General; the State of Illinois; and the Realtor, Health Outcome Technologies. The Settlement Agreement requires the Hospital to pay $4,500,000 over a twenty-four month period. At September 30, 1999 and 1998, the amount of this settlement obligation outstanding was $3,100,000 and $4,500,000, respectively, and is included with estimated third-party payor settlements in the accompanying balance sheets.

### The Trust's Suit Against Nomura

402. In 2000, the Trust sued Nomura to recover the principal balance of the Nomura Loan. (Jt.Ex.137.) The Trust alleges that Nomura improperly originated and underwrote the loan, thus breaching warranties in the agreements transferring the loan to the Trust. *Id.*

403. Factual matters set forth in the Conclusions of Law will stand as additional Findings of Fact.

### Summary of Key Findings

Based on the above, the following is a summary of the key findings reached in this case:

1) Doctors Hospital was insolvent at all times from August 28, 1997 through April 17, 2000.

2) All Lease payments made by Doctors Hospital exceeded reasonably equivalent rental value.

3) The Trust was the initial transferee of rent payments made by Doctors Hospital pursuant to the Lease during the period pre-July 1998, but rent payments after that date were not from Debtor's property.

4) The $801,926 paid into the Cash Collateral Account on May 11, 1998 were made with funds from Doctors Hospital.

5) The Cash Collateral Account was not a true escrow account.

6) The parties post-Agreement course of performance did not modify the Daiwa Loan Agreement such that Doctors Hospital (rather than MMA Funding), should be treated as the actual borrower.

7) MMA Funding was not the alter ego or instrumentality of the Debtor such that Doctors Hospital should be treated as the actual borrower on the Daiwa Loan.

8) In making the Guaranty and Related Agreements, Doctors Hospital incurred an obligation without receiving reasonably equivalent value while Debtor was insolvent.

9) Plaintiff is barred from voiding the Lease as a fraudulent transfer because the Lease was rejected.

### CONCLUSIONS OF LAW

#### Venue and Jurisdiction

This Adversary proceeding and related claim arise out of and relate to the Chapter 11 case of Doctors Hospital of Hyde Park, Inc. Jurisdiction lies over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. The allegations arise under 11 U.S.C. §§ 544(b), 547, 548, 549, and 550. Therefore, this constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(C), (E) and (F).

Venue lies under 28 U.S.C. §§ 1408 and 1409.

### I. PLAINTIFF SUED THE PROPER DEFENDANT

The Trust first argues that Plaintiff sued the wrong party because Defendant LaSalle as Trustee is not the real party in interest with respect to the Challenged Payments. Rather, the Trust argues that Defendant served strictly in the capacity of Trustee under the Pooling and Servicing Agreement ("PSA"), whereby Nomura's immediate successor, ASC, transferred to LaSalle as Trustee all of its rights in the Nomura Loan. This argument fails.

 Courts have routinely recognized the trustee of a trust as the real party in interest in litigation concerning assets held by the trust. *Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980); *Henning v. Rando Mach. Corp.,* 620 N.Y.S.2d 867, 868, 207 A.D.2d 106, 110 (N.Y.App.Div.1994).

One such precedent involved this very Trust. The Trust brought suit against Nomura alleging breaches of various representations and warranties made in connection with the sale of the Nomura Loan to the Trust. The named plaintiff in the case is LaSalle as Trustee. The court in *LaSalle Bank Nat'l. Ass'n. as Trustee v. Nomura Asset Capital Corp.,* ruled that

LaSalle as Trustee was the real party in interest when suing on behalf of that trust. 180 F.Supp.2d 465, 470 (S.D.N.Y.2001). In doing so, it was noted that "LaSalle, as trustee, 'possesses certain customary powers to hold, manage, and dispose of assets for the benefit of' the certificateholders and, therefore, 'is a real party to the controversy . . .' " *Id.*

A trustee "holds legal title to the trust corpus for the benefit of the beneficiaries." *Gaigal v. Laub*, 236 A.D.2d 362, 363, 653 N.Y.S.2d 637, 638 (N.Y.App.Div. 1997). A trust, in contrast with the trustee, is not a legal person and has no capacity to sue or be sued. *In re Markos Gurnee Partnership*, 182 B.R. 211, 215 (Bankr.N.D.Ill.1995).

In support of its position that Doctors Hospital sued the wrong party, the Trust cited *In re FSC Corp.*, 64 B.R. 770 (Bankr.W.D.Pa.1986). In that case, however, the sole role of the trustee was to receive interest payments from the debtor-in-possession in trust and distribute them to disclosed principals. Here, the Trust's responsibilities under the Pooling and Servicing Agreement ("PSA") were wide-ranging and the principals (i.e., the certificateholders) were not disclosed therein. Thus, Plaintiff sued the proper defendant.

## II. *COUNT X*

### A. *RECOVERY OF LEASE PAYMENTS UNDER § 548*

Pursuant to § 548 of the Bankruptcy Code, creditors may recover property that the debtor transferred in an improper manner-through either (a) "actual fraud"-that is, a deliberate intent to hinder or delay collection efforts, or (b) "constructive fraud"—that is, without receiving fair value in exchange when the debtor was in a condition of insolvency. *In re McCook Metals, L.L.C.*, 319 B.R. 570, 586–87 (Bankr.N.D.Ill.2005). Doctors Hospital seeks to recover from the Trust based on

allegations that Doctors Hospital transferred property through constructive fraud.

As applicable to this case, the relevant language of § 548 provides:

> The trustee may avoid any transfer of an interest of the debtor in property . . . that was made . . . within one year before the date of the filing of the petition, if the debtor . . . (B)(i) received less than a reasonably equivalent value in exchange for such transfer . . . and (ii)(I) was insolvent on the date that such transfer was made; (II) was engaged in a business transaction . . . for which any property remaining with the debt was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a).

Essentially similar provisions-but with a longer limitations period-are contained in §§ 5 and 6 of the Uniform Fraudulent Transfer Act ("UFTA") as adopted in Illinois, and are properly asserted under § 544 of the Code. *See In re Image Worldwide, Ltd.*, 139 F.3d 574, 576–77 (7th Cir. 1998) ("[U]nder the strong-arm provision of the Bankruptcy Code, 11 U.S.C. § 544(b), the trustee can avoid any transaction of the debtor that would be voidable by any actual unsecured creditor under state law.").

Doctors Hospital has the burden of proving each element of a fraudulent transfer claim by a preponderance of the evidence. *In re McCook Metals, L.L.C.*, 319 B.R. 570, 587 (Bankr.N.D.Ill.2005); *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 73 (Bankr.N.D.Ill.2002).

The burden of proving lack of reasonably equivalent value under 11 U.S.C. § 548 rests on the Trustee. *Barber v.*

*Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir.1997). The issue of whether a debtor received reasonably equivalent value is a question of fact measured at the time of the transfer. *In re Mussa,* 215 B.R. 158, 172 (Bankr.N.D.Ill.1997).

There is no fixed formula for determining reasonable equivalence. *Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir.1997). Rather, the determination depends on all of the facts of each case. *Id.* Important elements in the determination of reasonable equivalence include fair market value and whether the transaction between the parties was at arms length. *Id.* (citing *Bundles v. Baker,* 856 F.2d 815, 824 (7th Cir.1988)). Fair market value is defined as "the price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect." *Black's Law Dictionary* 1587 (8th ed.2004). The test used to determine reasonably equivalent value requires the court to determine the value of what was transferred and to compare it to what was received. *See Barber v. Golden Seed Co.,* 129 F.3d 382, 387 (7th Cir.1997).

**B. *LEASE PAYMENTS FAR EX-CEEDED REASONABLY EQUIV-ALENT RENTAL VALUE***

Plaintiff presented essentially unchallenged evidence that Doctors Hospital did not receive reasonably equivalent value for the rental payments it made pursuant to the Lease. Gary DeClark, an expert in real estate and appraisals, testified that the fair market rental for the real property subject to the Lease on a net basis as of August 1, 1997 was $2,110,000 per year. (Tr. II: 141; Jt. Ex. 160 at 3.) Based on that appraisal, the monthly fair market rental for the hospital property was $175,833.33.

DeClark's conclusion was based on accepted appraisal methodologies. *Id.* at 142–43. In developing financial return rates for the Hospital Property, he assigned risk rates, but they did not reflect any specific operational characteristics of Doctors Hospital. *Id.* at 158–59, 161.

The Lease, between two entities controlled by James Desnick, was not an arm's length transaction, making the rent payments subject to heightened scrutiny for fair market value. *See In re Bundles,* 856 F.2d 815, 824 (7th Cir.1988). The potential effect of the related-company transaction was noted by Doctors Hospital's auditor, who wrote in December 1997: "The revised rent agreement between HPCH and Doctors Hospital requires an active recalibration of the rent expense which may end up having no bearing on a fair rent expense that would have been achieved in an arm's length transaction." (Jt.Ex.100.) Robinson, CFO of Medical Management of America, Inc., agreed with that statement. (Tr. I: 150.)

The Trust's special servicer, Orix, also recognized that the rent was something other than fair market. In a webcast in February 2004, its representative stated: "What Nomura did here was size the lease to the loan. They determined the amount of proceeds they wanted to lend based on the business enterprise value, and then they structured the lease to make those debt service payments." (Jt. Ex. 151 at 22–23.) The Orix representative also stated:

So Nomura did not know, as far as we can tell, as far as the evidence shows, what it would do with the property when it took it back. It didn't know to whom it might lease the property. It didn't know under what terms it might lease the property. It didn't know the duration of that lease. It didn't even know what the overall demand for that prop-

erty or even an alternative use for that property might be.

*Id.* at 22.

The Trust failed to offer evidence to rebut the Trustee's fair market valuation. Therefore, in view of the evidence presented, to the extent that Doctors Hospital's rental payments to the Trust exceeded the fair market rental established by DeClark ($175,833.33/month) Doctors Hospital did not receive reasonably equivalent value in exchange.

### C. *CASH FLOW PRE–JULY 1998*

#### 1. *"Transfers"*

The Bankruptcy Code defines the term "transfer" to encompass a wide range of dispositions: "transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption. 11 U.S.C. § 101(54).

For purposes of the Uniform Fraudulent Transfer Act as adopted in Illinois, a transfer "means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." 740 ILCS 160/2(*l*).

Accordingly, all rent payments discussed here were "transfers."

#### 2. *The Nomura Transaction and the Cash Flow Agreements*

Four documents were executed for the purpose of integrating the Nomura Loan transactions into the pre-existing Daiwa Loan: (1) the Intercreditor Agreement (Jt.Ex.12); (2) the Cash Collateral Agreement (Jt.Ex.3); (3) the Collection Account Agreement (Jt.Ex.14); and (4) the Payment Direction Letter (Jt.Ex.92) (collec-tively the "Cash Flow Agreements"). There is no evidence in the record to suggest that any of these documents are ambiguous. Their interpretation is therefore to be determined based on plain reading of the documents. *First Bank & Trust v. Firstar Info. Serv. Corp.*, 276 F.3d 317, 322 (7th Cir.2001).

The Nomura Loan Agreement required the cash management structure set forth in the Cash Flow Agreements. (Jt.Ex.11, 2.12.) The Cash Flow Agreements required that two new bank accounts be established: (1) the Cash Collateral Account, and (2) the Collection Account.

The Cash Collateral Account, Account No. 677802001, was governed by the Cash Collateral Account Agreement. LaSalle National Bank acted as Cash Collateral Account Bank. (Jt.Ex.13.)

#### 3. *Payments the Trust Received Pre–July 7, 1998*

The actual flow of funds prior to July 7, 1998 contravened rather than conformed to the Cash Flow Agreements. Thus, from October 1997 through June 1998 Doctors Hospital transferred $4,922,486 directly from its operating account to the Trust's Cash Collateral Account. (Jt.Ex.202, ¶¶ 115, 124.)

The Trust argues that the pre-July 1998 funds that went directly from the Debtor to the Trust in contravention of the Intercreditor Agreement, and without the consent of Nomura or AMRESCO, were not interests of the Debtor as the funds were "earmarked" for debt service payments under terms of the Intercreditor Agreement. Thus, though they were received by the Debtor, they were not "owned" by the Debtor. (Def. Post–Trial Proposed Conclusions of Law, 7, ¶ 32) (citing *In re Golfview Dev. Ctr., Inc.*, 309 B.R. 758, 774 (Bankr.N.D.Ill.2004) ("The earmarking doctrine may apply where funds are given

to a debtor which are intended for a particular party."); *In re Network 90 Degrees, Inc.*, 98 B.R. 821, 836 (Bankr.N.D.Ill.1989) (Schmetterer, J.)).

■ The earmarking doctrine "is applicable only where a third party lends money to the debtor for the specific purpose of paying a selected creditor." *In re Smith*, 966 F.2d 1527, 1533 (7th Cir.1992). "In such circumstances the payment is 'earmarked' and the third party simply substitutes itself for the original creditor." *Id.* In this case, the borrowings that Daiwa sent to MMA Funding's account went directly and automatically to Doctors Hospital's general operating account (Tr. I: 72; Jt. Exs. 197, 198) rendering the earmarking doctrine inapplicable.

The Daiwa borrowings that Doctors Hospital received were not intended for anyone but Doctors Hospital. The funds went into the general operating account owned and controlled by Doctors Hospital. The funds were then used to make various payments, including rent payments to the Trust. The Trust points to no evidence that Daiwa or anyone else suggested that the funds were designated or entrusted for rent payments. The funds were placed in the larger pool of cash in Doctors Hospital's account, and then certain of those funds were transferred to the Trust.

One of the essential elements of earmarking is "the debtor's lack of control over the transferred property." *In re Golfview Dev. Ctr., Inc.*, 309 B.R. 758, 775 (Bankr.N.D.Ill.2004). In this case, Doctors Hospital had unfettered control over the funds in its operating account, and therefore no earmarking took place.

Further, at least one court has questioned whether the earmarking doctrine applies outside of a preference context. *See In re Eerie World Entm't*, No. 00–13708, 2006 WL 1288578, at *6–7 (Bankr. S.D.N.Y. April 28, 2006).

■ Alternatively, the Trust argues that Doctors Hospital held the pre-July 1998 funds pursuant to a "constructive bailment" for the benefit of the beneficiaries of the Cash Collateral Account, and accordingly never "owned the funds." (Def. Post–Trial Conclusions of Law, 7, ¶ 33.) "A bailment is the delivery of property for some purpose upon a contract, express or implied, that after the purpose has been fulfilled, the property shall be redelivered to the bailor, or otherwise dealt with according to his directions, or kept until he reclaims it." *Am. Ambassador Cas. Co. v. the City of Chicago*, 205 Ill.App.3d 879, 881, 150 Ill.Dec. 755, 563 N.E.2d 882, 884 (1990).

■ To recover under an ordinary bailment theory, the Trust must prove the following elements: (1) an express or implied agreement to create a bailment; (2) delivery of the property in good condition; (3) the bailee's acceptance of the property; and (4) the bailee's failure to return the property or the bailee's re-delivery of the property in a damaged condition. *Id.* The Trust did not allege or prove any of these elements.

■ "A constructive bailment, or a bailment implied in law, may be found where the property of one person is voluntarily received by another for some purpose other than that of obtaining ownership." *Centagon, Inc. v. Board of Directors of 1212 Lake Shore Drive Condominium Ass'n*, No. 00 C 1110, 2001 WL 1491523, at *7 (N.D.Ill. Nov. 21, 2001) (citing *Am. Ambassador Cas. Co. v. City of Chicago*, 205 Ill.App.3d at 882, 150 Ill. Dec. 755, 563 N.E.2d at 885). In cases of constructive bailment, "the law implies a contract for the keeping of the property until it shall be restored to the owner or his agent, and the contract implied is that of a depositary." *Id.* In this case, the evidence did not establish that Doctors

Hospital did not own the Daiwa borrowings, to the contrary, its ownership was established.

■■■■ A bailee does not have title to the property subject to the bailment. Restatement (Second) of Trusts § 5 cmt. a (2006); *see Robbins v. Cont'l Nat'l Bank & Trust Co.*, 324 Ill.App. 422, 443, 58 N.E.2d 254, 263 (1944). Here, the funds in Doctors Hospital's bank account belonged to Doctors Hospital. Therefore, there is no bailee based on the facts in this case and the Trust's bailment theory has no application to the evidence here.

### 4. *The Trust Was the Initial Transferee of Funds of the Debtor in the Pre–July 7, 1998 Cash Flow*

The minimum requirement for a "transferee" as the term is used in Section 550 of the Bankruptcy Code is "dominion and control" over the transferred property. *Bonded Fin. Services, Inc. v. European American Bank*, 838 F.2d 890, 893 (7th Cir.1988) (stating the dominion test stresses the ability of the recipient to use the money as it sees fit).

The test for dominion and control is whether the party had the right to use the transferred property for its own purposes. *Bonded Fin.*, 838 F.2d at 893 ("When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded.").

The "dominion test" requires that a transferee be "free to invest the whole [amount] in lottery tickets or uranium stocks." *Bonded Fin.*, 838 F.2d at 894. "Dominion is therefore akin to legal control (e.g., the right to invest the funds as one chooses), not mere possession." *In re Cohen*, 300 F.3d 1097, 1102 (9th Cir.2002); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 59 (2d Cir.1997) (holding that a "commercial entity that in the ordinary course of its business, acts as a mere conduit for funds and performs that role consistent with its contractual undertaking in respect of the challenged transaction is not an initial transferee.").

■■■■ The Trust argues that it was not the initial transferee of any interests of the Debtor because it had nothing to do with the Cash Collateral Account. Rather, the Trust argues that it was simply an escrow from which the Trust's certificate-holders and others received funds. The Trust claims that LaSalle Bank, not LaSalle as Trustee, was the escrow agent, that the grantor was MMA Funding, and that the principal beneficiaries were Doctors Hospital and the Trust's certificateholders. There is no evidence or written instrument in the record to establish that the Cash Collateral Account was an escrow account, and therefore this argument fails.

■■■■ Bankruptcy courts must look to state law in determining whether an account is a "true escrow." Illinois courts have defined an escrow as "a written instrument which by its terms imports a legal obligation, and which is deposited by the grantor, promisor or obligor, or his agent with a stranger or third party, to be kept by the depository until the performance of a condition or the happening of a certain event and then to be delivered over to the grantee, promisee or obligee." *Garvey v. Parrish*, 84 Ill.App.3d 578, 584, 40 Ill.Dec. 13, 405 N.E.2d 1105, 1111 (1980) (citing *Rinehart v. Rinehart*, 14 Ill.App.2d 116, 123, 143 N.E.2d 398 (1957)). "An escrow executed and deposited upon a valuable consideration is not revocable except according to the terms of the agreement and deposit." 28 Am.Jur.2d *Escrow* § 8 (2006).

In this case, no written instruments were offered suggesting that the Cash Collateral Account is a true escrow account. Rather, the evidence demonstrates that

the Trust is the successor-in-interest to Nomura with respect to the Nomura Loan. The "Trust" named as a defendant here is LaSalle Bank as Trustee for the certificateholders of a trust. The Trust and the trustee came into being as a result of a Pooling and Servicing Agreement ("PSA") whereby Nomura's immediate successor, ASC, transferred to LaSalle as Trustee all of its rights in the Nomura Loan. This is undisputed, as it was stipulated to by the Trust: "ASC as 'Depositor' sold to LaSalle as 'Trustee' all of ASC's 'right, title and interest...in and to' [the Nomura Loan]...." (Jt.Ex.202, 106.) The PSA describes the sale of the loans as one "to the Trustee." (Jt.Ex.23, Sec.2.01.) The Trust's own actions also belie that the Trustee is not the real party in interest; when the Trust sued Nomura to recover its loss on the Nomura Loan, it sued in the name of LaSalle as Trustee. (Jt.Ex.137.)

The agreement that established the account specifically provided that a cash collateral account shall be established in the name of "Nomura Asset Capital Corporation as Mortgagee of HPCH, LLC." (Jt.Ex.13, Sec.3(a).) An account in Nomura's name was in fact opened. (Jt.Ex.113.) The Cash Collateral Account Agreement further provided that "the accounts maintained hereunder are subject to the sole dominion, control and discretion of [Nomura]...." (Jt.Ex.13, Sec.6.) The agreement also provided that Nomura had "the sole right to make withdrawals from the Cash Collateral Account." *Id.* Sec. 2. The loan agreement between Nomura and HPCH provided: "The cash collateral account shall be under the sole dominion and control of Lender." (Jt. Ex. 11 at 43, sec. 2.12(b).) In its answer to the complaint, the Trust admitted that the Daiwa borrowings were sent by Daiwa "directly to a lockbox controlled by Nomura." (Jt.Ex.142, 55.) The LaSalle Bank officer responsible for oversight of the Cash Collateral Account confirmed that the Trust alone controlled the account. (Pl.Ex. 32 (Severyn) at 35, 39–41.)

The Trust's escrow theory is also at odds with stipulations that it made for purposes of trial. The Trust stipulated, for example, that upon execution of the Nomura Loan, Doctors Hospital "began making direct transfers from its general account *to the Trust*" by sending money to the Cash Collateral Account. (Jt. Ex. 202, 115; emphasis supplied.) In another stipulation, the Trust agreed that it "took from the funds in the Nomura Cash Collateral Account amounts sufficient to fund reserve accounts...." (Jt.Ex.202, 119.) Most telling is this stipulation: "From July 1998 through April 2000, the Trust retained $23,771,082 of the funds sent to the [Cash Collateral Account]." (Jt.Ex.202, 129.) Each of these stipulations demonstrates that the Trust, not just LaSalle Bank as an "escrow agent," controlled and received funds flowing to the Cash Collateral Account.

■ Having made these stipulations, the Trust cannot now claim that it was merely a beneficiary of funds that were paid out of the Cash Collateral Account. The stipulations were made after all discovery was completed, and were made for purposes of trial. Accordingly, they are binding judicial admissions. *See Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995) (judicial admissions are "formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them."); *McCaskill v. SCI Mgmt.,* 298 F.3d 677, 680 (7th Cir.2001) (noting that a judicial admission is "any deliberate, clear, and unequivocal statement" made in the course of judicial proceedings).

The PSA, which created the Trust made clear that it was not the type of pass-through entity that courts refer to as having no interest in the transfers; the Trust

was the entity that was intended recipient of the transfers. Under the PSA, the Trust was the owner of the Mortgage Loans, including the Nomura Loan, and other assets related to the Mortgage Loans. (Jt. Ex. 23 at 64–67.) The operation and management of the Trust Fund was governed by the Trustee generally through the Servicer and Special Servicer. (Jt. Ex. 23, Articles III and IV generally, at 85–174.) The obligations and duties of the Trustee, the Servicer, the Special Servicer and other parties were delineated in the PSA. (Jt.Ex.23.) The corpus of the Trust or Trust Fund consisted generally of all the Mortgage Loans transferred to the Trust, the right to collect funds under the Mortgage Loans, rights to insurance proceeds with respect to the Mortgage Loan, all rights related to the Mortgage Loans, including any rights and security granted in connection with the Mortgage Loans such as guarantees and indemnities, and the Lock Box Accounts, Cash Collateral Accounts, Escrow Accounts, and the like. (Jt. Ex. 23 at 59, 64.)

The Trustee, generally through the Servicer and Special Servicer, performed all duties that an owner of a mortgage loan would perform, including foreclosing and generally enforcing all of the rights with respect to the Mortgage Loans and the related assets of the Trust Fund. (Jt. Ex. 23, Articles III and IV generally, at 85–174.)

The Trustee, the Servicer, and the Special Servicer were all entitled to receive fees and reimbursements for the services performed. (Jt. Ex. 23, at 107, 209.) In certain instances, the Trustee, the Servicer or Fiscal Agent made advances of funds to certificateholders in connection with Distributions. (Jt. Ex. 23 at 171–74.) The certificateholders had no rights with respect to operation and management of the Trust Fund and had no liability for actions of the Trustee, Servicer or Special Servicer or any other party to the Pooling and Service Agreement. (Jt. Ex. 23 at 222.)

Generally, only the Trustee, the Servicer or the Special Servicer had rights to enforce the Mortgage Loans and other assets comprising the Trust Fund. (Jt. Ex. 23 at 222, Articles III and IV, at 85–174.) In substance, the Trustee operated the business of liquidating the corpus of the Trust and making distributions to certificateholders based upon the type and priority of the Certificate. As evidenced by the instant litigation and the Trust's litigation against Nomura, the Trustee on behalf of the Trust sued and defended the Trust. Unlike an escrow agent or depositing bank, the Trust acting through the trustee did not pass through the transfers in kind. The Trustee in operating the business of the Trust had a financial interest in the transfers. This was the vehicle chosen to operate business of the Trust.

Based on the above, it is clear that the Trust exercised dominion and control over the funds such that it was the initial transferee of payments received pre-July 1998. The Trust argues that a conveyance claim cannot be brought against LaSalle *as Trustee*, since it did not have the right to use the challenged payments for its own purposes, but rather would have transmitted the payments to the certificateholders as required under the PSA. However, the clear language in the PSA demonstrates that the Trust did exercise "dominion and control" over the funds and thus was the initial transferee. Moreover, evidence did not establish to suggest that the Trust was a true escrow. To the contrary, the evidence established that the Trust was not a true escrow.

Therefore, it must be concluded that the Trust was the initial transferee of payments it received from Doctors Hospital pre-July 7, 1998.

### 5. The $801,926 Paid Into the Cash Collateral Account on May 11, 1998 Were Funds Owned by Doctors Hospital

The Trust contends that part of the $4,922,486 in payments pre-July 1998 paid into the Cash Collateral Account on May 11, 1998, was not made with funds owned by Doctors Hospital. Rather, the Trust contends that such funds represented the proceeds of a loan made by Brickyard Bank to Desnick personally. The Trust relies on Joint Exhibits 94 and 158 to support this proposition. Joint Exhibit 158 indicates that $801,926 was an advance to Doctors Hospital from Desnick. Joint Exhibit 94 is a memorandum from Robinson at Medical Management of America, the manager of Doctors Hospital, directing Brickyard Bank to transfer the $801,926 to the Cash Collateral Account. The memorandum also shows that the $801,926 was part of a larger advance to Doctors Hospital, as an additional amount of $198,073 was transferred from Brickyard Bank to Doctors Hospital's operating account. Thus, the memorandum shows that Desnick advanced funds to the Trust on behalf of Doctors Hospital and transferred additional funds to Doctors Hospital's operating account. It is clear that Desnick advanced these funds on behalf of Doctors Hospital. The funds do not appear to be a gift from Desnick, rather they were transferred to the Trust on behalf of Doctors Hospital. "In the bankruptcy setting, courts have held that transfers by a debtor of borrowed funds constitute transfers of the debtor's property." *In re Smith,* 966 F.2d 1527, 1533 (7th Cir.1992).

Moreover, the Trust stipulated to the following: "In May 1998 Doctors Hospital caused $801,926.62 to be transferred to the Nomura Cash Collateral Account." (Jt.Ex.202, ¶ 125.) Therefore, based on this binding stipulation as well as the evidence in this case, the $801,926 paid into the Cash Collateral Account were funds owned by Doctors Hospital.

For reasons stated all pre-July 1998 transfers to the extent they exceeded reasonable fair rental market value are voidable if Debtor was or became insolvent at the time of those transfers.

### D. CASH FLOW POST–JULY 7, 1998

In the post-July 1998 timeframe, the flow of funds conformed exactly as required under the Cash Flow Agreements. Pursuant to the Intercreditor Agreement and the Payment Direction Letter, all advances to which MMA Funding was entitled under the Daiwa Loan Agreement were paid into to the Cash Collateral Account. By signing the Intercreditor Agreement and the Payment Direction Letter showing how cash would flow thereunder, MMA Funding agreed to the use of its funds for repayment of the Nomura Loan.

Since Doctors Hospital was not a borrower under the Daiwa Loan Agreement, Doctors Hospital was not entitled to such funds as a borrower and had no ownership interest therein. Rather, such funds were directed into the Cash Collateral Account solely by MMA Funding, the borrower under the Daiwa Loan Agreement.

Pursuant to the Intercreditor Agreement and the Payment Direction Letter, all advances to which MMA Funding was entitled under the Daiwa Loan Agreement were paid into the Cash Collateral Account. The sources of funds into the Cash Collateral Agreement were advances to MMA Funding under the Daiwa Loan Agreement, amounts received from the Collection Account, and the interest income. Although Doctors Hospital also signed the Intercreditor Agreement and the Payment Direction Letter, those documents did not give Doctors Hospital any ownership interest in the Daiwa advances

that it did not already have under the Daiwa Loan Agreement. Doctors Hospital was not the borrower under the Daiwa Loan Agreement and had no interest in the advances thereunder. It therefore had no power to "direct" those advances into the Cash Collateral Account.

Based on these facts, the Defendant Trust argues that the Daiwa borrowings were assets of MMA Funding, the borrower named in the Daiwa Loan documents, not assets of Doctors Hospital. Therefore, the Trust argues that it could not possibly be the initial transferee of "an interest of the debtor" under 11 U.S.C. § 548 as the funds it received were not interests of Doctors Hospital.

Doctors Hospital, in response, argues the followings: (1) despite the language in the loan documents, the Daiwa Loan agreements were modified by the parties post-agreement course of performance; (2) the substance of the Daiwa Loan Transactions is a loan to Doctors Hospital; (3) MMA Funding was the alter ego or instrumentality of Doctors Hospital; and (4) even viewing the loan agreement as written, the Trust was the initial transferee of Doctors Hospital's funds.

■■■ The arguments proposed by the Trustee for Doctors Hospital fail for reasons discussed below. Because the post-July 1998 rent payments were not made with funds owned by Doctors Hospital, they cannot be recovered as fraudulent transfers.

### 1. *The Daiwa Loan Transaction*

Doctors Hospital argues that in the Daiwa Loan transaction, MMA Funding, the nominal borrower, was simply an entity created to protect Daiwa's interests in the event Doctors Hospital went bankrupt. Therefore, Doctors Hospital argues that this Court should look beyond the unambiguous loan documents in evidence and instead look to the "form" of the transaction.

While "[c]ourts will eschew appeals to form which obscure the substance of a transaction," *In re Joy Recovery Tech. Corp.* 286 B.R. 54, 74 (Bankr.N.D.Ill.2002), in this case the parties acted in accordance with the transaction documents which are fully integrated, unambiguous documents. While the Trustee urges that MMA Funding was only the "documented borrower," the Trust and Daiwa relied on its separateness and the warranties that MMA Funding made regarding its separateness.

Doctors Hospital argues that as a court of equity, this Court should look behind the form of the transaction and relationships to determine the substance of the transaction. To do so, however, would ignore the unambiguous loan documents and the parties reliance thereon. MMA Funding was created for a specific purpose and had a specific reason to exist separately from Doctors Hospital. MMA Funding was created as an entity to protect Daiwa's interests in the event that Doctors Hospital went bankrupt. Clearly Daiwa relied on this separateness before becoming a party to the loan agreement with Doctors Hospital. Thereafter, the loan agreements involving the Trust also treated and characterized MMA Funding as a separate entity. This separateness will not be disregarded.

MMA Funding was created in March 1997 for the purpose of the Daiwa Loan. (Tr. II, p. 24; Jt. Exs. 117, 166, 171, 173.) The Trustee argues that MMA Funding was a "classic shell company." MMA Funding, however, had a specific purpose to serve as a bankruptcy-remote entity. This was done to "isolate" the financial assets in the special purpose entity, and thereby protect the lender from the bankruptcy risk of the operating company. Thomas E. Plank, *The Security of Securi-*

*tization and the Future of Security,* 25 Cardozo L.Rev. 1655, 1665–67 (2004). The whole idea is to ensure that if the operating company does file bankruptcy, the financial assets will not be part of that bankruptcy. *Id.* at 1662–66. This also allows for loans to be made at a lower interest rate than would otherwise be available to the operating company. *Id.* at 1666–69.

In the Daiwa Loan, MMA Funding was created as a special purpose bankruptcy-remote subsidiary in order to facilitate the loans made by Daiwa. (Jt. Exs. 117, 168, 171; Tr. II, pp. 113, 121.) As reflected by the correspondence among the attorneys working on the Daiwa Loan, Daiwa would not have made the loans without this structure. (Jt.Exs.117, 168, 171.)

Securitization transactions, such as the Daiwa Loan, are premised on the idea that the transfer of the underlying financial asset will be recognized as a "true sale" to the special purpose subsidiary, and the parties to the securitization obtain legal opinions to that effect. Thomas E. Plank, *The Security of Securitization and the Future of Security,* 25 Cardozo L.Rev. 1655, 1662–66 (2004). In addition, the transaction parties structure the special purpose bankruptcy-remote subsidiary to ensure that it will not be subject to substantive consolidation in the event the operating company files for bankruptcy protection, and again seek a legal opinion to that effect. *Id.* The whole idea is to ensure that if the operating company does file bankruptcy, the financial assets of the special purpose subsidiary will not be part of that bankruptcy.

In this case, pursuant to the Contribution Agreement signed in connection with the Daiwa Loan, Doctors Hospital transferred all of its receivables on a continuing basis to MMA Funding as a "true sale." By virtue of the Contribution Agreement, Doctors Hospital parted with all right, ti-

tle, and interest in and to the receivables. The Contribution Agreement contained extensive detailed covenants requiring MMA Funding to be maintained as a separate legal entity from Doctors Hospital throughout the life of the Daiwa Loan. (Jt.Ex.5, Ex. IV.)

A UCC–1 statement was filed in connection with the transfer of the receivables. The UCC–1 statement stated, "The Company and the Provider intend and agree that the Contribution Agreement provides for bona fide contributions and a full and complete transfer of ownership by the Provider to the Company of all Receivables." (Jt.Ex.175.) The UCC–1 statement also made clear that MMA Funding was the owner of the receivables and that it granted security interests in the receivables to Daiwa. *Id.* Legal opinions were delivered at the closing of the Daiwa Loan validating the separate existence of MMA Funding. (Jt.Ex.166, 167.)

 The transaction documents in this case are fully integrated unambiguous documents. "The interpretation and construction of an unambiguous contract are questions to be decided by a court as a matter of law." *Modern Steel Treating Co. v. Liquid Carbonic Industrial/Medical Corp.,* 298 Ill.App.3d 349, 353, 232 Ill.Dec. 619, 698 N.E.2d 710, 712 (1998). Under Illinois law, where contract terms are unambiguous they are to be given their clear and natural meaning and the rights of the parties are limited by the terms expressed in the contract. *Jewel Companies, Inc. v. Serfecz,* 220 Ill.App.3d 543, 163 Ill.Dec. 235, 581 N.E.2d 186 (1991). The Illinois Supreme Court has provided that when a contract is unambiguous:

> Both the meaning of the instrument and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids ... What the

parties to a written contract may have understood as to the meaning of the language used is not admissible in evidence. The intention or understanding of the parties, when there is a written contract in evidence, must be determined not from what the parties thought but from the language of the contract itself.

*Rakowski v. Lucente*, 104 Ill.2d 317, 323, 84 Ill.Dec. 654, 657, 472 N.E.2d 791, 794 (1984) (citation omitted).

▪ The Daiwa Loan Agreement and related transaction documents are clear. *See In re Bellevue Place Assocs.*, 173 B.R. 1009, 1018 (Bankr.N.D.Ill.1994). "Where the terms of an agreement are not clear, subsequent conduct of parties to such agreement may be used to construe the contract." *Id.* This is also not a case in which any of the parties agreed upon a modification of the original contracts.

Pursuant to Section 3.01 of the Daiwa Loan Agreement, and on each subsequent Funding Date throughout the life of the Daiwa Loan, MMA Funding re-affirmed its representations, warranties and covenants, including its representation that it owned the Receivables, and also the separateness covenants in Exhibit IV to the Contribution Agreement. (Jt. Ex. 1, Section 3.01, Exhibit III(k), Exhibit IV(p); Jt. Ex. 5, Exhibit IV; Tr. I, pp. 182–86.)

Doctors Hospital expressly acknowledged the separateness of MMA Funding and that the transfer of the Receivables was a "true sale" when the Daiwa Loan was consummated (Jt. Ex. 5, 5.08, Exhibit IV), and expressly ratified these covenants and representations in the amendment to the Contribution Agreement on February 25, 1999. (Jt.Ex.6.) Doctors Hospital benefitted from the separateness of MMA Funding, as it used MMA Funding to its advantage when consummating the Daiwa Loan. Doctors Hospital cannot now argue that the separateness of MMA Funding should be ignored.

The Plaintiff places great emphasis on evidence which demonstrates that parties involved in the Daiwa Loan transaction *treated* Doctors Hospital as the borrower, not MMA Funding. The Plaintiff argued that the Trust's own loan services viewed Doctors Hospital as the borrower, as did Robinson. However, whether or not certain parties viewed Doctors Hospital as the borrower in the Daiwa Loan does not change the fact that MMA Funding was the true borrower. The unambiguous loan documents make clear that MMA Funding was the borrower in the Daiwa Loan. MMA Funding may not have been an operating company, but it did indeed have a function as a special purpose entity. As a special purpose entity, it was the borrower in the Daiwa Loan. MMA Funding may, as Robinson put it, have been only the "documented borrower." (Tr. I: 178.) However, it is precisely its role as the "documented borrower" that the parties relied on.

### 2. *MMA Funding Should not be Treated as the Alter Ego or Instrumentality of Doctors Hospital*

Plaintiff argues that MMA Funding was the alter ego or instrumentality of Doctors Hospital. As a result, Plaintiff argues that when the two entities are combined, Doctors Hospital becomes the borrower under the Daiwa Loan, and the Daiwa borrowings become borrowings of Doctors Hospital. Therefore, Doctors Hospital argues that the funds the Trust received should be treated as interests of the Debtor despite the fact that MMA Funding was the borrower under the terms of the transaction documents as written.

As a preliminary matter, the Trustee argues that Doctors Hospital is not entitled to assert the alter ego theory because

relief was not requested in its pleadings or at any time during this case.

However, use of the alter ego theory is not barred under Federal pleading rules even though the specific theory was not pleaded in the Complaint. The alter ego doctrine is an equitable remedy and does not create substantive rights and duties. *Conopco, Inc. v. S.K. Foods*, No. 98 C 1882, 1999 WL 965554, at *3 (N.D.Ill. Sept.30, 1999). "Rather, a proper claim involving an 'alter ego' must be grounded on a well-pled underlying cause of action such as tort, contract, or both." *Id.* In this case, the underlying causes of action are the fraudulent transfer claims against the Trust. The alter ego theory is one of the legal theories of recovery on those claims, and "parties are not required to plead legal theories." *Disch v. Rasmussen*, 417 F.3d 769, 776 (7th Cir.2005). Therefore, the use of the alter ego theory by the Plaintiff is not barred due to tardiness in failing to assert it in earlier pleadings, and we must turn to the evidence here to see if applies to the doctrine.

Illinois courts apply a two-part test in determining whether one corporation is the alter ego of another.

> Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is so controlled and its affairs so conducted that it is a mere instrumentality of another, and it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice.

*Main Bank of Chi. v. Baker*, 86 Ill.2d 188, 205, 56 Ill.Dec. 14, 427 N.E.2d 94, 101 (1981); *see also Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 569–70 (7th Cir.1985) (finding that a corporate entity will be disregarded and the veil of limited liability pierced when two requirements are met: "first, there must be

such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist; and second, circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.").

In determining whether the first prong of the test has been met, Illinois courts consider many factors including the following: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; commingling of funds; (8) diversion of assets from the corporation by or to a shareholder; (9) failure to maintain arm's length relationships among related entities; and (10) whether the corporation is a mere facade for the operation of the dominant shareholders. *Jacobson v. Buffalo Rock Shooters Supply Inc.*, 278 Ill.App.3d 1084, 1088, 215 Ill.Dec. 931, 664 N.E.2d 328, 331 (1996) (citation omitted). "It is a well-established principle that a corporation is separate and distinct as a legal entity from its shareholders, directors and officers and, generally, from other corporations with which it may be affiliated." *Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 204, 56 Ill.Dec. 14, 427 N.E.2d 94, 101 (1981) (citing *Dregne v. Five Cent Cab Co.*, 381 Ill. 594, 46 N.E.2d 386 (1943)). Further, the use of common officers and directors of itself does not render one corporation liable for the obligations of another. *Id.* at 205, 56 Ill.Dec. 14, 427 N.E.2d 94 (citing *Superior Coal Co. v. Department of Finance*, 377 Ill. 282, 36 N.E.2d 354 (1941)). Such practices are common and exist in most parent-subsidiary relation-

ships. *Id.* at 204–05, 56 Ill.Dec. 14, 427 N.E.2d 94 (citing *Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 161 (7th Cir.1963)).

Because of requirements to be met to pierce the corporate veil, a party seeking this remedy has the substantial burden of showing that the corporation is merely a sham which exists for the benefit of another dominating entity, its alter ego. *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 278 Ill.App.3d 1084, 215 Ill.Dec. 931, 664 N.E.2d 328 (1996). The plaintiff has the burden of demonstrating that adhering to the corporate form would cause it to suffer some unfairness, such as fraud, deception, or some compelling public interest. *Sea–Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 523 (7th Cir.1991); *People v. V. & M Indus., Inc.*, 298 Ill. App.3d 733, 233 Ill.Dec. 218, 700 N.E.2d 746 (1998).

This requirement can be satisfied if a plaintiff can show that failing to pierce the corporate veil would result in "unjust enrichment"—the receipt of money or its equivalent under circumstances that "suggest that it ought not to be retained because it belongs to someone else." *Sea–Land Servs., Inc. v. Pepper Source*, 993 F.2d 1309, 1312 (7th Cir.1993). The plaintiff must show the existence of "something more than the mere prospect of an unsatisfied judgment." *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1390 (7th Cir. 1994). It must show something like "an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation ..." *Sea–Land Servs., Inc.*, 993 F.2d at 1311–12. The power to pierce the corporate veil "should be exercised reluctantly and cautiously." *C M Corp. v. Oberer Development Co.*, 631 F.2d 536, 541 (7th Cir.1980); *accord Jacobson*, 215 Ill.Dec. 931, 664 N.E.2d at 331.

In *Sea–Land Services v. Pepper Source*, after canvassing Illinois law, this Circuit defined "promoting injustice" expansively:

> Generalizing from these [state and federal] cases [in Illinois that discuss "promoting injustice"], we see that the courts that properly have pierced corporate veils to avoid "promoting injustice" have found that, unless it did so, some "wrong" beyond a creditor's inability to collect would result: the common sense rules of adverse possession would be undermined; former partners would be permitted to skirt the legal rules concerning monetary obligations; a party would be unjustly enriched; a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; *or* an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful.

941 F.2d 519, 524 (7th Cir.1991) (emphasis added).

In this case, MMA Funding was owned 99% by Doctors Hospital and 1% by MMA. MMA was 100% owned by James Desnick and his Trusts, and Desnick also owned 100% of Doctors Hospital. The Trustee therefore argues that Doctors Hospital had ability to control the affairs of MMA Funding. Further, MMA Funding kept no corporate records, had no officers or employees, filed no tax returns and had no assets other than the Contribution Agreement with Daiwa that Doctors Hospital allegedly ignored. Therefore, Doctors Hospital agues that MMA Funding was nothing more than an instrumentality of Doctors Hospital and, as such, it meets the first part of the test set out above.

Doctors Hospital places great emphasis on the fact that MMA Funding had no checking account, no insurance, no telephone, no separate stationery or business

forms and no tax purpose. Plaintiff also apparently believes that because MMA Funding, Inc., as manager of MMA Funding, did not exercise each and every one of its powers under the Operating Agreement (Tr. II, pp. 53–60), MMA Funding is not entitled to retain its separate legal status. Essentially, Plaintiff seeks to combine MMA Funding's assets simply because MMA Funding had no functions besides the Daiwa Loan. (Tr. I, p. 120.) This argument neglects to take into account that MMA Funding was created as a special purpose entity (Tr. II, pp. 113–14, 121.) It was specifically designed to have limited functions; to receive the receivables and pledge them as collateral. *Id.*

MMA Funding was not an operating company. Robinson (the manager of Doctors Hospital) acknowledged that it was never intended to be an operating company. (Tr. II, p. 24.) However, its lack of operations (and functions related to operations) does not mean that its corporate form should be ignored. In the same way, the absence of separate financial statements and tax returns for MMA Funding after the closing date of the Daiwa Loan do not warrant disregarding the separateness of Doctors Hospital and MMA Funding. The trial record reveals that both Daiwa and Nomura relied on the separateness of these entities. MMA Funding was created as a functional vehicle and performed its intended function. Its function was to serve as a bankruptcy-remote entity and vehicle for transmission of a cash flow from it to Daiwa. The fact that it was not making widgets does not mean that its separate function should be ignored.

Even assuming *arguendo* Plaintiff satisfied the first part of the test, it clearly falls well short of proving the second part of the test, the necessity to prove that "observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice."

*Main Bank of Chicago v. Baker,* 86 Ill.2d 188, 205, 56 Ill.Dec. 14, 427 N.E.2d 94, 101 (1981).

Plaintiff acknowledges that if the separate existence of MMA Funding is observed, the Trust may not be held liable for the transfers it received. Plaintiff argues that the injustice which would exist would be allowing the Trust to avoid liability for its alleged receiving fraudulent transfers. Further, Doctors Hospital argues that MMA Funding was created to protect Daiwa in the context of the Daiwa Loan, not the Trust in the context of the Nomura Loan. This, apparently, is the injustice that Doctors Hospital argues would exist if MMA Funding is not considered the mere instrumentality of Doctors Hospital. In short, Plaintiff argues that the "injustice" would consist of its losing this case.

While it is true that any recovery in this case could inure to the benefit of the creditors of Doctors Hospital, Plaintiff does not rely on any fraud or injustice done to third parties for its invocation of the alter-ego remedy. Rather, it asserts that the Trust may not be found liable for the alleged fraudulent transfers it received. This does not fall in the category of "wrong" that would support a piercing of the corporate veil. MMA Funding was created for a special purpose which was to serve as a bankruptcy-remote entity. MMA Funding was not created as a cover for fraud or to work an injustice.

In *Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings),* a similar issue was decided in context of a 11 U.S.C. § 547 preference proceeding. 216 B.R. 371 (Bankr.S.D.N.Y. 1998). In that case, the debtor sought to recover loan repayments made by its subsidiary and the subsidiary of its subsidiary. The court, however, dismissed the claims noting that "as a rule, parent and subsid-

iary corporations are separate entities, have separate assets and liabilities." *Id.* at 375. Accordingly, the court in *Regency* held that the debtor "did not possess legal title or any indicia of ownership of the funds" and dismissed the claims. *Id.* at 377. For similar reasoning, Doctors Hospital did not own the assets of MMA Funding, and may not recover such assets as fraudulent conveyances.

In its post-trial brief, Plaintiff argues from a practical standpoint, that Doctors Hospital *must* be regarded as the borrower under the Daiwa Loan because Doctors Hospital, as the operating company, required proceeds of the Daiwa Loans to operate its business. This argument does not, by itself, change the terms of the underlying agreements or the agreed-upon separateness of Doctors Hospital and MMA Funding. This argument also ignores the fact that the structure established pursuant to the Intercreditor Agreement allowed Doctors Hospital to utilize more than $67,242,520 more from the Cash Collateral Account. (Jt.Ex.158.)

It should also be noted that "reverse piercing," where the parent company asserts that the subsidiary is not really a separate entity, is generally not favored. 13 Ill. Law & Prac. Corps. § 11 (2006) (citing *In re Rehabilitation of Centaur Ins. Co.*, 158 Ill.2d 166, 198 Ill.Dec. 404, 632 N.E.2d 1015 (1994)). Courts applying Illinois law have held that a corporation may not pierce its own corporate veil, but that it will be pierced in the interests of protecting third parties. *Daley v. American Drug Stores, Inc.*, 294 Ill.App.3d 1024, 229 Ill.Dec. 373, 691 N.E.2d 846 (1998), *appeal denied,* 178 Ill.2d 574, 232 Ill.Dec. 846, 699 N.E.2d 1031 (1998); *Flynn v. Allis Chalmers Corp.*, 262 Ill.App.3d 136, 199 Ill.Dec. 408, 634 N.E.2d 8 (1994); *Sinquefield v. Sears Roebuck and Co.*, 209 Ill.App.3d 595, 154 Ill.Dec. 325, 568 N.E.2d 325 (1991).

Allowing a corporation to pierce its own veil would have the effect of denying the corporation its own corporate existence. *In re Rehabilitation of Centaur Ins. Co.*, 158 Ill.2d 166, 198 Ill.Dec. 404, 632 N.E.2d 1015 (1994).

For reasons stated, Plaintiff cannot prevail as to the post-July 1998 transfers even if Debtor was insolvent or became insolvent as a result of the transfers.

### E. *PLAINTIFF HAS ESTABLISHED INSOLVENCY*

The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation..." 11 U.S.C. § 101(32). The Illinois Uniform Fraudulent Transfer Act contains essentially the same definition of insolvency. *See* 740 ILCS 160/3 ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."). Generally, fair valuation reflects the price that a willing buyer would pay in an arm's length transaction. *See In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d 87, 92–93 (7th Cir.1986); *In re Hoffinger Industries, Inc.*, 313 B.R. 812, 817 (Bankr.E.D.Ark. 2004) ("[F]air market value implies a willing seller and a willing buyer."); *In re WRT Energy Corp.*, 282 B.R. 343, 369 (Bankr.W.D.La.2001) (same).

The Bankruptcy Court has broad discretion when considering evidence to support a finding of insolvency. Insolvency is a question of fact. *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979); *In re Join–In Int'l. (U.S.A.) Ltd.*, 56 B.R. 555, 560 (Bankr.S.D.N.Y.1986).

The Plaintiff alleging insolvency must establish it by a preponderance of the evidence. *In re KZK Livestock, Inc.*, 290 B.R. 622, 625 (Bankr.C.D.Ill.2002) The Trustee must therefore prove that the

Debtor was more likely insolvent than not at the time of the transfers. *Id.*

■ It is generally accepted that whenever possible, a determination of insolvency should be based on seasonable appraisals or expert testimony. *In re Roblin Indus., Inc.,* 78 F.3d 30, 38 (2d Cir.1996). Additionally, unless a business is "on its deathbed," the proper valuation standard is a going concern basis. *In re Taxman Clothing Co.,* 905 F.2d 166, 169–70 (7th Cir.1990) (finding that a business was not on its deathbed on the date at issue "because the assets that it could realize on in the ordinary course of its business exceeded the expenses of realizing on them, plus its (other) liabilities.").

### 1. *Expert Opinions in Evidence*

■ Through expert testimony from Scott Peltz ("Peltz") and Michael Lane ("Lane"), plaintiff presented evidence that Doctors Hospital was insolvent at all times from August 28, 1997 through April 17, 2000.

■ For the first time, Defendant argues in its post trial brief that Peltz should now be disqualified, relying on *In re Med Diversified, Inc.,* 334 B.R. 89 (Bankr. E.D.N.Y.2005). In that case, it was held that Peltz, plaintiff's insolvency expert in this case, was not qualified to testify as an expert on valuation of a company. *Id.* at 96. The Trust did not argue this point at trial where it could have been fully aired. When the Trust was given an opportunity at trial to object to Peltz's qualifications, the Trust did not. (Tr. IV: 68–69.) The Court then qualified him as an expert in insolvency. (Tr. IV: 69.) The Trust thus waived any objection based on *Med Diver-*

*sified* or any other ground. Second, Peltz was not offered as an expert in insolvency in *Med Diversified;* he was offered as a business valuation expert. Nor was he there using the capitalization of normalized income methodology, the principal methodology that he used in finding Doctors Hospital's insolvency. Third, the main reason he was disqualified in *Med Diversified* was his lack of a certification in business valuation. 334 B.R. at 96. In this case no such issue arises. Fourth, Peltz has been qualified as an expert in insolvency in numerous other cases, including a previous case before this Court. (Jt. Ex. 72 at Tab E.) The isolated *Med Diversified* decision therefore does not diminish the force of his opinions in this case, particularly when the Trust waived any objection to his qualification.

Plaintiffs' experts used the appropriate balance sheet test for insolvency, and properly valued Doctors Hospital as a going concern. Using a capitalization of normalized cash flow method, plaintiff's experts showed that Doctors Hospital had a negative fair value of equity from September 30, 1997 to March 31, 2000. The experts concluded that Doctors Hospital could not be valued using a discounted cash flow method because of the presence of fraud, a historical inability to reach forecasted results, and other reasons. The Trust's expert likewise used the capitalization of cash flow method. (Jt. Ex. 31 at 13; Jt. Ex. 72 at 5.) Plaintiff's experts tested their conclusions from the capitalized cash flow method by applying two other transaction methods: capital markets method and merger and acquisition method. All three methods showed a negative fair value of equity, and thus insolvency, as follows:

| | Indicated Fair Value of Equity (in Thousands) | | | |
| --- | --- | --- | --- | --- |
| Valuation Method | September 30 1997 | September 30 1998 | September 30 1999 | March 31 2000 |
| Capitalization of Cash Flow Method | $ (18,882) | $ (19,227) | $ (28,556) | $ (31,946) |
| Capital Markets Method | (20,286) | (13,331) | (36,104) | (32,415) |
| Merger and Acquisition Method | (23,449) | (19,940) | (49,962) | (43,036) |

In addition, Plaintiff's experts performed a sensitivity analysis to test the key assumptions for Doctors Hospital's asset values and liabilities. (Jt. Ex. 72, Tab C5.)

The Trust attempted to prove that Doctors Hospital was solvent from August 28, 1997 through April 17, 2000. The Trust's expert Thomas Blake ("Blake") opined that Doctors Hospital was solvent only through September 30, 1998. However, in opining that Doctors Hospital was solvent as of September 30, 1997 and September 30, 1998, Blake made improper assumptions and adjustments that, when corrected, as shown below, render Doctors Hospital insolvent during that entire period. The Trust's expert used the same general methodology as Doctors Hospital's experts.

Plaintiff's case on insolvency was greatly enhanced by the testimony of Lane, an expert in health care, Medicare/Medicaid, and the Chicago health care market. Blake had no such special expertise. Lane testified in great detail concerning the numerous regulatory and market factors that ultimately led to Doctors Hospital's demise. Against that background, plaintiff's evidence on insolvency, including its experts' ultimate opinion, was generally more credible than the Trust's.

The evidence produced the following summary comparison of the different expert opinions. ("American Express" lists values from Plaintiff's experts Lane/Peltz, while "CRA" refers to values from Defendants' expert Blake).

The major differences in analysis are discussed below, with the resulting conclusion of insolvency at the time of Transfer payments in issue.

### 2. Tax Rate: "Tax Affecting" as a Non–Chapter S Corporation

Lane/Peltz analyzed Doctors Hospital as similar to a regularly taxable corporation and therefore treated it as subject to federal income tax in their analysis. The result was to reduce its value. (Jt. Ex. 72, Tab C.2 at 4.) Blake treated the hospital as a Subchapter S corporation and did not tax-affect Doctors Hospital's cash flows for federal tax purposes. (Jt. Ex. 31 at 23.) In his report, Blake apparently treated Doctors Hospital as an S corporation be-cause Doctors Hospital was an Subchapter S corporation during the relevant time period. *Id.* In his testimony, he said he could find no industry information that Doctors Hospital would be purchased by a C corporation. (Tr. VI: 62–63.)

Peltz, on the other hand, testified that he tax-affected Doctors Hospital's cash flows because in "it is standard methodology to tax-affect [sic] the normalized cash flow of an S corporation." (Tr. IV: 134–35.) He then explained his reasoning:

And that's because primarily the S corporation is an election that anyone can make. And so, as an example in this case and there is an exhibit in this report that shows it, Mr. Blake suggests at the end of the day that a buyer would pay $18 million more because Doctors Hospital has an S election in place when, in fact-when, in fact, they could buy the hospital and make their own election for $18 million less.

The behavior that valuations are derived from is primarily C corporation activity. And also an S corporation while, as I said, doesn't not pay federal income tax, it normally pays the amount of funds out to its equity holders to cover their income taxes.

So even if you were to say you shouldn't tax affect the cash flow because it doesn't pay tax, you would then provide a reserve for the distributions required to cover their income tax

And so I don't believe for that reason that not tax affecting is correct.

(Tr. IV: 135.)

Peltz had authority to back up his view. He relied on a book by two experts in business valuation who opined:

> To value an S corporation ownership interest, the analyst first should determine if the subject is a controlling or a minority interest.

### 2. Tax Rate: "Tax Affecting" as a Non–Chapter S Corporation

\* \* \*

If valuing a controlling interest, the experts generally agree that there may be no difference in value between the S corporations and C corporations. Logically, the experts' consensus is that C corporation valuation methods may be used for valuing controlling ownership interests in S corporations.

(Tr. IV: 139–40.) In this case, Peltz was valuing a 100 percent interest in Doctors Hospital, so tax-affecting the hospital as a C corporation was appropriate.

Moreover, it is not logical to suggest that a buyer would pay substantially more for Doctors Hospital just because the buyer is a S corporation. (Tr. V: 87–88; Tr. VIII: 35.) The object of an insolvency analysis is to determine the *value* of Doctors Hospital to a theoretical buyer, regardless of the nature of the buyer.

### 3. Contributions By Desnick

For Doctors Hospital to be found solvent, it was necessary for Blake to add $18,000,000 to Doctors Hospital's Fair Value of Equity for each of the fiscal years 1997 and 1998, (Jt. Ex. 31, Tab C.3), supposedly on the assumption that Desnick stood ready to contribute those sums to the hospital cash flow in those years even though he had not done so. That amount equaled the amount that Desnick agreed to pay in fines in settlement of the government's Medicare fraud claims years later in 1999 and 2000. (Tr. VI: 89.) Blake characterized those payments as "contingent payments." *Id.*

There was no evidence that Desnick had an obligation to make any such contribution to Doctors Hospital. He was the hospital's sole shareholder, but that did not transform him into a source of "contingent payments." For contingent payments to exist, there must be some circumstances under which Doctors Hospital would have a right to the payments. In 1997 and 1998 no such circumstances existed. In effect, Blake took the position that a buyer would pay an extra $18 million to purchase the assets of Doctors Hospital in order to cover liabilities that had not been determined as of September 30, 1997. Furthermore, the $14 million settlement with the government was executed after Doctors Hospital filed for bankruptcy.

Adding a nonexistent contribution from Desnick to the value of Doctors Hospital's assets is also inconsistent with the capitalization of cash flow methodology used by both insolvency experts. That methodology determines the present value of expected future cash flows based on a perpetuity calculation of normalized annual cash flows. (Jt. Ex. 72, Tab C1 at 1.) Blake was therefore assuming that Desnick would continue making the contribution indefinitely. That assumption is not supported by evidence or logic. Desnick took his equity-and more-out of Doctors Hospital by way of the Nomura Loan and the large withdrawals of cash in fiscal year 1997. Once the magnitude of fraud at the hospital surfaced, it was only a matter of time before Desnick abandoned the enterprise.

Blake testified that a putative purchaser would make capital contributions into the company in 1997 and 1998 to cover the Government settlement. (Tr. VII: 18.) That notion, however, ignores the reality of bargaining. A buyer required to put additional capital into the enterprise to meet some unliquidated debt would likely demand a substantial discount in purchase price based on the risk of such debt.

Blake's theory defies common sense. It is also contrary to precedent. "Information that the hypothetical willing buyer could not have known is obviously irrelevant to this calculation." *First Nat'l Bank of Kenosha v. U.S.*, 763 F.2d 891, 894 (7th Cir.1985). In addition, even assuming that Desnick's potential contributions were proved to be contingent assets, Blake failed to reduce them to present value based on the likelihood (or lack of likelihood) that they would be made. *See In re Xonics Photochemical, Inc.*, 841 F.2d 198, 199–200 (7th Cir.1988).

The assumed contributions from Desnick were not assets of Doctors Hospital, contingent or otherwise. As a consequence, they cannot be considered in an insolvency analysis. Blake testified that his report shows Doctors Hospital's indicated fair value of equity for 1997 at $15,766,000. (Tr. VII: 16–17.) The indicated fair value of equity is the number to which Blake added the contributions from Desnick; it is the "bottom line" prior to that addition. (Jt. Ex. 31 at 17.) Blake then answered in the affirmative when asked whether that was "a figure that a reasonably informed hypothetical buyer would consider as *the fair market value of the assets of Doctors Hospital as of 9/30/97.*" (Tr. VII: 17; emphasis supplied.) Reaching that "fair market value of assets" is the ultimate objective in determining whether Doctors Hospital was solvent: if the value is positive, the hospital was solvent; if the value is negative, the hospital was insolvent. (Jt. Ex. 31 at 9–10.) Blake's objective was to reach "fair valuation" for Doctors Hospital's assets, and the standard of value that he used was "the same as fair market value," the price at which the property would change hands between a willing buyer and a willing seller with neither under any compulsion to sell, and both parties having reasonable knowledge of relevant facts. *Id.* at 11. So when Blake testified that $15,766,000 was a figure that a reasonably informed buyer would consider as the fair market value of Doctors Hospital, he was saying that that number is the "bottom line" on solvency or insolvency. The theoretical Desnick contributions (theoretical because they were made years after Blake counted them into value) were added to that bottom line after computing fair value of Doctors Hospital.

Blake made the same admission as to fiscal year 1998, where the indicated fair value of equity (before the theoretical Desnick contributions) was a *negative* $12,507,000 (Jt. Ex. 31 at 17), meaning of course that Doctors Hospital was insolvent that year.

#### 4. *Considering Events Subsequent to Transfer*

Defendant correctly points out that events subsequent to the transfer period may be considered. This debtor survived for three years before filing is bankruptcy, and that may be considered in evaluating whether a company had unreasonably low capital at time of the transfers. *Moody v. Security Pacific Business Credit*, 971 F.2d 1056, 1074 (3rd Cir.1992).

■ Further, precedent makes it clear that courts:

[M]ay consider information originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of a pertinent date. Thus, it is not improper hindsight for a court to attribute current circumstances which may be more correctly defined as current awareness or current discovery of the existence of a previous set of circumstances.

*In re Mama D'Angelo, Inc.*, 55 F.3d 552, 556 (10th Cir.1995) (citation omitted); *In re W.R. Grace & Co.*, 281 B.R. 852, 869 (Bankr.D.Del.2002).

These cases support consideration of all events during the relevant timeframe, including the stipulated information concerning both cash withdrawals from the cash payments made to Doctors Hospital by Desnick from 1997 forward, as well as the funding of two settlements with the federal government, both before and after bankruptcy was filed.

However, "consideration" of subsequent events means that they are weighed and evaluated, not that subsequent volunteered contributions by Desnick to his corruptly operated failing hospital necessarily ring the solvency bell.

Plaintiff's experts properly "considered" Desnick's contributions to Doctors Hospital during 1999 and 2000 along with all other relevant data. Desnick's withdrawals and contributions were specifically referenced in Peltz/Lane's report, and specifically in the context of the hospital's ability to pay its debts. (Jt. Ex. 72 at 5.) Peltz testified that he compared "the amounts that went in and came out," and then went on to quantify those amounts by time period. (Tr. IV: 97.) The exhibits to Lane/Peltz's report contains numerous analyses of Doctors Hospital's cash flow, which of course includes Desnick's contributions and withdrawals. (Jt. Ex. 72, Tabs B5, C2.)

Neither *In re Mama D'Angelo, Inc.*, 55 F.3d 552 (10th Cir.1995) nor *In re W.R. Grace & Co.*, 281 B.R. 852, 869 (Bankr. D.Del.2002) apply to the facts of this case. Those cases dealt not with improper hindsight but with "current 'discovery' or 'awareness' of circumstances then in existence." 55 F.3d at 556, 281 B.R. at 869. That is not at all what the Trust attempts to show. The "previous set of circumstances," according to the Trust, is Desnick's contributions of $18 million per year as if those had been made in 1997 and 1998. But, as Blake admitted when questioned by the Court, Desnick contributed those amounts "in 1999 and 2000 when the settlements were actually made." (Tr. VI: 91.) Thus no "previous set of circumstances" included those payments by Desnick.

As the Trust acknowledges, "whether the debtor were solvent or not under the balance sheet approach must be determined by analyzing what a willing buyer would have given (or demanded) for the debtor's entire package of assets and liabilities at the relevant time ..." (Def. Br. at 56.) At trial Blake testified that that amount was $15,766,000 for 1997 and a negative $12,507,000 for 1998, i.e., the value of the hospital *before* adding the Desnick contributions. He stated that the

$15,766,000 was "a figure that a reasonably informed hypothetical buyer would consider as the fair market of the assets of Doctors Hospital as of 9/30/97." (Tr. VII: 17.) In other words, Blake admitted that Doctors Hospital was solvent by only $15,766,000 as of September 30, 1997 (not $33,766,000 as his report shows), and Doctors Hospital was *insolvent* by $12,507,000 as of September 30, 1998 (not solvent by $5,493,000).

Desnick's further settlement payments could not be considered contingent assets of Doctors Hospital because Desnick had no legal obligation to contribute to Doctors Hospital. At some point an owner may determine that further capital contributions are not in his best interests. There was no reason to assume absolutely, as Blake did, that a putative investor would assume that Desnick would make contributions in the years in issue.

The cases cited by the Trust on the treatment of Desnick's contributions do not involve facts similar to this case, where the Trust asks this Court to assume future contributions from a source with no obligation to make any. In *Credit Managers Ass'n. of Southern California v. The Federal Company*, 629 F.Supp. 175, 184 (C.D.Cal.1985), the court, in concluding that plaintiff's assignors were not undercapitalized, considered the fact that a secured lender *agreed* in advance to loan funds to plaintiff's assignors. After considering contributions that the secured lender agreed to loan, the court found that the company had sufficient cash flow to stay in business. In *Allied Products Corp. v. Arrow Freightways, Inc.*, 104 N.M. 544, 545, 724 P.2d 752, 753 (1986), the court noted that the owner of the defendant had injected his own money into the company, but does not address that fact in affirming the lower court's finding that the company was insolvent. In *Kupetz v. Continental Illinois Nat'l Bank & Trust Co. of Chica-go*, 77 B.R. 754, 762 (C.D.Cal.1987), the court considered an existing personal guaranty, not owner contributions unconnected to any obligation.

The central problem with Blake's "contribution from owner" theory is that he assumed *a particular kind of potential buyer.* He assumes that the buyer will have the same attributes and interests of Desnick and the same claimed propensity to contribute money to Doctors Hospital. But that is contrary to Blake's own methodology, which assumes an anonymous hypothetical buyer, not a specific buyer. (Jt. Ex. 31 at 11–12.) What Blake assumes is that a buyer could reasonably anticipate that Desnick would make contributions without any obligation to do so. As a result, Blake assumes that a reasonably informed buyer will pay more than the fair value of assets.

Peltz did not say that contributions by Desnick were similar to capital accessed by companies during "the early days of all these Telecoms." (Tr. IV: 98) In fact, he *contrasted* Desnick's position (and in doing so, directly answered a question from the Court):

> In this instance, generally what I saw was that the infusions that were made appeared to have been made in order to barely keep the entity afloat. There was no commitment. Funds flew out as fast as they went in. It didn't appear to be what would be considered a financing or equity infusion. The subsequent funds paid, as I said before, appeared to have been coerced, not voluntary.

*Id.* at 98–99.

The $14 million contribution in 2000 cannot be considered for additional reasons. First, it was made after the bankruptcy filing; and, second, Doctors Hospital received no benefit from it. The settlement agreement released only Desnick personally, not the hospital. (Jt.Ex.162.)

Finally, the decision in *First National Bank of Kenosha v. U.S.*, 763. F.2d 891 (7th Cir.1985), does not support Blake's addition of the Desnick contributions. (Def. Br. at 69–70.) Plaintiff cited *First National* for its statement of the general proposition "that subsequent events are not considered in fixing fair market value" and that "[i]nformation that the willing buyer could not have known is obviously irrelevant to this calculation." 763 F.2d at 894. The Trust acknowledged that the Seventh Circuit, like other courts, adheres to this rule. (Resp. at 69.) The "subsequent event" in *First National* was an actual offer for the deceased's farm land that was made after her death. The Trust equates that offer with Desnick's $18 million in contributions in 1999 and 2000. First, the *First National* court was making a limited exception to the general rule that "most subsequent events would be excluded." 763 F.2d at 894. It did so only because courts have ruled that evidence of a reasonably contemporaneous and actual sale price received for property is directly relevant to the issue of that property's value. *Id.* At trial there was no evidence of a third party making a real offer to purchase Doctors Hospital for a certain amount; there was only Blake reaching a valuation. Second, the *First National* decision nowhere suggested that hypothetical massive capital contributions are the type of subsequent events that a willing buyer would have considered in calculating how much to offer for Doctors Hospital. Such contributions are more akin to the court's hypothetical discovery of oil on the farmland in *First National:* "it is beyond the contemplation of the parties on the relevant valuation date." Third, even if *First National* could be read as the Trust wishes, the capital contributions would still have to come from the potential buyer himself; they still are not part of the fair value of the Doctors Hospital's equity.

### 5. *Company Specific Risk Premium*

█ Both insolvency experts agreed that an after-tax weighted average cost of capital ("WACC") is the appropriate risk-adjusted discount rate to use in calculating the capitalization rate applied to Doctors Hospital's cash flow. (Jt. Ex. 31 at 24.) The experts differed, however, on the percentage of the company specific risk premium used in reaching the WACC; Blake used a premium of five percent, while Lane/Peltz used ten percent. Blake's percentage was based on "the nature of the related party transactions with Desnick and his associated entities." (Tr. VI: 73–75.) Blake ignored all other risks associated with Doctors Hospital, i.e., management problems (including Desnick's reputation), the Medicare/Medicaid fraud, and the hospital's unreliable internal financial statements. (Tr. IV: 129–31.)

Blake's basis for excluding all of the other risks was that "adjustments have been made to normalize historical financial performance, industry factors are already 'baked into' the beta factor affecting the equity risk premium, and a size adjustment has already been incorporated." (Jt. Ex. 31 at 25; Tr. VI: 73–75.) Doctors Hospital's experts, however, cited risks that were not otherwise accounted for in the calculation of WACC. Peltz testified that he looked at "specific issues relating to the hospital," including depth of management, fraud occurring at the hospital, management's reputation, unreliability of financial statements, and the greater effect that the Balanced Budget Act of 1997 ("BBA") would have on Doctors Hospital because of its high percentage of Medicare/Medicaid patients. (Tr. IV: 91–93.) Healthcare expert Lane specifically disagreed with Blake's assumption that there were widespread fraud investigations in the entire industry in 1997 and 1998. (Tr.

III: 124–25, 127; Jt. Ex. 31 at 25.) He testified that the investigations focused on "selected targets," that Doctors Hospital was one of them, and so the risk associated with the investigations was not "baked into the industry." *Id.* at 127. Out of 5000 hospitals in the United States, only 110 were being investigated at the time of the Nomura Loan. (Tr. IV: 20–21.) Lane's opinion is backed up by the public reporting of the "guideline companies" that Lane/Peltz used to calculate "unlevered beta," a measure of industry risk. (Jt. Ex. 72, Tab. C.2 at 3.) Lane reviewed the relevant forms 10–K and 10–Q of HCA, Universal Health Services, Health Management Associates, and Tenet Health Care. He found that before 2000 only HCA reported being the target of a fraud investigation. (Tr. III: 125–27.) The stock price of HCA went down in 1997, while the stock price of the others went up, showing that the market had not accounted for industry-wide "baked in" risks. (Tr. III: 128–29.)

Arthur Gimmy, one of the Trust's experts in its litigation with Nomura, concluded that Doctors Hospital, an "atypical subject, with its over-reliance on Medicare and Medicaid, would need to be capitalized at the highest end of any survey of acute hospitals." (Jt. Ex. 53 at 47.) Peltz was thus conservative in choosing a 10 percent risk premium.

### 6. *Alleged Fraudulent Earnings—Upcoding*

Through systematic "upcoding"—hospital practices designated more expensive procedures instead of applicable less expensive procedures to be billed.

In his analysis, Blake added back to Doctors Hospital's net income $4.5 million in fraudulent earnings that he claims were booked in 1997. (Jt. Ex. 31, Tab C.5.) He asserts that the hospital wrongfully received larger income that was due. Lane/

Peltz "double-counted" adjustments for fraud by failing to reverse that prior booking. *Id.* at 24.

First, it is far from clear that Doctors Hospital wrote off the $4.5 million in 1997. The documents that Blake uses to support this conclusion are not financial statements, but a memorandum from September 1998, a document identified only as "Adjusting Entries," a document identified only as "Doctors Hospital of Hyde Park, Inc. (FYE 9/30)," and another identified as "Working Capital Ratio as of 9/30/97 Balance Sheet for Use in Projected Cash Flows." (Jt. Ex. 31 at 24 n. 44.) Only one of those documents, the memorandum, is in the record. (Jt.Ex.66.) It thus cannot support a conclusion that the $4.5 million was written off in 1997. The financial statements do not reference the $4.5 million until the year ended September 30, 1999. (Jt.Ex.28.)

Even assuming that Doctors Hospital booked the $4.5 million in fiscal year 1997, however, there was no reason for Lane/Peltz to add it back in to net income. As Lane explained, such an add-back made no sense when Doctors Hospital is viewed as a whole. (Tr. III: 115–17.) In particular, fraudulent revenues could not be accounted for by a one-time adjustment. Billing irregularities typically are not limited to a specific twelve-month period, "but rather carry over from year to year." (Jt. Ex. 147 at 13.) The fraud was "systemic;" Doctors Hospital "was riddled with fraud which really affected the revenues that were reported and suggested that the revenues that were reported were not accurate." (Tr. IV: 126–27.) Lane/Peltz's view is corroborated by a report by Coopers & Lybrand, prepared in connection with the Nomura Loan and used by Blake to support some of his opinions. (Jt. Ex. 31, Tab B.) It estimated a $4.6 million reduction in Doctors Hospital's patient

revenues based on upcoding of 12 billing codes. *Id.* at II–3–4. That amount, however, was only Coopers & Lybrand's "best case;" its "worst case" was a reduction in revenues of $29 million. And that was only for the twelve months (ending July 31, 1997) covered by the Coopers & Lybrand report and only for Medicare, not Medicaid. In contrast, the $4.5 million that Doctors Hospital ultimately paid was for upcoding over a period of 4½ years, covered both Medicare and Medicaid, and related to only two billing codes. (Jt. Ex. 161; Tr. IV: 127.) In the face of the Coopers & Lybrand report alone, it would have been improper for Lane/Peltz to add back the $4.5 million.

Coopers & Lybrand used the $4.6 million "best case" reduction in revenues solely because it was in accordance with generally accepted accounting standards. A potential buyer would have to consider the higher "worst case" reduction of $29 million. (Tr. III: 120–22.)

ZA Consulting, one of the Trust's experts in its litigation with Nomura, concluded that the Coopers & Lybrand findings "called into question the validity of the Hospital's previously reported historical financial performance as well as the hospital's future ability to achieve this level of financial performance." (Jt. Ex. 146 at 9.) Both ZA Consulting and another of the Trust's experts, J.H. Cohn, made the same $4.6 million adjustment to Doctors Hospital's one-year projected normalized income that Coopers & Lybrand did. *Id.* at 57; Jt. Ex. 147 at 18.

A $4.5 million add-back would also have flown in the face of other revenue issues at Doctors Hospital. As noted earlier, its internal financial statements were inherently unreliable. (Tr. III: 97, 108–09.) It was consistently collecting less cash than it was receiving as revenues. (Jt.Ex.76) and it intentionally overstated its borrowing base, causing Daiwa to hold back $3 mil-

lion needed to fund the hospital's operations. (Jt. Ex. 60; Tr. IV: 128–29.) An add-back also would have ignored the well-known impact that the Balanced Budget Act was going to have on Doctors Hospital's revenues.

### 7. Treatment of Excessive Lease Payments for Insolvency Analysis

As earlier discussed, lease payments far exceeded rental value. Plaintiff's evidence directly established that Doctors Hospital clearly did not receive reasonably equivalent value for the rental payments it made pursuant to the Lease. DeClark, an expert in real estate and appraisals, testified that the fair market rental for the real property subject to the Lease on a net basis as of August 1, 1997 was $2,110,000 per year. (Tr. II: 141; Jt. Ex. 160 at 2.) Based on that appraisal, the monthly fair market rental for the hospital property should have been $175,833.33.

Lane/Peltz, relying on DeClark's opinion that Doctors Hospital's rent was above fair market value, normalized the hospital's net income by reducing its rent payments to fair value. (Jt. Ex. 72, Tab C.2; Tr. IV: 86–87.) Citing § 482 of the Internal Revenue Code, Peltz explained that a purchaser of Doctors Hospital would not pay in excess of fair market rent because he would not be allowed to deduct any business expense that exceeds fair market. (Tr. IV: 87.) To the extent that the rent payments exceeded fair market value, Lane/Peltz viewed them as debt and deducted them from the enterprise value. *Id.* In other words, to the extent that the payments were in excess of market rent, they were capitalized as an additional, nonoperating liability.

Blake made no adjustment to the rent expense for fair market value. (Tr. VI: 101.) He admitted that he made no as-

sumption that the lease was "a valid arm's length valuation of the fair rental value." *Id.* Yet on cross-examination he agreed with an authority on valuation that leases between related parties should be carefully scrutinized, that "the analyst should evaluate whether the lease amounts are equivalent to what the company would pay on an arm's length's basis." *Id.* at 148. He also admitted that that principle applies to the lease in this case. *Id.* at 149.

As for Lane/Peltz's capitalization of the excess lease payments, Blake admitted having no objection to their methodology; he only disputed that Lane/Peltz used the proper discount rate. (Tr. VI: 100–01.) Lane/Peltz used the 9.67 percent Nomura Loan rate; Blake said he should have used Lane/Peltz's 17.5 percent Weighted Average Cost of Capital ("WACC"). (Tr. IV: 121.) Peltz, however, amply justified his approach. He stated that "in determining present value, it is appropriate, when available, to use the interest rate implicit in the income stream that is being discounted." *Id.* at 122. Because the lease payments were designed to service the Nomura Loan debt, it was appropriate to use the interest rate on that loan. *Id.* at 121–22. Peltz also felt it would be inappropriate to use WACC because it contains a large element of equity return, while the lease relates to a debt. To use an equity return to discount a debt cash flow "would be simply wrong." *Id.* Peltz verified his opinion with an authoritative text. *Id.* at 122–26.

Blake also observes that Lane/Peltz did not apply a tax rate to the capitalization of excess lease payments calculation. (Jt. Ex. 31 at 22.) No tax rate was applied because the excess lease payments represented amounts above fair market value. As noted earlier, § 482 of the Internal Revenue Code would prevent deduction of a rent expense in excess of fair market. (Tr. IV: 87.)

DeClark's conclusion was based on accepted appraisal methodologies. *Id.* at 142–43. In developing financial return rates for the Hospital Property, he assigned risk rates, but they did not reflect any specific operational characteristics of Doctors Hospital. *Id.* at 158–59, 161.

The Defendant Trust failed to rebut the Trustee's fair market valuation. Therefore, in view of the evidence presented, to the extent that Doctors Hospital's rental payments to the Trust exceeded the fair market rental established by DeClark ($175,833.33/month) Doctors Hospital did not receive reasonably equivalent value in exchange.

### 8. *Guideline Company (Capital Markets) Method*

In addition to their capitalization of cash flow method, Lane/Peltz used two other methods to validate their conclusion concerning Doctors Hospital's insolvency. One of them was the capital markets method. (Jt. Ex. 72, Tab C.3.) Blake criticized this methodology because Lane/Peltz used comparable companies that were much larger than Doctors Hospital and adjusted their pricing multiples. (Jt. Ex. 31 at 26.) Lane/Peltz expressly recognized that the comparables were much larger but used them because there were no publicly traded companies that operated a single hospital. They still found the capital markets method "instructive" after making the appropriate adjustments. (Jt. Ex. 72, Tab C.3.) Peltz felt that the methodology was repeatable, subject to peer review, and not inherently speculative. (Tr. IV: 147.) In any event, that method was simply a check on the main body of their work using the capitalization of cash flow method. It's weight here was only to corroborate, and this opinion does not rest on it.

### 9. *Guideline Transactions (Merger and Acquisition) Method*

Blake was also critical of the comparable transactions that Doctors Hospital used in its merger and acquisition method. (Jt. Ex. 31 at 26–27.) Lane/Peltz had identified only 36 or 37 hospital transactions in Illinois during the period 1994 to 2000. (Tr. VIII: 29.) From those they chose twelve that they deemed comparable to Doctors Hospital. (Jt. Ex. 72, Tab C.4.) With such a limited group of transactions, it is not surprising that they are not in all respects comparable to a transaction involving Doctors Hospital. But again, the merger and acquisition method was just a corroboration of computations under Lane/Peltz's principal methodology.

### 10. *Blake's Reliance on Dobson Report*

Attached to Blake's report is a report by Allen Dobson of the Lewin Group, prepared for Nomura's use in its litigation with the Trust. (Jt. Ex. 31, Tab C.) Blake relies on Dobson's report when stating facts and conclusions in his own report. (Jt. Ex. 31 at 6–8.)

Dobson's report purports to identify the reasons for Doctors Hospital's bankruptcy, with a view toward showing that Nomura, the Trust's predecessor, could not have known about them at the time it made the Nomura Loan. The report, however, is not an insolvency analysis. Dobson is an economist, not an appraiser. (Jt. Ex. 31, Tab C.) Nor is he an accountant or CPA. (Jt. Ex. 31, Tab C.)

▆▆▆ Dobson's methodology was to base his conclusions on an inquiry whether the reasons for Doctors Hospital's bankruptcy were "knowable" to a "reasonable person" in August 1997. (Pl.Ex. 24 (Dobson) at 52–53.) He readily admitted that the "knowable" standard is not an industry standard and has never been subjected to any kind of peer or critical review. *Id.* at 53. In fact, he acknowledged that he created the standard specifically for the litigation. *Id.* at 54. Therefore, his opinion cannot be given weight of an expert's opinion based on recognized standards. *See Ammons v. Aramark Uniform Services, Inc.,* 368 F.3d 809, 815–16 (7th Cir.2004) (explaining that pursuant to *Daubert,* a court must determine whether: (1) the expert would testify to valid scientific, technical, or other specialized knowledge; and (2) his testimony will assist the trier of fact); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); Fed.R.Evid. 702.

Dobson identified several causes of Doctors Hospital's bankruptcy. (Jt. Ex. 31, Tab C at 1.) Prominent among them was the departure of the hospital's CEO in September 1998 and a group of physicians who supposedly followed him to another hospital. *Id.* at Tab C, 1, 5–6, 8, 14, 32.

Dobson's report failed to acknowledge that Doctors Hospital's revenues were overstated by at least $18.5 million due to Medicare/Medicaid fraud, even though Dobson was well aware of that fact. (Pl. Ex. 24 at 116.) He was also aware that Coopers & Lybrand's report on Doctors Hospital made a $4.6 million adjustment in revenue just for Medicare fraud and just for one twelve-month period. *Id.* at 161. Without taking that overstated revenue into account, no analysis of the causes of Doctors Hospital's bankruptcy is possible.

Dobson first focuses on the departure of Stephen Weinstein and other unidentified "key management executives," as a cause of Doctors Hospital's bankruptcy. He assumes, without any stated basis or study, that the quality of management declined when Weinstein and the others left the hospital. These key executives, however, were the same ones who presided over the hospital when it was riddled with Medi-

care/Medicaid fraud in the mid–1990's. They were also the ones who failed to address the hospital's inability to reconcile internal financial statements with year-end results, rendering the statements "very suspect" and "inherently unreliable." (Tr. III: 97, 108–09.) In addition, their business strategy led to the deterioration of the hospital's case mix index, leading directly to lower revenues. (Jt. Ex. 31, Tab C at 19–20.) Dobson was unable to quantify the effect of the executives' departure; he did no study to determine what the impact might be. (Pl.Ex. 24 at 147.) The departure of Weinstein should therefore be completely discounted as a cause of Doctors Hospital's decline.

Nonetheless, based on deposition testimony of one witness, Dobson assumed that "at least ten high-revenue producing physicians" left Doctors Hospital shortly after Weinstein left. (Jt. Ex. 31, Tab C at 6.) Dobson concluded that the departure of these physician were a cause of Doctors Hospital's bankruptcy. He did not know, however, who the doctors were. (Pl.Ex. 24 (Dobson) at 150.) He did not know what their practice areas were. *Id.* at 153. He did not know how much revenue they took from the hospital, either individually or as a group. *Id.* at 153–54. And he did not know the types of patients that they supposedly took with them. *Id.* at 154. He did believe that some of the physicians had Medicaid patients, but he did not know whether Medicaid patients typically follow their doctors to another hospital. *Id.* at 181.

Michael Nelson, Doctors Hospital's chief financial officer at the time of Weinstein's departure, did not recall any noticeable decline in the hospital's business as a result of the departure of these physicians. (Pl.Ex. 29 (Nelson) at 37.) Michael Lane, Plaintiff's healthcare expert, stated that in order to judge the financial impact of a physician leaving a hospital, one would have to know his patient admissions on an annualized basis, his patient base within those admissions, whether he was admitting Medicare or Medicaid patients, and the dates of the physicians' departures. (Tr. IV: 35.) Dobson knew none of this.

Dobson observed that Doctors Hospital's patient case mix was declining from 1996 to 1999. However, the steepest decline took place from 1996 to 1998—*before* the physicians left, so their departure could not have caused it. (Jt. Ex. 31, Tab C at 19.) Dobson has ignored his own finding that "these results likely reflect DHHP's business strategy. . . ." (Jt. Ex. 31, Tab C at 19–20.)

In another section of his report, Dobson observed that Doctors Hospital was unable to control its costs per case between 1997 and 1999. (Jt. Ex. 31, Tab C at 9–10.) But again he failed to link the decline to the departing physicians. Such a link would be difficult to make, of course, because Dobson knew nothing about their areas of practice or how many patients supposedly left Doctors Hospital as a result of their departure.

Dobson's judgment is flawed in many other respects. He does not account for or discuss the impact on Doctors Hospital of: (1) the Medicare and Medicaid fraud that lasted through 1998 but apparently ceased in 1999 because of the government investigations or (2) the decline in the case mix index from 1.4 to 1.1 which he later acknowledged accounts for most of the decline in Medicare revenues and was a planned strategy of Doctors Hospital. (Jt. Ex. 31, Tab C at 20.) Both of these issues obviously impacted revenues. Dobson also concluded that total expenses per case rose and jumped to the conclusion that costs were therefore out of control. (Jt. Ex. 31, Tab C at 9.) However, Dobson later in his report illustrated that Doctors Hospital's Medicare PPS Costs were lower

than its primary and secondary competitors until the end of Fiscal Year 1999 when such costs became identical to the costs in Doctors Hospital's primary market but still 17% below its secondary market competitors. (Jt. Ex. 31, Tab C at 24.) Dobson also illustrates that Doctors Hospital's Medicare costs per case and CMI Adjusted Medicare cost per case were below primary and secondary competitors. (Jt. Ex. 31, Tab C at 25, 26.) Even recognizing that Doctors Hospital did have a lower case mix, Dobson fails to point out that Doctors Hospital's Average Length of Stay ("ALOS") was 25% above its competitors in 1996 but improved thereafter although it never reached the level of its competition. Dobson also never compares the differences in facilities, types of practices, patient mixes, case mixes, or overhead to illustrate his opinion that Doctors Hospital's expenses were out of control as opposed to its competitors.

Dobson leaps to another conclusion in his discussion of patient volume and total hospital cases. He presented data showing that "service volume demanded in the overall market area was declining between 1996 and 1999." (Jt. 31, Tab C at 12.) Then, ignoring that data and apparently assuming that Doctors Hospital was unaffected by conditions in the market, he concluded that the hospital's "decrease in cases between 1998 and 1999 were due to the departure of key admitting physicians in October 1998." *Id.*

In another portion of his report, Dobson noted that hospitals that rely on public payers do not fare as well financially as hospitals that have a greater share of business from private payers because private payers pay more than Medicare and Medicaid. Dobson then noted that Doctors Hospital was particularly sensitive to Medicare and Medicaid payment rates and the effects of the Balanced Budget Act of 1997 ("BBA"). However, Dobson never links these causes to the drop in revenues from fiscal year 1998 when the BBA was being implemented. (Jt. Ex. 31, Tab C at 17.)

Dobson compared Doctors Hospital's financial results with those of hospitals in its local market area and concluded that its decline was not the result of natural market forces but of internal events such as physicians leaving the hospital. For example, Dobson concluded that the effects of the BBA "were manageable" because "neighboring hospitals' Medicare revenues were relatively constant over the 1996 to 1999 time frame." (Jt. Ex. 31, Tab C at 8.) Dobson was thus making apples-to-apples comparisons of Doctors Hospital with large hospitals such as University of Chicago. He took no account of any peculiar characteristics of Doctors Hospital such as its high Medicare/Medicaid patient population, Desnick's background, and the very case mix decline that he cites as a cause of the hospital's bankruptcy.

In reaching his conclusion as to Total Margins, Dobson failed to take into account that Doctors Hospital was particularly sensitive to Medicare and Medicaid payment rates. (Jt. Ex. 31, Tab C at 27.) Dobson also failed to look into many of the characteristics peculiar to Doctors Hospital that resulted in its demise, i.e., obsolescence, decreasing population, intense competition, increased costs, low case mix, high dependence on Medicare and Medicaid, the effect of the BBA, highly overbedded market, low outpatient services, the reputation of Desnick, higher cost base, and unreliable internal financial statements and record. (Tr. IV: 41–46.)

Dobson did not interview any of the physicians who allegedly left Doctors Hospital so it is impossible to determine whether their departure was due to the fraud and government investigation; the reputation of Desnick; or whether the doc-

tors who left included those who were involved in the upcoding or gave unnecessary medical services to patients. (Pl.Ex. 24 (Dobson) at 195.)

Dobson believes Doctors Hospital's bankruptcy was caused in part by "overly cautious billing practices by physicians aware of federal investigations of hospital billing practices." (Jt. Ex. 31, Tab C at 1.) Billing practices of physicians, however, have nothing to do with billing practices of hospitals. (Tr. IV: 42.) As Lane explained, "Physicians bill for their own business, hospitals bill for inpatient services on their behalf." *Id.* So there would have been no reason for physicians to be cautious about their billing practices.

### Conclusion as to Insolvency

Plaintiff proved by a preponderance of the evidence that Doctors Hospital was insolvent at all times from August 28, 1997 to April 17, 2000.

### F. INABILITY TO PAY DEBTS

Plaintiff also proved that it met the third alternative test in section 548(a)(1)(B)(iii), i.e., that Doctor's Hospital had debts beyond its ability to pay as they matured at all times from August 28, 1997 to April 17, 2000. Lane/Peltz reached that conclusion based on the dramatic decline in the Hospital's profitability after August 28, 1997, its level of undercapitalization, its insolvency on and after August 28, 1997, the business risks facing Doctors Hospital stemming from allegations of fraud and depletion of its cash reserves, and, finally, its financial statements for the fiscal year ending September 30, 1999, which indicated substantial doubt about its ability to continue as a going concern.

Desnick pulled almost $22 million in cash out of the hospital in 1997, almost all of it prior to the Nomura Loan. (Jt. Ex. 85, Schedule 1 at 5.) Thereafter, Desnick's cash withdrawals and cash infusions were almost equal, at $14.5 million and $14.2 million, respectively. (Tr. IV: 97.) But by the time of the Nomura Loan the damage was done: from a cash standpoint Doctors Hospital was crippled and would never recover. Doctors Hospital's monthly balance sheets show negative cash for almost every month after the Nomura Loan, including the entire period from September 1997 through April 1998. (Jt.Ex.195.) Daily cash on hand, when not extremely negative, hovered close to the zero mark for all of fiscal years 1997, 1998, and 1999. (Jt. Ex. 72, Tab B.5.) Monthly results of days cash on hand for fiscal years 1996 through 2000 show a declining trend beginning in October 1996 of 0.15 days and averaging negative 11.45 days by October 1999. *Id.* at 19.

Desnick began making cash contributions to Doctors Hospital in the fourth quarter of 1997 and continued to make contributions in ever increasing amounts through the date of bankruptcy. (Tr. I: 156–57; Tr. IV: 97.) Doctors Hospital needed Desnick's contributions because it did not have enough cash on hand to meet its obligations. (Tr. I: 158.) Doctors Hospital could continue to operate despite the cash deficiencies only to the extent that Desnick continued to make contributions. *Id.* at 159.

Numerous trial exhibits reflect Doctors Hospital's cash situation. One May 1998 memo from Robinson to Richard Felbinger, the hospital's chief financial officer, discusses the recurrence of "large overdrafts" in the hospital's checking account. (Jt.Ex. 59.) As noted earlier, Daiwa withheld almost $3 million in cash payments to Doctors Hospital, prompting Felbinger to ask Desnick for $1.8 million. (Jt.Ex.60.) At that time, Felbinger proposed releasing approximately $1.3 million in "held checks dating from Dec. 1997 to May 1998." *Id.* "Held checks" were checks to vendors prepared by Doctors Hospital and then held

until it had funds sufficient to cover them. (Pl.Ex. 26 (Felbinger) at 42–43.) Again in June 1998 Felbinger advised Desnick that Doctors Hospital needed $1.4 million, $500,000 of which was needed to cover held checks. (Jt. Ex. 62; Pl.Ex. 26 (Felbinger) at 42–43.) Felbinger testified in his deposition that vendors "were calling and screaming and threatening to withhold future services or goods from us." (Pl.Ex. 26 (Felbinger) at 44.) In July 1998 Felbinger asked Desnick for $3 million to cover cash needs. (Jt.Ex.64.) He never received all of it and toward the end of the month found himself in a "$1.5 million dollar hole." *Id.* at 2; Pl.Ex. 26 (Felbinger) at 54.

In a memorandum to Robinson on August 18, 1998, Desnick stated as a possible reason for a "cash crunch" that Felbinger "paid too many of the payables too quickly." (Jt.Ex.65.) In a September 1998 memorandum, Felbinger advised Desnick that Doctors Hospital's balance sheet "shows that we are expecting $1.3 million more than we will ever receive." (Jt.Ex.66.) He also noted "that this situation existed at September 30, 1997..." *Id.* At about the same time several of the hospital's vendors put it on "credit hold," meaning that they had stopped providing services or goods needed to operate the hospital facility. (Jt. Ex. 67; Pl.Ex. 26 (Felbinger) at 59.)

In October 1998 a memorandum from new CFO Michael Nelson showed that the juggling of cash continued. Nelson observed in it that:

> ... we should be in a positive cash position at the end of the week. This will allow us to fund the payroll.... However, we will have another problem with cash during that week as Amresco will start to fill the buckets again. As such, our cash availability will be limited.

(Jt.Ex.74.) Doctors Hospital's survival continued to depend on Desnick; for example, Nelson assumed a $1,000,000 "investment" from him in October 1998. (Jt.Ex.75.)

In December 1998, after Doctors Hospital received a payment from Medicare, Robinson noted: "we had positive balances in our account for· the first time in three months...." Robinson wrote in February 1999: "we are consistently collecting less cash than we are recording as net revenues. I do not know why this is happening." (Jt.Ex.76.) In attempting to find out why, Robinson wrote: that "... the fact that answers are so hard to get is indicative of a number of problems that I believe we are addressing both from a personnel and a systems perspective." (Jt.Ex.104.)

In September 1999, Doctors Hospital's bank complained to Robinson about the hospital's overdraft, saying it was "$150,-000 over the acceptable amount." (Jt.Ex.105.) In reporting on this to Desnick, Robinson noted that a check to the hospital's employee health insurer would clear that day. *Id.* He stated, "They had cancelled our insurance pending the receipt of that check." *Id.*

Many other exhibits in the record reflect Doctors Hospital's inability to pay its bills in a timely way. (Jt.Exs.15, 77, 101, 102, 104, 105, 107, 108, 191.)

## G. INADEQUATE CAPITAL

"Unreasonably small capital" is not defined in either § 548 or the UFTA. *See In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr.D.Mass.1989). The proper analysis, however, is "forward-looking, requiring consideration of liabilities the debtor 'would incur' or contemplated transactions for which the remaining assets were 'unreasonably small.'" *In re Thunderdome Houston Ltd. P'ship*, No.

98 C 4615, 2000 WL 889846, at *10 (Bankr.N.D.Ill. June 23, 2000) Unreasonably small capital "encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future." *Vadnais Lumber*, 100 B.R. at 137. "Viewed in this light, an 'unreasonably small capital' would refer to the inability to generate sufficient profits to sustain operations." *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir.1992). The *Moody* court adopted a test based on reasonable foreseeability, which requires an objective assessment of the firm's financial projections. *Id.* at 1073 ("The critical question is whether the parties' projections were reasonable.").

Although acknowledging that Doctors Hospital's internal financial statements were unreliable (Tr. III: 108–09), plaintiff's experts showed that Doctors Hospital's capital was unreasonably small from August 28, 1997 through April 17, 2000. In analyzing the cash available to fund Doctors Hospital's operations, Lane/Peltz concluded that the company had inadequate net working capital, unacceptable levels of debt as a percentage of total invested capital, significant losses on operations, worsening accounts payable days outstanding, and extensive physical deterioration and functional obsolescence of its facilities. As for Doctors Hospital's cash available to fund principal and interest on its debt obligations, the experts showed that its interest coverage ratio was highly volatile and generally at or below industry averages and that its days cash on hand steadily declined from 1996 on.

In summary, plaintiff proved that Doctor's Hospital was engaged in business for which its remaining property constituted unreasonably small capital from August 1997 to April 2000, thus satisfying the second alternative test in section 548(a)(1)(B)(ii).

### III. *COUNT VIII*

Pursuant to Count VIII, Doctors Hospital still seeks the following:

(a) to void the Guaranty, the Assignment, the Pledge and Security Agreement, and the Equity Pledge Agreement; and

(b) to recover all proceeds from the sale of hospital assets that formed the collateral associated with the Guaranty, Assignment, and pledges.

Other relief was abandoned by a post-trial filing.

Doctors Hospital has the burden to prove that the Guaranty, the Assignment, the Pledge and Security Agreement, and the Equity Pledge Agreement (the "Guaranty and Related Agreements") were constructively fraudulent pursuant to § 160/5(a)(2) of the Illinois Uniform Fraudulent Transfer Act ("IUFTA"). *See* 740 ILCS 160/5(a)(2). Under the IUFTA,

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS 160/6.

Plaintiff seeks to void the Guaranty and Related Agreements as fraudulent transfers under the IUFTA by using the strong-arm powers under § 544 of the Bankruptcy Code.

Doctors Hospital has the burden of proving each element of a fraudulent transfer claim by a preponderance of the evidence. *In re McCook Metals, L.L.C.*, 319 B.R. 570, 587 (Bankr.N.D.Ill.2005); *In*

*re Joy Recovery Tech. Corp.*, 286 B.R. 54, 73 (Bankr.N.D.Ill.2002). Therefore, the Trustee has the burden of proving that in making the Guaranty and Related Agreements, Debtor incurred an obligation without receiving reasonably equivalent value while Debtor was insolvent.

The Guaranty and Related Agreements were executed by Doctors Hospital on August 28, 1997. They were made in favor of Nomura, the Trust's predecessor. The agreements were thus transfers of an interest of the Debtor. *See In re Image Worldwide, Ltd.*, 139 F.3d 574 (7th Cir. 1998) (corporate guaranty found to be fraudulent transfer). In making the Guaranty and Related Agreements, Debtor also incurred an obligation.

**A. REASONABLY EQUIVALENT VALUE NOT RECEIVED DIRECTLY**

The question of whether Doctors Hospital received reasonably equivalent value is a question of fact. *In re Image Worldwide, Ltd.*, 139 F.3d 574, 576 n. 2 (7th Cir.1998).

■■■ It is clear from evidence presented at trial that Doctors Hospital did not receive any direct benefits from making the Guaranty and Related Agreements. All of the proceeds of the Nomura Loan were initially deposited in an account in the name of Desnick and his spouse. (Jt.Ex.202, ¶ 85.) None of the proceeds of the Nomura Loan were disbursed to Doctors Hospital. (Jt. Ex. 135, Stipulated Facts 31.) Desnick was the only party that benefitted from this transaction. Doctors Hospital wound up with a $50 million obligation on the Guaranty, which was a direct obligation because HPCH had no ability to repay the Nomura Loan in the absence of the Lease. Doctors Hospital certainly did not receive any direct value or meaningful direct consideration for the Guaranty and Related Agreements, or otherwise in connection with the Nomura Loan.

**B. VALUE NOT RECEIVED INDIRECTLY**

In determining reasonably equivalent value, "indirect benefits may also be taken into account." *In re Image Worldwide, Ltd.*, 139 F.3d 574, 578 (7th Cir.1998). "The most straightforward indirect benefit is when the guarantor receives from the debtor some of the consideration paid to it." *Id.* at 579. Indirect benefits can also be realized when "the loan strengthened the corporate group as a whole, so that the guarantor corporation would benefit from 'synergy' within the corporate group." *Id.* at 578–79. Indirect benefits can also include intangibles, such as goodwill, and an increased ability to borrow working capital. *Id.* "[I]ndirect benefits to a guarantor [also] exist when 'the transaction of which the guaranty is a part may safeguard an important source of supply, or an important customer for the guarantor. Or substantial indirect benefits may result from the general relationship.'" *Id.* (citation omitted).

While Doctors Hospital did not realize any direct benefits, the Trust argues that Doctors Hospital received indirect benefits in making the Guaranty and Related Documents. The Trust argues that indirect benefits should be recognized for several reasons: (1) a representation that in the Guaranty, Doctors Hospital represented and acknowledged that the "indebtedness evidenced by the Note is and will be of direct benefit, interest, and advantage to it". (Jt.Ex.17); (2) the Guaranty and Related Documents were made at arm's length with Doctors Hospital as the "primary credit party;" (3) the Nomura Loan provided "synergistic benefits" to Doctors Hospital, including capital contributions from Desnick that came from the Nomura Loan

proceeds, and (4) benefits from the "cross stream" guaranty of the Nomura Loan.

However, Doctors Hospital did not thereby realize indirect benefits.

### 1. *Language of the Guaranty*

■ The Trust argues that Doctors Hospital represented and acknowledged that the Nomura Loan indebtedness "will be of direct benefit, interest, and advantage to it." (Jt.Ex.17.) This representation alone does not create a benefit to Doctors Hospital. Moreover, the Trust fails to cite authority supporting the proposition that based on this representation, Doctors Hospital is estopped from arguing it received no benefit. Courts have held that estoppel based on conduct of the debtor cannot be used to restrain a trustee from pursuing avoidance actions. *Pine Top Ins. Co. v. Republic Western Ins. Co.,* 123 B.R. 277, 285 (N.D.Ill.1990) ("The rationale is simply that the trustee, when seeking to avoid such preferential transfers, does not assert a cause of action belonging to the debtor, but instead asserts an action in his representative capacity vis a vis the debtor's general unsecured creditors."). Therefore, despite this representation, there is no evidence that Doctors Hospital realized any actual benefit.

### 2. *No Arm's Length Transaction*

The Trust attempts to argue that Doctors Hospital received benefits from the Nomura Loan because it was the "primary credit party" in an arm's length transaction. The transaction, however, was not at arm's length. Desnick was on both sides of the deal, as 100 percent owner of Doctors Hospital and 96.2 percent owner of HPCH. A single law firm represented HPCH, Doctors Hospital, Desnick, and Medical Management of America-all controlled by Desnick. (Pl.Ex. 36 (Wall) at 25–26.)

Even if the transaction was at arm's length, it still provided no direct or indirect benefit to Doctors Hospital. As the Trust acknowledged, the only way HPCH could repay the Loan was by using the cash flow of Doctors Hospital, including the rent payments. While Doctors Hospital may therefore be viewed as the "primary credit party," it received nothing in return from being that party except liabilities on the Guaranty and the Lease. Desnick benefitted from the Loan proceeds and provided no guaranty. Despite being the "primary credit party," Doctor's Hospital received no benefit from being such a party.

### 3. *No "Synergistic" Benefits*

The Trust argues that Doctors Hospital received "synergistic benefits" from the Nomura Loan because Desnick's entire "corporate group" was "strengthened" by the Nomura Loan. Neither Doctors Hospital nor HPCH received any of the Loan proceeds. Rather, those entities received only the burdens of the Loan. The only party that was "strengthened" by the Loan was Doctor Desnick, as the proceeds were used for his benefit. Doctors Hospital could not have benefitted by a Loan in which it saw none of the proceeds.

In its counterclaim and cross-claim in this case, the Trust stated, "Substantially all of the proceeds of the loans were used not for the business operations of the Desnick entities, however, but were diverted for the personal benefit of Desnick." (Jt.Ex.142, ¶ 24.) It also stated, "While the proceeds of the [Daiwa and Nomura Loans] passed through one or more entities, the proceeds, in fact, were utilized for the personal benefit of Desnick and select individuals." *Id.* at 39. In stipulated facts on its motion for summary judgment in *LaSalle Bank as Trustee v. Nomura Asset Capital Corp.,* No. 00 Civ 8720 (S.D.N.Y),

the Trust stated, "The loan proceeds were not reinvested back into the hospital; rather, more than $48 million of the proceeds went directly into the pockets of Desnick." (Jt.Ex.136, ¶ 23.)

In the face of its own admissions and other evidence that Doctors Hospital did not receive any of the Nomura Loan proceeds, the Trust cannot now say that Doctors Hospital benefitted from the Nomura Loan. There is no evidence to support the proposition that the Nomura Loan somehow "strengthened" Doctors Hospital.

The Trust also argues that Doctors Hospital benefitted from the Nomura Loan because Desnick made substantial contributions to Doctors Hospital after the consummation of the Nomura Loan. While Desnick made contributions to Doctors Hospital, the record shows that he withdrew as much cash from Doctors Hospital as he put in. (Tr. IV: 97.) Thus, on a net basis Desnick did not make "substantial contributions of cash" to Doctors Hospital from the Nomura Loan or elsewhere.

Moreover, Desnick had no obligation to make any contributions to Doctors Hospital. There are no documents in evidence to suggest that Desnick was required to make contributions to Doctors Hospital based on the Guaranty. Rather, the Nomura Loan documents contain no restrictions on the use of the Loan proceeds. (Jt.Ex.11, sec.2.2.) The documents allowed HPCH, after payment of transaction costs, to use the funds "for any lawful purpose." *Id.* The Nomura Loan proceeds "were not reinvested back into the Doctors Hospital" (Jt.Ex.136, ¶ 23), and Desnick had no obligation to make any contributions to Doctors Hospital.

There is no evidence to suggest that by guaranteeing the Nomura Loan, Doctors Hospital was somehow "strengthened" or received "synergistic benefits." Therefore, despite the Trust's argument, Doctors Hospital received no direct or indirect benefit from guaranteeing the Nomura Loan.

### 4. *No Indirect Benefit From "Cross Stream" Guarantee*

The cases relied on by the Trust do not support the finding the Doctors Hospital received any indirect benefits from guaranteeing the Nomura Loan. In *In re Image Worldwide, Ltd.,* a Seventh Circuit panel affirmed the lower court's finding that the debtor did not receive reasonably equivalent value where one subsidiary corporate received all of the proceeds of a loan while an affiliated subsidiary guaranteed the loan. 139 F.3d 574 (7th Cir.1998). Although recognizing that such a "cross-stream" guaranty could provide an indirect benefit to the guarantor, it was noted that such an indirect benefit must be "fairly concrete," such as the guarantor receiving some of the consideration paid. *Id.* at 578. Indirect benefits from a guaranty may also be found where a loan strengthens a corporate group as a whole, so that the guarantor corporation would benefit from a "synergy" within a corporate group. *Id.* at 578–79. It was found, however, that there was no consideration for the guaranty. *Id.* at 580. By the time of the guaranty, the guarantor had wound down and was inactive so there could be no synergy as "there were not two functioning corporations that benefitted mutually from the loan." *Id.* at 581.

In this case, HPCH was a special purpose entity with no operations. It simply held title to the hospital real estate and repaid the Nomura Loan via Doctors Hospital's lease payments. The loan proceeds were not used to acquire or improve the real estate (Jt.Ex.136, ¶ 64) and Doctors Hospital already had a lease for the hospital premises when the new lease was executed. (Jt.Ex.155.) Because there was no functioning corporate group and no syner-

gy, there is no way that Doctors Hospital could benefit, directly or indirectly, from the Guaranty and Related Agreements. The purpose of the Nomura Loan was not to promote synergy among related companies, rather it was to provide the means for Desnick to extract the perceived equity out of Doctors Hospital. ·

Courts generally find indirect benefits from a cross-stream guaranty where it "was the result of arm's length negotiations at a time when the common enterprise was commercially viable." J.F. Williams, *The Fallacies of Contemporary Fraudulent Guaranties: Fraudulent Transfer Law as a Fuzzy System*, 15 Cardozo L.Rev. 1403, 1437 (1994). Reasonably equivalent value arises in the context of joint corporate operations, where the guarantor may benefit from things like "[g]oodwill in a business context, the maintenance of a parent's financial strength, the enhanced ability to borrow money, and the ability of a business to use an affiliate's distribution system to distribute its own products." *Id.*

The other cases relied on by the Trust are easily distinguished from the facts in this case. In *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2d Cir. 1981), the court found that an indirect benefit would exist where two affiliates, through a system of guaranties and cross-guaranties, guaranteed loans to their independent third-party distributors, and as a result actually received more cash on a daily basis from the borrowing third-party distributors. In this case, there was no single enterprise, and Doctors Hospital received no cash or benefits that it did not already have.

In *In re Royal Crown Bottlers of North Alabama, Inc.*, 23 B.R. 28 (Bankr.N.D.Ala. 1982), it was held that a payment made by debtor on an obligation by its parent corporation could not be recovered as a fraudulent transfer where debtor and its parent

corporation shared an identity of interest. No such circumstances exist in this case. In *In re Lawrence Paperboard Corp.*, 76 B.R. 866 (Bankr.D.Mass.1987), on a motion for summary judgment the court found that a genuine issue existed on the question of fair consideration. The defendant argued that indirect benefits arose because part of the loan funds were distributed to the guarantor, the guaranties were reciprocal, and there was identity of interests between one supplier parent and the manufacturing subsidiary-circumstances that again do not exist here.

### Conclusions as to Count VIII

Based on the above, it is clear that Doctors Hospital received no direct or indirect benefits as a result of making the. Guaranty and Related Agreements. Therefore, Debtor did not receive reasonably equivalent value in incurring the obligations of the Guaranty and Related Agreements.

In order to void the Guaranty and Related Agreements as fraudulent transfers, it must also be found that Debtor incurred the obligations at a time when Debtor was insolvent. The Guaranty and Related Agreements were consummated on August 28, 1997. As extensively discussed supra, Debtor was insolvent on August 28, 1997. Therefore, Plaintiff satisfied its burden in proving that Debtor incurred an obligation, without receiving reasonably equivalent value at a time when Debtor was insolvent.

As such, the Guaranty and Related Agreements will be found void as fraudulent transfers pursuant to Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* and all proceeds from sale of hospital assets that comprised collateral associated with those documents (now held in escrow pending this ruling) will be declared to belong to the Plaintiff Trustee.

Judgment will separately enter for Plaintiff on Count VIII.

## IV. COUNT IX

### SECTIONS 544 AND 550 OF THE BANKRUPTCY CODE

Count IX was brought pursuant to §§ 544 and 550(a)(1) of the Bankruptcy Code, and the Uniform Fraudulent Conveyance Act as adopted in Illinois, 740 ILCS 160/1 et seq. The Trustee seeks to void the Lease and in any event, to recover payments made under the Lease to the extent they exceed a fair market rental pursuant to 11 U.S.C. § 544(b)(1) which provides in pertinent part:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). "Under the strong-arm provision of the Bankruptcy Code, 11 U.S.C. § 544(b), the trustee can avoid any transaction of the debtor that would be voidable by any actual unsecured creditor under state law." *In re Image Worldwide, Ltd.*, 139 F.3d 574, 576–77 (7th Cir.1998). The applicable state law asserted by the Trustee under § 544(b)(1) is the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 et seq. (the "UFTA").

If transfers are avoidable under § 544(b)(1), the trustee can recover them under 11 U.S.C. § 550. 11 U.S.C. § 550. Section 550 provides:

> [T]o the extent that a transfer is avoided under section 544 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550.

Pursuant to Count IX, it must be determined whether the Lease and any rental payments to the extent they exceed a fair market value were constructively fraudulent under § 160/5(a)(2) of the IUFTA. *See* 740 ILCS 160/5(a)(2). Under the IUFTA,

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS 160/6; *Creditor's Committee of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 946–47 (7th Cir.2007).

■ Trustee has met all of the elements to prove a cause of action under 740 ILCS 160/5(a)(2). Because the elements of a cause of action under § 548 of the Bankruptcy Code mirrors those found in § 160/5(a)(2) of the IUFTA, the findings made with respect to § 548 apply to the requirements of § 160/5(a)(2). For reasons articulated below, it is found and concluded that payments of rent that exceed fair market value made by the Debtor to the Trust pre-July 1998 were constructively fraudulent under § 160/5(a)(2) of the IUFTA. Those payments are therefore avoidable under § 544(b)(1) of the Bankruptcy Code and the Trustee may recover those payments under § 550(a)(1) from the Trust for the benefit of Debtor's estate.

The Lease, executed on August 28, 1997 by Doctors Hospital as part of the Nomura Loan Transaction, evidenced Doctor's Hospitals obligations under the Lease, including lease payments. As discussed earlier in these Conclusions, the lease payments made by Doctors Hospital were in excess of fair market rental and Plaintiff will prevail as to the excess payments.

Plaintiff also argues that because Doctors Hospital did not receive fair value or reasonably equivalent value for the execution and delivery of the Lease and because the Lease was executed at a time when Doctors Hospital was insolvent, the Lease constitutes a fraudulent transfer.

Plaintiff thereby seeks to void the Lease pursuant to §§ 544 and 550 of the Bankruptcy Code and the Uniform Fraudulent Transfer Act. A lease may be avoided as a fraudulent transfer under the Uniform Fraudulent Transfer Act. *See In re 1425 Corp.*, No. 99 C 8316, 2001 WL 32875, at *11 (N.D.Ill. Jan.12, 2001). In order to void the Lease as a fraudulent transfer, the Trustee would ordinarily have the burden of proving that the Debtor incurred the obligation without receiving reasonably equivalent value at a time when Debtor was insolvent. 740 ILCS 160/5(a)(2). However, here the Trustee cannot seek this relief.

On May 26, 2000 Debtor filed a Motion for Authority to Reject Unexpired Lease of Nonresidential Real Property ("Motion to Reject"). In its Motion to Reject, Debtor asserts that because of the high cost of rent, totaling $760,000 per month, and the cessation of Debtor's operations, "the obligations under the Lease impose an unreasonable burden on the Debtor and its estate and the rejection of the Lease is in the best interests of the Debtor and its estate." The Motion was clearly warranted at the time because the property was not needed and the rent payments were excessive. The Lease was clearly a bur-

den. Therefore, on May 31, 2000 an Order was entered granting the Motion to Reject.

■ Rejection of the Lease precludes the fraudulent transfer relief sought by Plaintiff. *In re Fashion World, Inc.*, 49 B.R. 690 (Bankr.D.Mass.1985). In *In re Fashion World, Inc.*, a creditor, who received notice of debtor's motion to reject an unexpired lease and attended the hearing on that motion later sought to argue that a change in the lease was a fraudulent transfer. In the motion to reject the unexpired lease, the debtor there had represented that the lease was burdensome and as a matter of sound business judgment should be terminated. *Id.* at 694. No objection was raised by the creditors' committee at that time, therefore the court precluded the relief sought by creditor. It was noted, "To argue differently, in the absence of any misrepresentation, now, would be illogical and legally inconsistent and would destroy all finality to the Court's determinations." *Id.*

■ In this case, an order was later entered on April 13, 2004 directing the United States Trustee to appoint a Chapter 11 Trustee in this case. Pursuant to § 1107 of the Bankruptcy Code, Chapter 11 debtors-in-possession maintain essentially the same rights and powers as do trustees appointed by the bankruptcy court to administer the estate. *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 558 n. 4 (3d Cir. 2003). Acts taken by a debtor-in-possession generally are binding upon a subsequently-appointed trustee. *Armstrong v. Norwest Bank Minneapolis, N.A.*, 964 F.2d 797, 801 (8th Cir.1992) ("[I]t is axiomatic that the Trustee is bound by the acts of the debtor-in-possession."). "Upon conversion and appointment, a trustee steps into the shoes of the debtor-in-possession with respect to all rights, responsibilities

and liabilities." *Official Unsecured Creditors' Comm. v. Rachles (In re S. Rachles, Inc.),* 131 B.R. 782, 785 (Bankr.D.N.J. 1991). It should not be implied from in the foregoing authority that a Chapter 11 Trustee has no power to seek orders to set aside acts of the Chapter 11 debtor that comprise a fraud on the Court or creditors, but if there is such authority it does not apply here. Therefore, because the Debtor rejected the Lease, the Trustee is now precluded from seeking to void it as a fraudulent transfer.

Assuming *arguendo* Trustee could in other circumstances seek to void the Lease as a fraudulent transfer, it should be observed that Doctors Hospital did receive some value as a party to the Lease. It certainly benefitted from use and occupancy of the Hospital Property. Plaintiff's argument that the Lease should now be avoided implies that Doctors Hospital should have been allowed to occupy the Hospital Property after August 28, 1997 at no cost. Such relief would not be appropriate if it were possible here. But that issue need not be reached because the Lease was rejected and cannot now be voided.

Because the Trustee is barred from voiding the Lease as a fraudulent transfer, judgment will enter in favor of Defendant in Count IX on Plaintiff's request to void the Lease, while entering judgment in favor of the Plaintiff measured by the excess rent that was paid.

## V. CALCULATION OF EXCESS RENT AND PREJUDGMENT INTEREST

Plaintiff argues that it should receive prejudgment interest from the date of each of the transfers to the date of an order entered in its favor. The Plaintiff has filed with this Court a chart showing Plaintiff's calculation of damages including a calculation of prejudgment interest. (Pl.'s Am. Proposed Findings of Fact and Conclusions of Law, Ex. B.) The chart, attached here as Exhibit A and entitled "Plaintiff's Calculation of Damages," shows the steps in that calculation. Column 1 shows the $15,117,647 in the monthly debt service payments that went to the Trust. Column 2 shows the net fair market rent, by month, for the Hospital Property. The amounts in Column 3 are the debt service payments minus the net fair market rent, i.e., the debt service payments in excess of net fair market rent. Column 4 shows the amount remaining in the Cash Collateral Account when the Lease was rejected ($761,395) less the post-petition disbursements ($25,210) to Doctors Hospital. The totals of Columns 3 and 4, therefore, represent the amounts of the excess rent payments to the Trust, totaling $2,668,746.35. Columns 5 and 6 show interest from the date of each payment at stated rate to reach a calculation of prejudgment interest. The preferred rate and accuracy of the prejudgment calculations have not been challenged and those are adopted here.

Whether to grant prejudgment interest is within the bankruptcy court's discretion. *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431, 439 (7th Cir.1989). "[P]rejudgment interest may be awarded where the amount due is liquidated and readily ascertainable, as it is here." *Calabrese v. Chicago Park Dist.,* 294 Ill.App.3d 1055, 1069, 229 Ill.Dec. 377, 691 N.E.2d 850, 859 (1998). Some courts have recognized that awarding prejudgment interest is necessary "to compensate the prevailing party for the lost time value of money." *In re First Nat. Parts Exchange, Inc.,* No. 98 C 5915, 2000 WL 988177, at *13 (N.D.Ill. July 12, 2000).

When no interest rate is set by statute, prejudgment interest should be awarded at the market rate-the average of the prime rate for the years in question.

*National Gypsum Co. v. City of Milwaukee,* 144 F.3d 1111 (7th Cir.1998); *Stanton v. Republic Bank of S. Chicago,* 144 Ill.2d 472, 163 Ill.Dec. 524, 581 N.E.2d 678, 682 (1991). Therefore the Court may award prejudgment interest at the rate equal to the average "prime rates" for the period.

■ Plaintiff's claimed damages include prejudgment interest from the dates of the fraudulent transfers. As to fraudulent transfers, courts have awarded prejudgment interest beginning from the time that demand or an adversary proceeding is initiated. Some other courts have awarded prejudgment interest from the date of the transfer. *See Moglia v. Universal Automotive, Inc. (In re First National Parts Exchange, Inc.),* No. 98 C 5915, 2000 WL 988177 at *14 (N.D.Ill. July 18, 2000). In this case, prejudgment interest will be awarded from the dates of each transfer.

Plaintiff's chart, "Plaintiff's Calculation of Damages," provides the requisite damage calculations. The chart provides:

Interest was calculated based on the number of days from the end of month (or period) to April 15, 2002, the Filing of Complaint. Interest was calculated using an average of the monthly Prime Rates for each of the fiscal years ("FY") or periods presented. The monthly prime rates, provided by the Federal Reserve Board, were obtained from the website www.nfsn.com/library/prime.htm.

Consistent with precedent, Plaintiff applied the "prime rate" in its calculations. In the discretion of this Court and in the absence of any objection by the Trust to Plaintiff's proposed calculations, Plaintiff's calculation of interest in the amounts and rate shown on the appended exhibit will be accepted.

The Trust argues that an award of prejudgment interest in this case is inappropriate because it received the payments innocently. The Trust cites no legal authority for this proposition. Moreover, the Trust is clearly a sophisticated creditor that received rent payments from Doctors Hospital far in excess of fair market value. It cannot now claim that it is innocent in receiving such payments.

## VI. *THE TRUST'S AFFIRMATIVE DEFENSES*

The Trust's third affirmative defense asserts that HPCH is the initial transferee of rent transfers, and the Trust is a good faith transferee for value and without knowledge of the voidability of the rent transfers, and as such, Plaintiff may not recover the transfers from the Trust. The Trust's third affirmative defense fails because the Trust, not HPCH, was the initial transferee of Doctor's Hospitals payments of rent prior to July 7, 1998, but not as to payments received post-July 7, 1998.

The Trust's fourth affirmative defense asserts that the Complaint is barred because it fails to state a claim against the Trust upon which relief can be granted. This affirmative defense fails, as Trustee for Doctors Hospital has stated and proved valid claims against the Trust.

The Trust's fifth affirmative defense asserts that the Complaint is barred by failure of consideration and/or failure of conditions precedent. This affirmative defense, which was not argued by the Trust, fails as it does not appear to apply to the facts of this case or have any apparent merit.

The Trust's sixth affirmative defense asserts that the Complaint is barred by various principals and/or doctrines of estoppel including, but not limited to, the principals and/or doctrines of equitable estoppel. This affirmative defense fails because the Trust did not prove that Trustee for the Doctors Hospital is estopped from bringing claims against the Trust.

The Trust's Seventh affirmative defense asserts that the Complaint is barred by

the principals or doctrines of *in pari delicto* or unclean hands. This defense fails because the Trust did not argue why Trustee for the Doctors Hospital is barred from bringing its claims against the Trust by the doctrines of *in pari delicto* or unclean hands.

The Trust's Eighth affirmative defense asserts that the Complaint is barred by virtue of the information, knowledge or belief, at all relevant times, held by the Debtor or the Estate. This affirmative defense was in essence a good faith or innocent intent defense. In addition to the Trust's failure to argue this defense, this defense fails as every party involved in this case was highly sophisticated and acted on advice of counsel. What they did and what they intended is set forth in the Findings of Fact and Conclusions of Law.

### CONCLUSION

Based on the foregoing Facts and Conclusions and by separate order to be entered, judgment will be entered as follows.

On Count VIII, Judgment for Plaintiff (a) declaring void the Guaranty, the Assignment, the Pledge and Security Agreement, and the Equity Pledge Agreement and (b) to recover all proceeds from sale of assets that formed collateral associated with the voided documents.

On Count IX, Judgment for Plaintiff to excess Lease payments in the total amount of $2,668,746.35, plus pre-judgment interest, and Judgment for Defendant on the application to void the Lease and on the prayer for additional Lease payments.

On Count X, Judgment for Plaintiff to avoid and recover excess Lease payments in the total amount of $2,668,746.35, plus pre-judgment interest; and Judgment for Defendant as to the Lease payments over that amount.

Collection on either dollar judgment entered in Counts IX and X will be credited against the dollar judgment on the other Count.

Prejudgment interest will be calculated and allowed as set forth in the Conclusions of Law.

# EXHIBIT A

**Doctors Hospital of Hyde Park ("DHHP")**
**Plaintiff's Calculation of Damages (Excluding Attorneys' Fees and Costs)**

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|---|
| Month | Debt Service Payment[a] (a) | Net Fair Market Rent ("FMR")[b] (b) | Debt Service Payments in Excess of Net Fair Market Rent (a)-(b) | Unused and Unapplied Reserve Funds Not Returned to DHHP[c] | Interest from Time of Transfer to Filing of Complaint (April 15, 2002)[d] | Interest from Filing of Complaint (April 15, 2002) to Trial Date (March 30, 2006)[e] | |
| Aug-97 | $ - | $ - | $ - | $ - | $ - | $ - | |
| Sep-97 | - | - | - | | - | - | |
| Oct-97 | 471,630.19 | 175,833.33 | 295,796.86 | | 112,143.48 | 58,200.26 | |
| Nov-97 | 472,354.46 | 175,833.33 | 296,521.13 | | 110,346.48 | 58,342.77 | |
| Dec-97 | 472,461.45 | 175,833.33 | 296,628.12 | | 108,244.88 | 58,363.82 | |
| Jan-98 | 472,487.96 | 175,833.33 | 296,654.63 | | 106,112.95 | 58,369.03 | |
| Feb-98 | 472,486.98 | 175,833.33 | 296,653.65 | | 104,178.26 | 58,368.84 | |
| Mar-98 | 472,403.17 | 175,833.33 | 296,569.84 | | 102,007.84 | 58,352.35 | |
| Apr-98 | 472,484.30 | 175,833.33 | 296,650.97 | | 99,263.25 | 58,368.31 | |
| May-98 | 472,455.77 | 175,833.33 | 296,622.44 | | 97,812.26 | 58,362.70 | |
| Jun-98 | 472,482.04 | 175,833.33 | 296,648.71 | | 95,748.45 | 58,367.87 | |
| Jul-98 | 472,453.57 | 175,833.33 | 296,620.24 | | 93,597.91 | 58,362.27 | |
| Aug-98 | 472,479.75 | 175,833.33 | 296,646.42 | | 91,464.62 | 58,367.42 | |
| Sep-98 | 472,478.70 | 175,833.33 | 296,645.37 | | 89,391.85 | 58,367.21 | |
| **Total FY 1998** | **5,668,658.34** | **2,110,000.00** | **3,558,658.34** | - | **1,211,012.22** | **700,192.84** | |
| Oct-98 | 472,450.30 | 181,108.33 | 291,341.97 | | 79,641.72 | 57,325.73 | |
| Nov-98 | 472,476.35 | 181,108.33 | 291,368.02 | | 77,756.94 | 57,328.85 | |
| Dec-98 | 472,448.01 | 181,108.33 | 291,339.68 | | 75,794.61 | 57,323.28 | |
| Jan-99 | 472,473.96 | 181,108.33 | 291,365.63 | | 73,846.42 | 57,328.38 | |
| Feb-99 | 472,472.86 | 181,108.33 | 291,364.53 | | 72,080.39 | 57,328.17 | |
| Mar-99 | 472,390.32 | 181,108.33 | 291,281.99 | | 70,105.59 | 57,311.93 | |
| Apr-99 | 472,469.96 | 181,108.33 | 291,361.63 | | 68,222.90 | 57,327.60 | |
| May-99 | 472,441.78 | 181,108.33 | 291,333.45 | | 66,271.57 | 57,322.05 | |
| Jun-99 | 472,461.47 | 181,108.33 | 291,359.14 | | 64,385.58 | 57,327.11 | |
| Jul-99 | 472,439.35 | 181,108.33 | 291,331.02 | | 62,424.65 | 57,321.57 | |
| Aug-99 | 472,464.93 | 181,108.33 | 291,356.60 | | 60,475.25 | 57,326.61 | |
| Sep-99 | 472,463.76 | 181,108.33 | 291,355.43 | | 58,583.19 | 57,326.38 | |
| **Total FY 1999** | **5,669,459.05** | **2,173,300.00** | **3,496,159.05** | - | **829,598.83** | **687,895.65** | |
| Oct-99 | 472,435.73 | 186,541.58 | 285,894.15 | | 60,420.16 | 56,251.83 | |
| Nov-99 | 472,461.17 | 186,541.58 | 285,919.59 | | 58,405.87 | 56,256.83 | |
| Dec-99 | 472,433.20 | 186,541.58 | 285,891.62 | | 56,315.40 | 56,251.33 | |
| Jan-00 | 472,458.53 | 186,541.58 | 285,916.95 | | 54,234.45 | 56,256.31 | |
| Feb-00 | 472,457.30 | 186,541.58 | 285,915.72 | | 52,282.86 | 56,256.07 | |
| Mar-00 | 472,402.79 | 186,541.58 | 285,861.21 | | 50,187.36 | 56,245.35 | |
| 4/1/00 - 4/16/00 (Pre-petition) | 472,454.38 | 99,488.84 | 372,965.54 | | 64,075.48 | 73,353.78 | |
| 4/17/00 - 4/30/00 (Post-petition) | | 87,052.74 | (87,052.74) | | (14,665.84) | (17,128.28) | |
| May-00 | 472,426.57 | 186,541.58 | 285,884.99 | | 46,087.40 | 56,250.03 | |
| | **3,779,529.67** | **1,492,332.67** | **2,287,197.00** | - | **427,341.15** | **450,023.24** | |
| Balance at May 31, 2000 | | | | 761,395.08 | 122,744.19 | 149,810.22 | |
| Disbursements to DHHP Mar-01 thru Aug-01 | | | | (19,597.60) | (1,757.23) | (3,855.98) | |
| | - | - | - | 741,797.48 | 120,986.96 | 145,954.24 | |
| **Total** | **$ 15,117,647.06** | **$ 5,775,632.67** | **$ 9,342,014.39** | **$ 741,797.48** | **$ 2,588,939.16** | **$ 1,924,065.96** | |

Notes.

(1) This schedule provides for the plaintiff's calculation of actual damages, excluding attorneys' fees and costs, resulting from payments made to the Trust in excess of the fair market rent ("FMR"). FMR amounts have been excluded in August and September 1997, as transfers to Trust didn't begin until October 1997, except for $31,451 contributed by HPCH at loan closing. Additionally, FMR amounts have been excluded subsequent to May 2000, due to the lease rejection on May 31, 2000

(2) Sources
(a) Data obtained from Expert Report of Carrie R. Widman, dated February 4, 2005, re. Flow of Funds to and from HPCH, LLC Cash Collateral LaSalle Account #677802001.
(b) Annual fair market rent ("FMR") of $2,110,000 at August 1, 1997 per Integra report dated February 2, 2005. Net rent excludes passthrough items such as capital improvements, taxes, and insurance. For this analysis, assumed 3% increase in FMR each fiscal year.
(c) Represents balance in the HPCH, LLC Cash Collateral (LaSalle Account #677802001) as of May 31, 2000 ($761,395.08) less amounts subsequently disbursed to DHHP ($19,567.60), totaling $741,797.48. Data obtained from Expert Report of Carrie R. Widman, dated February 4, 2005.
(d) Interest was calculated based on the number of days from the end of month (or period) to April 15, 2002, the Filing of Complaint. Interest was calculated using an average of the monthly Prime Rates for each of the fiscal years ("FY") or periods presented. The monthly Prime Rates, provided by the Federal Reserve Board, were obtained from the website www.nfsn.com/library/prime.htm.
Average Prime Rate used were as follows:

| | | | |
|---|---|---|---|
| Aug-Sept 1997 | 8.50% | Oct 1999 to May 2000 | 8.59% |
| FY September 1998 | 8.50% | June to Dec. 2000 | 9.50% |
| FY September 1999 | 7.90% | Jan. to Dec. 2001 | 7.11% |

(e) An interest rate of 4.97% was calculated using the average monthly Prime Rates (see 2(d)) for the period April 2002 to March 2006